assertion of the Fifth Amendment privilege
      'costly'.'

Campbell v. Gerrans, et al., 592 F.2d 1054, 1057-58 (9th Cir. 1979) (emphasis added; internal and external citations omitted). A court's refusal to consider an individual's motion for summary judgment (which is based solely on evidence equally available to all parties in the litigation) due to the individual's assertion of his/her fifth amendment privilege against self-incrimination would make any assertion of such privilege costly to the individual. See Pedrina v. Chun, 906 F.Supp. 1377, 1398 (D. Haw. 1995) (where the court granted summary judgment in favor of defendants despite plaintiffs' claims that summary judgment should not be granted because the defendants asserted the fifth amendment right against self-incrimination during their depositions).

    In Pedrina, the United States District Court for the District of Hawaii cautioned that an individual should not be allowed to rely on his own testimony/affidavit to support his version of an issue in dispute when he has previously asserted the fifth amendment privilege in response to inquiries on that very issue. Id. We acknowledge this Honorable Court's instruction. However, in the instant case, the support for this motion does not come from any testimony or evidence which Defendant Lum has previously refused to offer due to his assertion of the fifth amendment privilege. On the contrary, the

- 8 -

evidence which supports this motion is derived from other sources herein.

Given this situation, Defendant Lum's earlier assertion of his constitutional privilege against self-incrimination should not prevent this Court from considering the instant motion.

    B.    THE CLAIMS AGAINST DEFENDANT LUM IN HIS OFFICIAL CAPACITY SHOULD BE DISMISSED BECAUSE THEY ARE DUPLICATIVE OF THE CLAIMS ASSERTED AGAINST DEFENDANT KPD AND DEFENDANT COUNTY OF KAUAI

It is well settled that "there is no longer a need to bring official-capacity actions against local government officials . . . local government units can be sued directly for damages and injunctive or declaratory relief." See Kentucky v. Graham, 473 U.S. 159, 167, n. 14, 105 S. Ct. 3099, 3106, 87 L.Ed.2d 114 (1985), accord Wong v. City & County of Honolulu, 333 F.Supp.2d 942, 947 (D. Haw. 2004) (dismissing official capacity claims against local officer as duplicative of claims asserted against the City & County of Honolulu). See also McMillian v. Monroe County, 520 U.S. 781, 785, n. 2, 117 S. Ct. 1734, 1737, 138 L.Ed.2d 1 (1997); Hafer v. Mello, 502 U.S. 21, 25, 112 S. Ct. 358, 361-62, 116 L.Ed.2d 301 (1991). "A suit against a law enforcement official in his official capacity generally represents merely another way of pleading the action against the entity of which the official is an agent." Carnell v. Grimm, 872 F.Supp 746, 752 (D. Haw. 1994) (dismissing plaintiff's claims against local police officers in their official capacities as

- 9 -

duplicative of plaintiff's claims against the City & County of Honolulu). "Therefore, courts should treat such suits as suits against the governmental entity." Id.

Counts I, II, IV, VI, VII, and VIII are asserted against all Defendants. See SCSF No. 1. For each of these causes of action where Defendant Lum is sued in his official capacity, Plaintiff has asserted a duplicative and identical claim against KPD and County Defendants. See SCSF No. 2. Claims against Defendant Lum in his official capacity are merely claims against KPD and County Defendants, the governmental entity for which Defendant Lum was an agent. Therefore, any and all claims which have been asserted against Defendant Lum in his official capacity should be dismissed as a matter of law.

    C.    THE CLAIMS AGAINST DEFENDANT LUM IN COUNTS I AND II OF THE FIRST AMENDED COMPLAINT SHOULD BE DISMISSED PURSUANT TO THE DEFENSE OF QUALIFIED IMMUNITY

The authorities make clear the fact that "non-judicial governmental officials, when acting in the performance of their public duty, enjoy the protection of what has been termed a qualified or conditional privilege." Towse v. State, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982). "It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties-suits which would consume time and energies which would otherwise be devoted to

governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration policies of government." Id. at 631, no. 8, 647 P.2d at 702 (quoting Barry v. Matteo, 360 U.S. 564, 571, 79 S. Ct. 1335, 3339 (1959)).

Qualified immunity is a privilege enjoyed by government officials to protect them in the exercise of discretionary functions. As stated by the United States Supreme Court, the goal of qualified immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L.Ed.2d 396, 102 S. Ct. 2727 (1982)). The United States Supreme Court in Saucier has further expanded on the doctrine of qualified immunity as follows:

> Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. As a result, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.

