1              IN THE UNITED STATES DISTRICT COURT

2                      STATE OF HAWAII

3

4   DARLA ABBATIELLO,            ) CIVIL NO. CV04 00562 SOM BMK

5             Plaintiff,         )

6         vs.                    )

7   COUNTY OF KAUAI; KAUAI POLICE )

8   DEPARTMENT; K.C. LUM,        )

9   WILFRED M. IHU; GORDON ISODA; ) Trial Date:  May 8, 2007

10  DEAN PIGAO; IRVIL KAPUA,     ) Time:        9:00 a.m.

11            Defendants.        ) Trial Judge: Susan O.

12                               )              Mollway

13

14               DEPOSITION OF WILFRED IHU

15  Taken on behalf of PLAINTIFF DARLA ABBATIELLO, at the offices of

16  Ralph Rosenberg Court Reporters, Inc., Lihu`e Plantation Bldg.,

17  2970 Kele Street, Ste. 207, Lihu`e, Hawai`i 96766, commencing at

18  9:31 a.m., on Saturday, October 14, 2006, pursuant to second

19  amended notice.

20

21  BEFORE:   JOY C. TAHARA, RPR, CSR 408

22            Notary Public, State of Hawai`i

23

24

25

# EXHIBIT C

1                               A P P E A R A N C E S

2

3        FOR PLAINTIFF                      DANIEL G. HEMPEY, ESQ.
         DARLA ABBATIELLO:                  Law Office of Daniel G.
4                                           Hempey
                                            3175 Elua Street
5                                           Lihu`e, Hawai`i 96766
                                            Tel. (808) 823-0000
6                                           Fax. (808) 632-2332
                                            hemplaw@hawaii.rr.com
7
                                            JOHN HOSHIBATA, ESQ.
8                                           Bronster Crabtree & Hoshibata
                                            2300 Pauahi Tower
9                                           1001 Bishop Street
                                            Honolulu, Hawai`i 96813
10                                          Tel. (808) 524-5644
                                            Fax. (808) 599-1881
11                                          jhoshibata@bchlaw.net

12       FOR DEFENDANTS COUNTY OF           CHRISTIANE L. NAKEA-TRESLER,
         KAUAI; KAUAI POLICE                ESQ.
13       DEPARTMENT:                        Office of the County Attorney
                                            4444 Rice Street
14                                          Suite 220
                                            Lihu`e, Hawai`i 96766
15                                          cntresler@kauai.gov

16       FOR DEFENDANT AND THIRD-PARTY      CARY T. TANAKA, ESQ.
         PLAINTIFF K.C. LUM:                Law Offices of Cary Tanaka
17                                          Fort Street Tower, Suite 510
                                            745 Fort Street
18                                          Honolulu, Hawai`i 96813
                                            carytanaka@aol.com
19
         FOR DEFENDANTS WILFRED M.          DAVID J. MINKIN, ESQ.
20       IHU, GORDON ISODA, and DEAN        McCorriston Miller Mukai
         PIGAO:                             MacKinnon LLP
21                                          Five Waterfront Plaza,
                                            4th Floor
22                                          500 Ala Moana Blvd.
                                            Honolulu, Hawai`i 96813
23                                          minkin@m4law.com