Saucier v. Katz, 533 U.S. at 201, 121 S. Ct. at 2156 (citations omitted) (emphasis added). See also, Anderson v. Creighton, 483 U.S. 635, 646, n.6, 107 S. Ct. 3034, 3042, 97 L.Ed.2d 523 (1987); Mattey v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1098, 89

- 11 -

L.Ed.2d 271 (1986); Davis v. Scherer, 468 U.S. 183, 195, 104 S. Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). "Because the defense of qualified immunity is designed to relieve government officials of the burdens of litigation as well as of the threat of damages, summary judgment is encouraged as a device for disposing of claims barred by qualified immunity." Ying Jin Gan v. City of New York, 996 F.2d 522, 532 (2nd Cir. 1993).

In Hunter v, Bryant, 502 U.S. 224, 112 S. Ct. 534, 116 L.Ed.2d 589 (1991), the United States Supreme Court further explained the broad reach of the qualified immunity privilege by stating the following:

> The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. . . . This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued.

Id. at 229, 112 S. Ct. at 537 (citations omitted) (emphasis added).

In Saucier, the Court set forth the required considerations for purposes of a qualified immunity analysis. The qualified immunity defense must be considered in proper sequence:

> A court required to rule upon the qualified immunity issue, must consider this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct

> violated a constitutional right? This must be the initial inquiry.
>
> \* \* \*
>
> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition.

Saucier v. Katz, 533 U.S. at 201, 121 S. Ct. at 2156. Accordingly, the threshold inquiry on a qualified immunity analysis is whether the facts as alleged show a constitutional violation by the officer seeking the immunity.

    1.    There is no evidence to support Plaintiff's allegations that Defendant Lum violated her constitutional rights.

Count I of the FAC alleges that Defendant Lum, as well as the other Defendants, deprived Plaintiff of "rights, privileges, and immunities secured to her by the Constitution and laws of the United States." See FAC at ¶¶96-97. To date, Plaintiff has failed to produce any evidence which supports a finding that Defendant Lum, in any way, deprived her of her rights, privileges, and/or immunities.

Likewise, Count II of the FAC alleges that Defendants conspired to violate Plaintiff's civil rights. See FAC at ¶¶104-

- 13 -

108.  Once again, Plaintiff fails to provide any factual basis for such allegation.

It is anticipated that Plaintiff will argue that she would have been able to produce evidence of a conspiracy had she been given an opportunity to depose Defendant Lum in this case. This argument fails as, by its very nature, Plaintiff should have been able to ascertan information which pointed to a conspiracy as, by definition, a conspiracy must occur between more than one person.  In this case, Plaintiff's counsel deposed numerous individuals employed by the County of Kauai and Kauai Police Department (including Defendants Ihu, Isoda, and Pigao, with whom Defendant Lum was alleged to have conspired with).  <u>See</u> SCSF No. 3.  Despite Plaintiff's discovery efforts, she has failed to produce any evidence that Defendant Lum was involved in any such alleged conspiracy to violate Plaintiff's constitutional rights.

Similarly, in Count VIII, Plaintiff claims that her rights under the Constitution of the State of Hawaii were also violated with respect to her freedom of speech, due process, equal protection and enjoyment of civil rights.  <u>See</u>, FAC at ¶¶134-138. Again, Plaintiff will not be able to sustain her burden with regard to these claims against Defendant Lum.

- 14 -

2. Assuming, arguendo, the evidence in this case supports Plaintiff's allegations that Defendant Lum violated her constitutional rights, such rights were not clearly established.

   a. Plaintiff's alleged protected speech should not be afforded constitutional protection.

Plaintiff alleges that her report of "misconduct and violations of the law to her superiors constituted her exercise of her constitutionally protected interest in freedom of speech, which was protected by the First Amendment of the Constitution of the United States." See FAC at ¶90. The United States Supreme Court's recent holding in Garcetti v. Ceballos, 126 S.Ct. 1951 (2006), clearly refutes Plaintiff's claim with respect to free speech.