24

25

```
 1                    A P P E A R A N C E S
                          (Continued)
 2

 3

       FOR DEFENDANT IRVIL KAPUA:        MICHAEL J. McGUIGAN, ESQ.
 4                                        Reinwald O'Connor & Playdon
                                          LLP
 5                                        Pacific Guardian Tower, Makai
                                          Tower
 6                                        733 Bishop Street, Suite 2400
                                          Honolulu Hawai`i 96813
 7                                        Mjm@roplaw.com

 8     NOTE:  All individuals present on Kaua`i -- EXCEPT for the
       following, who were present via land line:  John Hoshibata, Cary
 9     Tanaka, and Michael McGuigan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2     EXAMINATION                                          PAGE

3            MR. HEMPEY                                      5

4

5                              E X H I B I T S
      NO.     DESCRIPTION                                 PAGE
6

7     1     Memo, to Quibilan, from Abbatiello,            5
            DA00119, DA00120

8     2     Memo, 2/9/04, to Asher, from Ihu, County       5
            of Kaua`i 001302
9

10    3     Memo, to Ihu, from Abbatiello, DA00126         5

11    4     Memo, to Kaui, from Abbatiello,                5
            DA00121-DA00125

12    5     Memo, 4/2/04, to Abbatiello, from Ihu,         5
            DA00127
13

14

15

16

17

18

19

20

21

22

23

24

25

09:41:00  1    doesn't matter.

1:02  2              MR. MINKIN:  Objection.  Vague and ambiguous.  Lack of

09:41:04  3    foundation based on the prior answers.

09:41:06  4        Q.   Let's talk about December 2003.  Are you aware of any

09:41:26  5    problems or tension between Darla Abbatiello and Irvil Kapua

09:41:32  6    during that time?

09:41:32  7        A.   No, I was not.

09:41:34  8        Q.   At some point in December 2003, was a problem reported

09:41:40  9    to you regarding Darla and Irvil Kapua?

09:41:46  10       A.   Not that I recall.

09:41:48  11       Q.   Are you aware of an incident involving an arrestee

09:41:54  12   named Heather Herron?

09:41:56  13       A.   I know the name, and it was brought to my attention;

.2:02  14    but it was brought to my attention, I believe, in January, not

09:42:06  15   in December.

09:42:08  16       Q.   Let me ask you the same question I asked you earlier

09:42:14  17   and change the date.  Are you aware of any problems or tension

09:42:16  18   between Irvil Kapua and Darla Abbatiello in January, in or about

09:42:22  19   January '04?

09:42:22  20       A.   Yes.

09:42:22  21       Q.   Could you describe what you knew that caused you to

09:42:30  22   answer yes a minute ago.

09:42:32  23       A.   Ofr. Abbatiello and her lieutenant came in to see me

09:42:38  24   sometime in January --

09:42:40  25       Q.   I'm going to interrupt you real quickly; can you

09:42:42  1    identify the lieutenant?

2:44  2         A.    The lieutenant is Ale Quibilan, and they informed me

09:42:48  3    of having problems with Irvil Kapua.

09:42:52  4         Q.    What specifically was said to the best of your

09:42:54  5    recollection?

09:43:04  6         A.    To the best of my recollection, that he was somehow

09:43:08  7    interfering with their vice investigations.

09:43:10  8         Q.    Do you remember anything else that was said during

09:43:14  9    that meeting?

09:43:18  10        A.    I don't know if it was that meeting or a subsequent

09:43:22  11   meeting that they alleged or told me of allegations that

09:43:30  12   Ofr. Kapua was on the take.

09:43:32  13        Q.    Do you remember if Darla Abbatiello and Ale Quibilan

3:38  14   were making those accusations, or do you know if they were

09:43:42  15   relaying accusations that were made to them by somebody else?

09:43:44  16        A.    They were relaying information to me that they got

09:43:48  17   from someone else.

09:43:50  18        Q.    As chief of police, let me ask you; if someone working

09:43:54  19   in the police department as an officer or detective -- I'm

09:44:02  20   asking you a hypothetical question.  If somebody's working in

09:44:06  21   the Kaua`i Police Department, let's say in Vice, and they

09:44:10  22   arrested a suspect and that suspect told them that another

09:44:16  23   officer had received payoff money to stop this type of arrest

09:44:24  24   from happening, would that be something you would expect the

44:30  25   officer to report up the chain of command?

09:44:32    1           A.    Yes.

:4:32       2           Q.    Why?

09:44:34    3           A.    It violates police standard of conduct for one thing.