In Garcetti, the plaintiff, Richard Ceballos, was a deputy district attorney. Garcetti, 126 S.Ct. at 1955. Mr. Ceballos was informed of potential inaccuraciees in an affidavit used to obtain a search warrant. Id. Mr. Ceballos investigated the matter and drafted a memorandum to his supervisors explaining that he was concerned about the inaccuracies of the subject affidavit and recommended the case be dismissed. Id. at 1955-56. Mr. Ceballos' supervisors did not agree with his recommendation and proceeded to prosecute the case. Id. at 1956. The defense counsel called Mr. Ceballos to testify at a hearing on a pretrial motion and Mr. Ceballos testified as to his observations of the

subject warrant. Id. Mr. Ceballos then claimed he was subject to retaliatory employment actions as a result of his investigation, findings and recommendation concerning the search warrant and the case. Id. Mr. Ceballos initiated an employment grievance which was denied. Id. Mr. Ceballos then filed suit in federal court alleging violations of the First and Fourteenth Amendments based on his investigation and memorandum concerning the same. Id. Ultimately, the Supreme Court reversed the Ninth Circuit's holding that Mr. Ceballos' allegations of wrongdoing were protected speech under the First Amendment. Id. In determining whether constitutional protection should be accorded to a public employee's freedom of speech, the Supreme Court in Garcetti stated:

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern.
> . . .
> If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.
> . . .
> If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

Id., 126 S.Ct. at 1958 (internal and external citations omitted). The Court went on to state:

> [W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

Id., 126 S.Ct. at 1960.

In analyzing whether an employee is speaking as a citizen on a matter of public concern, the Garcetti Court stated that the "controlling factor" was whether that employee's "expressions were made pursuant to his duties as a calendar deputy." Id., 126 S.Ct. at 1959-60. In its analysis the Court found it significant that the memorandum written by the employee was written pursuant to his official duties and professional responsibilities and thus found that there was no protection under the First Amendment. Id., 126 S.Ct. at 1960.

Applying the above standards and analysis to our case, it is clear that Plaintiff's alleged protected speech should not be afforded constitutional protection.

Plaintiff admits she was on-duty when she submitted her report regarding the statements made by A.B. about Defendant Kapua and his alleged corrupt acts. See SCSF No. 4. Plaintiff also admits that she reported Defendant Kapua's alleged misconduct because she was a "law enforcement officers [sic] and

- 17 -

duty bound to report possible criminal activities." See SCSF No. 5.

Clearly, Plaintiff did not make her reports as an employee speaking as a citizen on a matter of public concern. On the contrary, Plaintiff's report of Defendant Kapua's alleged misconduct and violations of the law were made based on her official duties and professional responsibilities as a police officer.

Along those lines, Plaintiff's report regarding her fear of Defendant Kapua were also made in her capacity as a law enforcement officer with KPD. Again, such reporting was not made for the community, but was made for the sole purpose of ensuring Plaintiff's own safety in the workplace.

> b.  Plaintiff's report of Defendant Kapua's possible illegal activities were investigated by Defendant KPD, and to date, warrant no discipline.

Plaintiff alleges that there was no investigation or disciplinary action taken against Defendant Kapua after she reported his "possible illegal activities." See FAC at ¶54 (emphasis added). As a preliminary matter, assuming arguendo there was no such investigation and/or discipline of Defendant Kapua, such fact is not a constitutional violation against Plaintiff. More importantly, Plaintiff's allegation is false as administrative and criminal investigations were conducted as a

- 18 -

<u>result of her written allegations about Defendant Kapua</u>. Defendant Ihu (then Acting Chief of Police) ordered both a criminal and administrative investigation be conducted as a result of Plaintiff's report concerning Defendant Kapua's possible illegal activity. <u>See</u> SCSF No. 6; <u>see also</u>, Exhibit "C" attached to SCSF, Deposition of Wilfred Ihu, pp. 11-16.

Further, per Plaintiff's request, Defendant Ihu ordered Lt. Asher to inform Defendant Kapua that any actions taken against Plaintiff or directed towards Plaintiff would not be tolerated. <u>See</u> SCSF No. 7. Defendant Ihu also personally told Defendant Kapua to stay away from Plaintiff. <u>See</u> SCSF No. 8. Further, Defendant Kapua was directed in writing by Lt. Asher to "have no physical or verbal contact with the involved in this investigation, to include any form of what may be construed as intimidation or influence[.]" <u>See</u> SCSF No. 9.

The above events concerning the investigation all took place while Defendant Ihu was Acting Chief of Police. Defendant Lum's appointment as Acting Chief of Police was not effective until May 1, 2004, after the investigations had commenced. <u>See</u> SCSF No. 10. Prior to Defendant Lum's appointment as Acting Chief of Police, Defendant Ihu spoke with Defendant Lum about the ongoing investigations involving Defendant Kapua, and Defendant Lum