09:44:40    4      It's a violation.

09:44:42    5           Q.    Would it be proper for the police officer to report

09:44:46    6      the allegation made by the arrested person even if the police

09:44:50    7      officer didn't necessarily believe it was true?

09:44:54    8           A.    It depends on the police officer.

09:44:58    9           Q.    How so?

09:45:00   10           A.    Not all allegations made by subjects to police are

09:45:08   11      brought to my attention.

09:45:12   12           Q.    What would trigger, in your mind, a duty for the

09:45:18   13      police officer in this hypothetical to report what she had

:45:22     14      heard?

09:45:24   15           MR. MINKIN:    Objection.    Lack of foundation.

09:45:26   16      Incomplete hypothetical.    If you can answer.

09:45:30   17           A.    Just hearing of allegations to me is not sufficient to

09:45:36   18      warrant some sort of investigation.    We need evidence.    We need

09:45:44   19      a report, a written report to us.

09:45:46   20           Q.    Is it fair to say you want the officer to have some

09:45:50   21      amount of corroboration in before they took such an

09:45:54   22      accusation --

09:45:54   23           A.    I would expect that from the officer, yes.

09:45:58   24           Q.    To your knowledge, when Darla Abbatiello reported

:46:04     25      statements made by Heather Herron, to your knowledge, do you

09:46:08  1   remember whether she and/or Mr. Quibilan had any kind of

:6:12  2   corroborative evidence?

09:46:16  3      A.   The fact that you had a witness would be enough for me

09:46:22  4   to proceed with whatever actions I would have to take.

09:46:28  5      Q.   Based on the report made to you about Heather Herron

09:46:32  6   from Darla and her lieutenant, what actions, if any, did you

09:46:36  7   take?

09:46:38  8          MR. MINKIN:  For the record, you're just talking about

09:46:40  9   the oral report, because the witness has said he needs a written

09:46:44  10  report to start anything.

09:46:44  11     Q.   Let's start with the oral report.

09:46:46  12     A.   I informed them put it to me in writing and I will

09:46:50  13  proceed with whatever actions I had to take.

16:54  14        Q.   And what happened next?

09:46:56  15     A.   I'm not exactly sure of the dates when I got a written

09:47:00  16  report, but I eventually received a written report.

09:47:06  17     Q.   Do you remember if that written report was written to

09:47:08  18  you, or was it written to someone else and sent up the chain of

09:47:12  19  command to you?

09:47:12  20     A.   I think it was written directly to me.

09:47:16  21     Q.   What did you do upon receiving the written report?

09:47:26  22     A.   I called my senior staff, mostly Asst. Chief Gordon

09:47:38  23  Isoda because he was the supervising in charge of both parties

09:47:46  24  or all parties involved, and they had a meeting as to what steps

47:50  25  we need to take.

09:47:54  1        Q.   Who was at the meeting?

7:58  2        A.   I think it was Gordon Isoda, myself, and Asst. Chief

09:48:04  3   Clayton Arinaga.

09:48:04  4        Q.   Can you tell me what was decided at the meeting.  Who

09:48:10  5   was gonna do what?

09:48:12  6        A.   The outcome of the meeting was that we needed to do an

09:48:16  7   administrative investigation based on the allegations and the

09:48:20  8   written report, and also a criminal investigation.

09:48:26  9        Q.   Do you remember when this meeting took place?

09:48:30 10        A.   It was sometime after -- it was soon after I got the

09:48:34 11   written report.

09:48:36 12        Q.   Were police personnel assigned to do the

09:48:42 13   administrative and criminal investigations?

18:44 14        A.   That's correct.

09:48:46 15        Q.   Did you assign them, or do you know if someone else

09:48:48 16   assigned them?

09:48:50 17        A.   I did the assignment.

09:48:52 18        Q.   Who was assigned to do the criminal investigation?

09:48:56 19        A.   I assigned my Criminal Intelligence Unit to do the

09:49:02 20   criminal investigation, by going through their commander who is

09:49:08 21   Lt. Stanton Koizumi.

09:49:10 22        Q.   Who did the administrative investigation?

09:49:14 23        A.   That was Lt. Roy Asher.

09:49:24 24        Q.   Are we still in or around January 2004?

09:49:28 25        A.   I think we're in February at this point.

09:49:32  1          Q.   To your knowledge, had any other agency been made

09:39  2     aware of Ms. Herron's statement?  In other words, specifically

09:49:46  3     had you or anyone at KPD reported this to the FBI yet?

09:49:50  4          A.   Not at that time, no.

09:49:52  5          Q.   To your knowledge, did you or anyone ultimately report

09:49:56  6     this allegation to the FBI?

09:49:58  7          A.   That's correct.

09:50:00  8          Q.   Do you know who took this to the FBI?

09:50:02  9          A.   Again, the investigation was being conducted by the

09:50:06  10    Criminal Intelligence Unit.  And with my permission, they

09:50:14  11    contacted the FBI because they felt like they needed to bring

09:50:18  12    another source into the investigation, into the criminal

09:50:22  13    investigation.

0:22  14          Q.   To the extent you can remember, can you tell me what

09:50:28  15    facts were before you that led you to -- well, let me ask you --

09:50:34  16    strike that.  Did you order -- the decision to have a criminal

09:50:38  17    and administrative investigation come from you, ultimately?

09:50:40  18          A.   Yes.

09:50:42  19          Q.   What facts were before you that led you to order those

09:50:46  20    two investigations?

09:50:50  21          A.   The written report from Darla Abbatiello and the

09:50:56  22    allegations in that written report prompted me to proceed with

09:51:00  23    both the criminal and administrative investigation.

09:51:06  24          Q.   To your memory, was there any facts outside of the

09:51:10  25    written report that anyone told you, or did you just base the

17

09:51:14  1    decision based on what was in that report?

51:16  2         A.    Primarily what was in the written report.

09:51:18  3         Q.    Do you recall whether -- do you know Darren Rose?

09:51:28  4         A.    Yes, I do.

09:51:28  5         Q.    To your knowledge, was Darren Rose with

09:51:32  6    Ofr. Abbatiello at the time Heather Herron made allegations

09:51:36  7    against Irvil Kapua?

09:51:38  8         A.    No, I was not aware of that.

09:51:38  9         Q.    Did you ever discuss the case with Darren Rose?

09:51:44  10        A.    No.

09:51:44  11        Q.    Do you know whether Heather Herron's allegations at

09:51:48  12   some point were tape-recorded?

09:51:50  13        A.    No, I don't.

52:06  14        Q.    I'm going to show you, if could you turn in your

09:52:08  15   exhibits, I've handed you exhibits.  If you could turn to

09:52:12  16   Exhibit No. 2, I think it's the second page there, might be the

09:52:16  17   third, third page.  On the bottom it's marked 2.  This is a

09:52:24  18   document with a Bates-stamp County of Kaua`i 001302, and it

09:52:34  19   appears to be a memo dated February 9, 2004.  Take a moment and

09:52:42  20   look at that.  Have you seen this memo before?

09:52:44  21        A.    Yes.

09:52:46  22        Q.    What is it?

09:52:46  23        A.    It's a memo assignment, Lt. Roy Asher to do the

09:52:52  24   internal investigation on Sgt. Kapua.

09:52:56  25        Q.    Did you create this memo?

09:53:04  1          A.    That's correct.

53:04  2          Q.    This would have been within a week or two of getting

09:53:08  3    the written report from Darla Abbatiello about Heather Herron's

09:53:10  4    allegations?

09:53:12  5          A.    That's correct.

09:53:14  6          Q.    If you look at the second paragraph, I think it's the

09:53:20  7    second sentence, it says, "When you notify Detective Kapua of

09:53:24  8    the investigation, you are also to inform him that any actions

09:53:26  9    taken against the officers or directed towards these officers

09:53:30  10   will not be tolerated."  And my question is, what led you to

09:53:34  11   write that?

09:53:38  12         A.    When Darla Abbatiello and Quibilan came to report to

09:53:46  13   me, they informed me that Sgt. Kapua was interfering with some

53:56  14   of their investigations and they wanted him not to interfere or

09:54:00  15   not to make any contact with them.

09:54:06  16         Q.    Did anyone else, besides the report from Quibilan and

09:54:20  17   Abbatiello that Kapua had been interfering with investigations

09:54:24  18   besides that, did anything else lead you to write that sentence?

09:54:30  19         A.    I'm not sure if Abbatiello said that they were afraid

09:54:38  20   of some kind of retaliation from Kapua or not.  But this is

09:54:44  21   fairly standard action that when an officer reports or files a

09:54:50  22   complaint against another officer, that for fear of retaliation

09:54:56  23   it's kind of standard for us to advise them not to make contact

09:55:00  24   with the officer making the complaint.

55:06  25         Q.    The next sentence says, directs Asher and Arinaga

10:05:52   1    procedure.

5:54    2           A.    I'm sure it's a violation to something in our
10:05:56   3    standards of conduct, yes.

10:06:00   4           MR. HOSHIBATA:  I'm sorry, this is John.  Could you
10:06:02   5    repeat that, I didn't hear.

10:06:04   6           MR. MINKIN:  The witness said I'm sure it's a
10:06:06   7    violation of something within our standards.

10:06:12   8           MR. HEMPEY:  Of conduct.

10:06:14   9           Q.    Did you or anyone in the department take any formal
10:06:24   10   action based on the report of fuck being yelled in the
10:06:30   11   restaurant?

10:06:30   12          A.    I don't understand what you mean by formal.

10:06:34   13          Q.    Did you take any action in response to that?

06:40   14          A.    I recall meeting with Kapua.  I don't know if it was
10:06:44   15   prior to that or after that I talked to him and telling him not
10:06:48   16   to do anything with Darla or anybody else in Vice, not to
10:06:54   17   approach them in any -- well, I guess I don't recall if it was
10:07:00   18   prior to or after that report I got from Darla.

10:07:04   19          Q.    But is it fair to say it was around that time frame
10:07:08   20   within a couple of weeks either way?

10:07:08   21          A.    That's correct.

10:07:10   22          Q.    So to restate in another way, within a couple of weeks
10:07:16   23   either way of Darla reporting to you that Irvil had said fuck in
10:07:20   24   a restaurant, you had a sit-down with Irvil and told him to stay
10:07:24   25   away from both Darla and everybody in Vice?

10:07:28  1        A.    That's correct.

07:32  2        Q.    To your knowledge, when you were chief, to your

10:07:36  3    knowledge at the time you were acting as chief, after that

10:07:40  4    conversation with Irvil, did he have any further contact with

10:07:46  5    Darla or anyone in Vice in defiance of --

10:07:52  6        A.    Not to my knowledge.

10:07:52  7        Q.    -- your talk?  To the best you can recollect, I'd like

10:08:00  8    you to relay the specifics of your conversation with Irvil Kapua

10:08:08  9    in which this happened.  In other words, did you call him into

10:08:12  10   your office?

10:08:14  11       A.    No.  I think he came in on his own.

10:08:18  12       Q.    What did he say?

10:08:20  13       A.    I had several meetings with Mr. Kapua, and each time

8:26  14   he would come to the meeting he thought it was wrong that I even

10:08:32  15   started an investigation on him.  And that's how it started.

10:08:36  16       Q.    Did he say why he thought it was wrong?

10:08:40  17       A.    He felt like I should have done some kind of inquiry

10:08:44  18   or background check prior to initiating an investigation.

10:08:50  19       Q.    Did he say specifically what you should have inquired

10:08:54  20   prior to starting?

10:08:56  21       A.    Well, first, my response to that was the only way I

10:08:58  22   can conduct an inquiry and the best way would be to conduct an

10:09:02  23   investigation.  And that was my response to him on that.

10:09:06  24       Q.    How did he counter?  What did he say next?

10:09:10  25       A.    I don't recall what he said.  I just told him how it

10:12:46  1          Q.   When he called her a bitch?

2:48  2          A.   That's correct.

10:12:52  3          Q.   Do you have any sense of when that happened?

10:13:00  4          A.   I'm still thinking it's after we started the

10:13:04  5    investigations.

10:13:04  6          Q.   So it's within the same --

10:13:06  7          A.   Time frame, yes.

10:13:08  8          Q.   -- time frame that we've been talking about all

10:13:10  9    morning?

10:13:10  10         A.   That's correct.

10:13:14  11         Q.   Did Darla express fear of Irvil Kapua to you more than

10:13:30  12    once?  On more than one occasion?

10:13:34  13         A.   Yes.

13:36  14         Q.   Approximately how many?

10:13:38  15         A.   Two that I ask recall.

10:13:40  16         Q.   What would be the time frame?

10:13:42  17         A.   Around the same time frame, the last time was in,

10:13:46  18    could have been in early April.

10:13:50  19         Q.   What do you remember her telling you?

10:13:54  20         A.   When she requested to be transferred from Vice back to

10:13:58  21    Patrol, that one of the reasons or part of the reason for that

10:14:04  22    request was because she was afraid of Kapua.

10:14:14  23         Q.   Did you explain to her that you had told Kapua to stay

10:14:18  24    away from her?

14:20  25         A.   I don't recall if I did.

10:25:28  1    what I marked Plaintiff's Exhibit 3, which has the Bates stamp

25:32  2    DA 00126.  Do you recognize that document?

10:25:40  3        A.   Yes.

10:25:42  4        Q.   Down under Darla's signature, that document appears to

10:25:50  5    be dated 3/31/04.  Did you receive this document on or around

10:25:56  6    3/31/04?

10:25:58  7        A.   I don't recall when I got it.

10:26:00  8        Q.   But you got it?

10:26:02  9        A.   Yes.

10:26:02  10       Q.   What is this?

10:26:04  11       A.   This is a to-and-from from Ofr. Abbatiello requesting

10:26:12  12   to be transferred to the Patrol Services Bureau.

10:26:16  13       Q.   When you received this letter, were you surprised,

:6:28  14     this to/from?

10:26:30  15       A.   In a way I was, yes.

10:26:34  16       Q.   Can you say why?

10:26:40  17       A.   Because I felt like she enjoyed being a vice officer

10:26:44  18   and she hadn't been in Vice long enough to leave something you

10:26:50  19   enjoyed doing.

10:26:52  20       Q.   You've testified earlier that I believe you thought

10:26:56  21   she was an average police officer.  How would you also

10:27:00  22   characterize her as average or different than average as a vice

10:27:04  23   cop?

10:27:04  24       A.   I have no idea of what she did in Vice.

10:27:08  25       Q.   But it was your sense that prior to receiving this

10:27:12   1    letter, Kapua issues aside, that she enjoyed working in Vice?

27:18      2        A.    Yes.

10:27:18   3        Q.    Were you close with Darla during your employment,

10:27:24   4    during the police department, at any time?

10:27:26   5        A.    I would say yes.

10:27:30   6        Q.    Did you ever have any kind of a falling out with her?

10:27:34   7        A.    No.

10:27:36   8        Q.    After you received this memo marked Plaintiff's

10:27:48   9    Exhibit 3, did you talk with Darla?

10:27:52   10       A.    I think we did have a conversation.  Yes.

10:27:56   11       Q.    You remember where that conversation took place?

10:28:00   12       A.    I'm thinking it was outside the police building around

10:28:02   13   the stairwell somewheres, where she and I spoke about this.

28:06      14       Q.    To the best that you can remember, will you relay the

10:28:12   15   content of that conversation to us.

10:28:16   16       A.    It's basically what she said in her memo; she wanted

10:28:22   17   to transfer back to Patrol because she was afraid of Irvil

10:28:32   18   Kapua.

10:28:32   19       Q.    What was her demeanor during that conversation?

10:28:36   20       A.    I didn't notice anything other than ordinary.

10:28:42   21       Q.    Did you believe her that she was afraid of Kapua?

10:28:56   22       A.    I don't know how to answer that.  The fact that she

10:29:04   23   put in a memo saying that she couldn't work under hostile

10:29:08   24   conditions and close to Irvil Kapua, I would say yes.

10:29:16   25       Q.    Did she provide you with any new information during

10:36:06  1    You transfer from a specific unit or designation within the

36:10  2    department, and that may carry with it the PO-9 or the PO-7.

10:36:16  3            MR McGUIGAN:  Objection --

10:36:20  4        Q.  With Mr. Minkin's clarifications, if you can.  I'm

10:36:24  5    trying to get your understanding of what happens with respect to

10:36:30  6    pay when you move within the department.

10:36:34  7        A.  If you move from one unit to another unit, if the pay

10:36:38  8    is higher, you get a higher pay in that new unit.  If the pay is

10:36:40  9    lower, you get the lower pay.

10:36:42  10       Q.  So if somebody moved from the unit, a specialized unit

10:36:46  11   such as Vice, down to a non-specialized unit such as Patrol

10:36:50  12   Services Bureau, you would expect a cut in pay?

10:36:52  13       A.  That is correct.

36:54  14       Q.  To your knowledge, there's no exceptions to that?

10:36:56  15       A.  None.

10:36:58  16       Q.  If somebody moved, for example, from a nonspecialized

10:37:04  17   position like, that carry the PO-7, for example, up to a

10:37:08  18   specialized position that carry the PO-9, is it your

10:37:12  19   understanding that the pay would go up?

10:37:14  20       A.  That's correct.

10:37:16  21       Q.  To your knowledge, are there any exceptions for that?

10:37:18  22       A.  No.

10:37:20  23       Q.  I'm going to show you, if you turn to Plaintiff's

10:37:34  24   Exhibit 5, which is an April 2, 2004 letter, apparently from you

37:40  25   to Ofr. Abbatiello.  And it's got the number on the bottom, DA

11:16:50  1    administrative investigation and that he needed, once he became

16:54  2    chief, to meet with the investigators and find out where they

11:16:58  3    were and what status the investigations were at.

11:17:02  4        Q.   You suggested that he meet with them?

11:17:06  5        A.   Yes.  I never told him specifics of the investigation.

11:17:12  6    He did not have a need to know or the right to know at that

11:17:14  7    time.

11:17:16  8        Q.   But before K.C. Lum took over as chief, is it correct

11:17:20  9    to say that you told him essentially that it was important that

11:17:26  10   he talk to Wes Kaui and Roy Asher about these investigations?

11:17:34  11       A.   That's correct.

11:17:38  12       Q.   Did he appear to understand when you told him that?

11:17:44  13            MR. TANAKA:  Objection.  Lacks foundation.  Calls for

17:48  14    speculation.

11:17:50  15            THE WITNESS:  Can I answer?

11:17:50  16            MR. MINKIN:  If you can.

11:17:52  17       A.   When I told him about the Kapua investigation, and

1:17:54  18    then his reaction was that's the one I'm worried about.

1:18:00  19       Q.   Do you know what he meant by that?

1:18:06  20       A.   No, I don't.

1:18:10  21       Q.   When was, was this in April '04?

1:18:14  22       A.   It could have been --

1:18:16  23       Q.   -- when he said that?

1:18:16  24       A.   It would have been in April, yes.

18:18  25        Q.   Did you follow up on what you mean by that?  Did you

11:18:24  1    ask him anything like what do you mean by that, why are you

18:28  2    worried about it?

11:18:28  3         A.   No, I did not.

11:18:28  4         Q.   But it is your recollection he used the word "worry"?

11:18:30  5         A.   That's the one I was worried about; something to that

11:18:34  6    nature, yes.

11:18:38  7         Q.   Is that in the same conversation when you stressed to

11:18:40  8    him the importance of communicating with Kaui and Asher?

11:18:44  9         A.   Correct.

11:18:46  10        Q.   Do you remember what specifically you told Lum about

11:18:54  11   the situation between, you know, Abbatiello and Kapua in or

11:19:02  12   around April '04?  Do you remember specifically what you told

11:19:06  13   him about the situation?

19:06  14             MR. MINKIN:  Asked and answered.

11:19:10  15             MS. NAKEA-TRESLER:  Join.

11:19:12  16        A.   Only that Kapua's being investigated because of the

11:19:18  17   allegations made by Abbatiello and that he needs to be aware of

11:19:22  18   that investigation and he needs to talk to the investigators to

11:19:26  19   get more information.

11:19:28  20        Q.   I'm trying to get if you had more information than

11:19:32  21   that.  So for example, did you tell him that a drug suspect had

11:19:38  22   made allegations of bribery?

11:19:40  23        A.   No, I did not.

11:19:42  24        Q.   Did you mention the name Heather Herron at all?

19:46  25        A.   No, I did not?

1        I, WILFRED IHU, hereby certify that I have read the

2    foregoing typewritten pages 1 through 63, inclusive, and

3    corrections, if any, were noted by me, and the same is now a

4    true and correct copy of my testimony.

5        Dated at, _____, Hawai`i, this _____ day of

6    _____, 2006.

7

8                                          _____

9                                          WILFRED IHU

10

11    Signed before me this _____ day

12    of _____, 2006.

13

14    _____

15    Witness to Deponent's Signature

16

17

18    CIVIL NO. CV04 00562 SOM BMK, <u>DARLA ABBATIELLO v. COUNTY OF</u>

19    <u>KAUAI; KAUAI POLICE DEPARTMENT</u>, taken on October 14, 2006, by

20    Joy C. Tahara, RPR, CSR

21

22

23

24

25

OCT 2 3 2006

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii (808) 524-2090

1                           C E R T I F I C A T E

2

3     STATE OF HAWAI`I                              )

4                                                   ) ss.

5     CITY AND COUNTY OF HONOLULU                   )

6               I, JOY C. TAHARA, RPR, CSR 408, Notary Public, State

7     of Hawai`i, hereby certify:

8               That on Saturday, October 14, 2006, at 9:31 a.m.,

9     before me appeared WILFRED IHU, the witness whose deposition is

10    contained herein; and that prior to being examined was duly

11    sworn;

12              That I am neither counsel for any of the parties

13    herein nor interested in any way in the outcome of this action;

14              That the deposition herein was by me taken down in

15    machine shorthand and thereafter reduced to print via

16    computer-aided transcription; that the foregoing represents, to

17    the best of my ability, a complete and accurate transcript of

18    the testimony of said witness.

19              DATED:  Honolulu, Hawai`i,  __October 21, 2006__ .

20

21                              _____

22                              Notary Public, State of Hawai`i

23                              My commission expires: 10/11/10

24

25