```
 1              IN THE UNITED STATES DISTRICT COURT
 2                        STATE OF HAWAII
 3
 4   DARLA ABBATIELLO,              ) CIVIL NO. CV04 00562 SOM BMK
 5              Plaintiff,          )
 6         vs.                      )
 7   COUNTY OF KAUAI; KAUAI POLICE  )
 8   DEPARTMENT; K.C. LUM,          )
 9   WILFRED M. IDA; GORDON ISODA;  ) Trial Date: May 8, 2007
10   DEAN PIGAO; IRVIL KAPUA,       ) Time  :    9:00 a.m.
11              Defendants.         ) Trial Judge: Susan O.
12   _____)              Mollway
13
14                   DEPOSITION OF PAUL KANOHO
15   Taken on behalf of PLAINTIFF DARLA ABBATIELLO, at the offices of
16   Ralph Rosenberg Court Reporters, Inc., c/o Hale & Goldberg,
17   Lihu`e Plantation Bldg., 2970 Kele Street, Suite 220, Lihu`e,
18   Hawai`i 96766, commencing at 9:02 a.m., on Wednesday,
19   November 8, 2006, pursuant to notice.
20
21   BEFORE:   JOY C. TAHARA, RPR, CSR 408
22             Notary Public, State of Hawai`i
23
24
25                        EXHIBIT F
```

```
 1                        A P P E A R A N C E S
 2
 3     FOR PLAINTIFF                JOHN HOSHIBATA, ESQ.
       DARLA ABBATIELLO:            Bronster Crabtree & Hoshibata
 4                                  2300 Pauahi Tower
                                    1001 Bishop Street
 5                                  Honolulu, Hawai`i 96813
                                    Tel. (808) 524-5644
 6                                  Fax. (808) 599-1881
                                    jhoshibata@bchlaw.net
 7
       FOR DEFENDANTS COUNTY OF     CHRISTIANE L. NAKEA-TRESLER,
 8     KAUAI; KAUAI POLICE          ESQ.
       DEPARTMENT:                  Office of the County Attorney
 9                                  4444 Rice Street
                                    Suite 220
10                                  Lihu`e, Hawai`i 96766
                                    cntresler@kauai.gov
11
       FOR DEFENDANT AND THIRD-PARTY   DIANE AGOR-OTAKE, ESQ.
12     PLAINTIFF K.C. LUM:             Law Offices of Cary Tanaka
                                       Fort Street Tower, Suite 510
13                                     745 Fort Street
                                       Honolulu, Hawai`i 96813
14                                     carytanaka@aol.com

15     FOR DEFENDANTS WILFRED M.    DAVID J. MINKIN, ESQ.
       IHU, GORDON ISODA, and DEAN  McCorriston Miller Mukai
16     PIGAO:                       MacKinnon LLP
                                    Five Waterfront Plaza,
17                                  4th Floor
                                    500 Ala Moana Blvd.
18                                  Honolulu, Hawai`i 96813
                                    minkin@m4law.com
19

20     FOR DEFENDANT IRVIL KAPUA:   KALANI BUSH, ESQ.
                                    Reinwald O'Connor & Playdon
21                                  LLP
                                    Pacific Guardian Tower, Makai
22                                  Tower
                                    733 Bishop Street, Suite 2400
23                                  Honolulu Hawai`i 96813
                                    Mjm@roplaw.com
24
       NOTE:  All individuals present in Kaua`i EXCEPT for Kalani Bush
25     who attended via land line, conference call.
```

```
 1                           I N D E X
 2   EXAMINATION                                              PAGE
 3       MR. HOSHIBATA                                         4
         MR. MINKIN                                           59
 4       MS. AGOR-OTAKE                                       66
 5       MR. HOSHIBATA                                        68
 6
 7
                             E X H I B I T S
 8   NO.    DESCRIPTION                                      PAGE
 9   1      Hawai`i Police Department -- Strip and            29
            Body Cavity Searches, General Order No.
10          603
11   2      Draft proposal presented by De Busca              40
12
```

```
09:19:07  1   certain things that happen, you know, in cases and whatnot.  And
  19:10   2   part of supervision I guess in that relationship, you know,
09:19:14  3   don't tell the boss everything.
09:19:17  4       Q.   In your present job at A&T, what do you do?
09:19:35  5       A.   I basically type for a living.  I review policy, try
09:19:41  6   to develop procedures and policies.  I also oversee recruitment
09:19:48  7   and hiring, which is probably our biggest responsibility.  We've
09:19:53  8   been in a manpower personnel deficit for several years and I
09:19:59  9   oversee that.  I also oversee the community relations division
09:20:05 10   which is being kind of on hold because of our other
09:20:10 11   responsibilities.
09:20:10 12       Q.   You said right now your superior officer is Acting
09:20:16 13   Assistant Chief Tanabe?
  20:19  14       A.   Yes.
09:20:20 15       Q.   Is there anybody in the hierarchy between you and
09:20:24 16   Acting AC Tanaka?
09:20:26 17       A.   No.
09:20:26 18       Q.   So you report directly to Tanabe?
09:20:29 19       A.   Yes.
09:20:31 20       Q.   As acting assistant chief, who does Tanaka report to?
09:20:38 21       A.   To the deputy chief.
09:20:40 22       Q.   Who is that right now?
09:20:41 23       A.   That's Acting Deputy Chief Isoda, Gordon Isoda.
09:20:57 24       Q.   In your duties as a lieutenant at A&T, do you recall
09:21:06 25   having any connection or anything to do with a strip search
```

```
09:21:11   1    policy?
09:21:12   2         A.   Yes.
09:21:18   3         Q.   When you came into A&T on your most recent assignment,
09:21:24   4    again, what year was that?
09:21:29   5         A.   Late 2002.
09:21:34   6         Q.   At that time, did the Kauai Police Department have a
09:21:38   7    strip search policy?
09:21:40   8         A.   No.  I didn't know it then, but I know right now.
09:21:47   9    When I first came into the section, I didn't know what general
09:21:53  10    orders we had.  We got about a hundred-and-some-odd general
09:21:57  11    orders.  I'm aware of some of 'em; but at the time I was
09:22:00  12    transferred, I had to kinda research and see what it is that we
09:22:04  13    did have and what we didn't have.
09:22:06  14         Q.   That took some time, right, to transition in and
09:22:09  15    research general orders and things?
09:22:11  16         A.   Yeah.  And I still don't know all of 'em at the top of
09:22:14  17    my head.
09:22:15  18         Q.   When did you become aware of the fact that KPD had a
09:22:20  19    strip search policy?
09:22:28  20         A.   For sure, when a draft was presented to me.
09:22:36  21         Q.   When was this draft presented to you?
09:22:38  22         A.   That was -- been over a year ago.
09:22:49  23         Q.   Can you put a month to that?  Month and year, I guess?
09:22:56  24         A.   Off the top of my head -- geez, maybe somewhere around
09:23:05  25    summer of last year.
```

| | | |
|---|---|---|
| 09:23:08 | 1 | Q. Summer of 2005? |
| 09:23:11 | 2 | A. Yes. |
| 09:23:15 | 3 | Q. Where did this draft come from? |
| 09:23:18 | 4 | A. That was presented to me by the commander of the |
| 09:23:27 | 5 | Investigative Services Bureau. |
| 09:23:28 | 6 | Q. Who was that? |
| 09:23:29 | 7 | A. That was Fred De Busca. He was the acting assistant |
| 09:23:36 | 8 | chief at the time. |
| 09:23:40 | 9 | Q. Now, was there a strip search policy that preceded |
| 09:23:47 | 10 | that draft at KPD? |
| 09:23:50 | 11 | MR. MINKIN: Objection. You're talking about a |
| 09:23:52 | 12 | written policy, or you talking about a nonwritten policy? |
| 09:23:55 | 13 | Q. Was there a written strip search policy at KPD before |
| 09:23:59 | 14 | you saw that draft given to you by Fred De Busca? |
| 09:24:04 | 15 | A. No, not to that degree. We may have had -- and this |
| 09:24:10 | 16 | is kinda off the top of my head -- we may have had arrest |
| 09:24:15 | 17 | handling procedures that discussed search, and we may have had |
| 09:24:20 | 18 | other policies related to patrol officer's safety, you know, |
| 09:24:26 | 19 | about handcuffing prisoners, searching prisoners, transfer of |
| 09:24:31 | 20 | prisoners and prisoner searching; but not to the extent that |
| 09:24:38 | 21 | this draft entailed. |
| 09:24:44 | 22 | Q. Was there, aside from the prisoner type or |
| 09:24:50 | 23 | prisoner-related policies that you just mentioned, were you |
| 09:24:52 | 24 | aware of any kind of unwritten policies that govern strip |
| 09:24:58 | 25 | searches before you got this draft from De Busca? |

| | | |
|---|---|---|
| 09:25:03 | 1 | A.    No. |
| 25:08 | 2 | Q.    Before you got this draft from De Busca, were you |
| 09:25:11 | 3 | aware of how or under what circumstances female prisoners were |
| 09:25:17 | 4 | strip-searched at KPD, if they were at all? |
| 09:25:22 | 5 | A.    As far as strip search, no. |
| 09:25:27 | 6 | Q.    No, meaning --? |
| 09:25:31 | 7 | A.    There wasn't a policy that I was aware of regarding |
| 09:25:34 | 8 | females and the strip-searching of females.  My own prior |
| 09:25:42 | 9 | experience and training, there were cursory searches in |
| 09:25:48 | 10 | self-defense type classes and courses.  They would talk about |
| 09:25:54 | 11 | doing a visual scan and then perhaps a cursory type search using |
| 09:26:00 | 12 | the back hand, back of the palm, or the back of your hand to -- |
| 09:26:07 | 13 | Q.    Pat down -- |
| 26:08 | 14 | A.    -- scan -- basically, yeah. |
| 09:26:11 | 15 | Q.    So when you say cursory searches though, this did not |
| 09:26:15 | 16 | entail actually having the female prisoner disrobe? |
| 09:26:19 | 17 | A.    I am not aware of any prior written order or |
| 09:26:29 | 18 | otherwise.  Yeah, not off top of my head for a total |
| 09:26:38 | 19 | disrobement. |
| 09:26:39 | 20 | Q.    Did you ever know of any incidents before this draft |
| 09:26:44 | 21 | from De Busca where a female prisoner was actually |
| 09:26:47 | 22 | strip-searched? |
| 09:26:49 | 23 | A.    Not specifically.  We could have had, you know, past |
| 09:26:53 | 24 | instances.  And I can't remember anything, any specific case |
| 27:04 | 25 | where someone may have been asked to disrobe so that either the |

```
09:27:08   1    clothing could be obtained for evidentiary purposes or to see if
09:27:15   2    anyone was hiding anything or concealing anything.  We may have
09:27:20   3    had situations like that, but I can't remember any specific
09:27:24   4    scenarios or instances.
09:27:26   5         Q.   So you really don't know if there were any strip
09:27:29   6    searches of females --
09:27:30   7         A.   Not off the top of my head that I can recall.
09:27:34   8         Q.   What about incidents of photographing female prisoners
09:27:42   9    while they were naked?  Had you ever heard of anything like that
09:27:47  10    happening?
09:27:47  11         A.   I don't recall anything like that in my career.
09:27:54  12         Q.   So as far as you know, during your entire career
09:27:57  13    you've never heard of anybody being requested to photograph a
09:28:03  14    naked female prisoner?
09:28:06  15              MR. MINKIN:  Asked and answered.
09:28:07  16         Q.   You can answer.
09:28:10  17         A.   You know, there's -- the only thing I can think of,
09:28:16  18    unless it's for identification type purposes, there are some
09:28:22  19    within the Detectives.  There's some situations where you
09:28:26  20    photograph a person in the nude, you know, a naked female victim
09:28:34  21    at an autopsy, things like that.  I just can't remember any
09:28:41  22    specific, like, case, you know, so-and-so versus so-and-so.
09:28:47  23              I know we photographed people who were nude for
09:28:53  24    various reasons.  And one of 'em would be for ID type purposes.
09:28:59  25    Like I said, you know, I've been to autopsies.  Female victims
```

```
09:29:03   1    were being photographed and they are in the nude.  Rape victims.
09:29:09   2    Even have female suspects who may have cross-injuries, detective
09:29:13   3    work, mutual assault, things like that, or for whatever reasons.
09:29:18   4            So yes, we have photographed people, nude people.  I
09:29:26   5    just don't --.  Like I can't remember any specific case, but I
09:29:30   6    know we've done it.  As far as, like, we could have photographed
09:29:36   7    female prisoners for whatever reasons in the course of our
09:29:40   8    history, but I don't recall any specific case, so.
09:29:45   9        Q.   This draft policy that you got from De Busca; was that
09:29:52  10    in writing?
09:29:53  11        A.   Yes.
09:29:54  12        Q.   Was it typewritten?
09:29:56  13        A.   Yes.
09:29:57  14        Q.   Do you know where that draft policy came from?
09:30:00  15        A.   When he presented it to me, he said that we'd like to
09:30:11  16    have this proposal worked up and that it was similar to
09:30:18  17    something that the Big Island police department had in place.
09:30:27  18        Q.   Was it in fact the Big Island police department's
09:30:31  19    strip search policy?
09:30:32  20        A.   I didn't do an immediate, any kind of immediate
09:30:37  21    research into that.  I did take that draft, and it was also
09:30:44  22    presented with an information packet that the lieutenant or the
09:30:52  23    Acting Assistant Chief De Busca had apparently got off a law
09:30:59  24    enforcement web site.  I took his draft, or the draft that was
09:31:03  25    presented to me by him, and the informational packet about
```

```
09:31:08  1    searches that was obtained off a law enforcement type web site,
09:31:16  2    and I circulated it to senior staff for their comments and
09:31:21  3    review.
09:31:28  4         Q.   So you circulated a written policy, basically your
09:31:35  5    draft?
09:31:36  6         A.   He didn't give me a working disc or anything to make
09:31:41  7    modifications on it.  And I just took the draft that was
09:31:48  8    presented to me unaltered, typed out a cover sheet, and
09:31:54  9    dispersed it to senior staff.
09:32:04 10         Q.   You also mentioned that there was a web site packet of
09:32:07 11    information?
09:32:08 12         A.   Yes.
09:32:08 13         Q.   Was that in writing or on a disc or?
09:32:11 14         A.   No, no.  That was in print, in type.
09:32:16 15         Q.   Was that circulated also to senior staff along with
09:32:19 16    the draft?
09:32:20 17         A.   Yes.
09:32:21 18         Q.   Do you know specifically what web site he got it from?
09:32:25 19         A.   I can't recall that.
09:32:27 20         Q.   Just for identification purposes, about how many pages
09:32:35 21    did that web site package consist of?
09:32:39 22         A.   I don't know for sure.  Maybe three to -- three to
09:32:51 23    half a dozen, but I'm not sure.
09:32:55 24         Q.   The senior staff that you circulated to comprised of
09:33:01 25    what officers?
```

```
09:33:05  1         A.   We've had some people going in and out on transfers
09:33:09  2    and whatnot.  In general, it was dispersed to --.  It would be
09:33:17  3    normally dispersed to the acting bureau commanders or bureau
09:33:21  4    commanders -- off the top of my head, I can't remember
09:33:23  5    specifically -- and then to, I think initially, just the deputy
09:33:32  6    chief.
09:33:33  7              Usually in my first draft presentation, most of our
09:33:39  8    general orders would be distributed to the bureau commanders and
09:33:43  9    deputy chief; and then following their review and comments, I'll
09:33:48 10    take those comments and then submit to the chief so that way the
09:33:52 11    chief can review not only the draft, but his senior command
09:33:58 12    staff comments on that draft as well at the same time.
09:34:01 13         Q.   Was that the procedure that you followed with respect
09:34:04 14    to the draft that De Busca gave you?
09:34:07 15         A.   As far as I can remember, yes.  I don't think I
09:34:11 16    distributed directly to chief at that time.  I think it was just
09:34:15 17    to the deputy chief, the acting deputy chief.
09:34:18 18         Q.   And who was that?
09:34:19 19         A.   That would have been Ron Venneman.
09:34:23 20         Q.   Would that have been -- did you actually receive any
09:34:27 21    comments on the drafts that were circulated to the bureau
09:34:31 22    commanders?
09:34:32 23         A.   Yes, I did.
09:34:33 24         Q.   What did you do with those comments?
09:34:36 25         A.   I kept them.
```

```
09:34:37   1        Q.   Did you incorporate them into the draft that you gave
  34:41    2   to Venneman?
09:34:43   3        A.   I attached drafts.  Those would have gone to the
09:34:49   4   chief, Chief Lum.
09:34:52   5             MR. MINKIN:  That's been a misstatement.  The initial
09:34:55   6   testimony was he circulated it to the bureau commanders and the
09:34:59   7   deputy chief --
09:34:59   8             THE WITNESS:  Yes.
09:35:00   9             MR. MINKIN:  -- at the same time.  Comments became
09:35:01  10   back, and then it would have gone to the chief.  So you asked
09:35:07  11   after you got it back from the commanders, did you give it to
09:35:09  12   Venneman.  That's a misstatement of the testimony.
09:35:11  13        A.   That it would have -- it would have gone comments then
  35:14  14   to chief, and that's best my recollection, that's what I did in
09:35:19  15   that process.
09:35:20  16        Q.   So do you have a specific recollection of giving the
09:35:23  17   comments and the draft to the chief at that time?
09:35:28  18        A.   Yes.  I did present the draft and comments.  I don't
09:35:33  19   remember the exact date though, but those were presented to
09:35:36  20   chief.
09:35:37  21        Q.   And the chief at that time was K.C. Lum?
09:35:40  22        A.   Yes.
09:35:40  23        Q.   What did the chief do with the draft and comments?
09:35:47  24             MS. AGOR-OTAKE:  Objection.  Speculation.
  35:49  25        Q.   If you know.
```

```
10:00:53   1        Q.   But at the time of the conference that you had in the
00:56      2   chief's conference room, the policy of the Kauai Police
10:01:01   3   Department was not to photograph people who are naked in the
10:01:08   4   form of a strip search or a body cavity search, correct?
10:01:19   5        MS. AGOR-OTAKE:  Objection.  I think you're misstating
10:01:21   6   what he previously said.  I think he said he wasn't aware of any
10:01:23   7   policy --
10:01:23   8        THE WITNESS:  Yes.
10:01:23   9        MS. AGOR-OTAKE:  -- not that there was a specific
10:01:25  10   policy that there were to be no strip searching or
10:01:29  11   photographing.
10:01:29  12        MR. HOSHIBATA:  I object to the speaking objections,
10:01:33  13   okay?
01:34     14        Q.   Was there a policy --
10:01:35  15        MR. MINKIN:  Objection.  Misstatement of the
10:01:37  16   testimony.  Assumes facts not in evidence.  Lack of foundation.
10:01:41  17        Q.   Was there a policy before this conference room meeting
10:01:47  18   here that you described in the chief's conference room, that the
10:01:50  19   Kauai Police Department would not search a naked woman in the
10:01:55  20   midst of a body cavity or a strip search?
10:02:00  21        A.   I don't recall having any policy to that degree.  As I
10:02:06  22   mentioned earlier, we did have other policies, arrest handling
10:02:11  23   procedures, that I believe mention searches and whatnot and
10:02:14  24   through training, searching prisoners, handcuffing prisoners,
02:19     25   and things like that.
```

```
10:02:24   1          Q.   Did anybody at this meeting, again at the chief's
02:28      2   conference room, ask for your opinion regarding this section or
10:02:31   3   the two sections on photographing?
10:02:34   4          A.   I don't recall if they asked for my opinion.
10:02:37   5          Q.   Do you recall any discussion at all amongst the people
10:02:40   6   attending the meeting about the differences in the two policies?
10:02:46   7          A.   Not specifically.  Like I said, I believe I did
10:02:51   8   mention it, to point out the difference in the two.  But that
10:02:55   9   may have been the extent of it.  I don't remember any specific,
10:02:59  10   off the top of my head, any specific references by anyone there.
10:03:03  11          Q.   Was there any action taken at that meeting regarding
10:03:07  12   the adoption of a policy?
10:03:09  13          A.   To this date, we do not have an approved -- I should
J3:13     14   put it, this particular policy --
10:03:17  15          Q.   This meaning --
10:03:17  16          A.   -- proposal hasn't been approved for distribution
10:03:21  17   department-wise.  It's still in effect a proposal draft.
10:03:26  18          Q.   So --
10:03:27  19          A.   It hasn't been, this particular proposal hasn't been
10:03:31  20   formally adopted into our general orders.
10:03:33  21          Q.   When you say this particular proposal, you're talking
.0:03:37  22   about the proposal that was suggested by De Busca?
.0:03:39  23          A.   Yes, sir.
0:03:39   24          Q.   So the provisions regarding photographing during strip
^-03:46   25   searches and body cavity searches at this point in time is not
```

| | | |
|---|---|---|
| 10:03:51 | 1 | part of the Kauai Police Department's standard of conduct or |
| 03:54 | 2 | general orders? |
| 10:03:55 | 3 | A.   As is referenced in the proposal. |
| 10:03:58 | 4 | Q.   Is there any standard of conduct, general order, or |
| 10:04:03 | 5 | other rule and regulation in the Kauai Police Department which |
| 10:04:08 | 6 | governs the photographing of naked people during strip searches |
| 10:04:14 | 7 | or body cavity searches? |
| 10:04:16 | 8 | A.   Off the top of my head, I don't recall us having |
| 10:04:19 | 9 | anything on the books right now about that. |
| 10:04:21 | 10 | Q.   Let me ask you this.  Who would be, other than you -- |
| 10:04:25 | 11 | A.   -- research it.  I'd have to go back and review |
| 10:04:29 | 12 | different arrest procedures.  But I don't recall anything else |
| 10:04:33 | 13 | other than this proposal to that extent. |
| 04:36 | 14 | Q.   You would know, correct, if there were other governing |
| 10:04:40 | 15 | provisions regarding photographing? |
| 10:04:43 | 16 | MR. MINKIN:  Objection.  Arguing with the witness. |
| 10:04:45 | 17 | The witness has already stated that he would have to go back and |
| 10:04:47 | 18 | check. |
| 10:04:49 | 19 | Q.   You can answer. |
| 10:04:50 | 20 | A.   Off the top of my head, I'd have to go back and check. |
| 10:04:54 | 21 | But I don't recall seeing anything else similar to that proposal |
| 10:05:05 | 22 | in our general order system.  I guess that's the best I can for |
| 10:05:05 | 23 | that. |
| 10:05:09 | 24 | And I'm only saying that because, you know, there are |
| 10:05:13 | 25 | situations that come up and someone will ask for reference |

```
10:16:05   1    notice, focus on, was the March date.
  16:07    2         Q.   During that meeting, did Chief Lum say anything at all
10:16:14   3    about that proposal?
10:16:15   4         A.   I don't remember specific statements other than that
10:16:19   5    he was gonna ask for a review of the proposal by the county
10:16:25   6    attorney's office, and that was the next progressive step in the
10:16:31   7    process.  I'm not sure off the top of my head if he made, you
10:16:36   8    know, any other statements on the policy other than that he was
10:16:39   9    gonna ask for a review and that he wanted it sent up to county
10:16:43  10    attorneys.
10:16:43  11         Q.   Who was the county attorney at that time?
10:16:48  12         A.   It would have been Ms. Nakazawa.  Lani Nakazawa.
10:16:53  13         Q.   Did he say that he was going to submit it to
  :6:55   14    Ms. Nakazawa?
10:16:56  15         A.   He could have asked me to -- normally, I go back farm
10:17:03  16    out, do a form letter, present it back to chief for signature,
10:17:08  17    and then we do a department-to-department mail-out.
10:17:12  18         Q.   Did you actually do a letter to Ms. Nakazawa?
10:17:16  19         A.   Yes, sir, I believe.  Yeah, it was me that did the
10:17:19  20    draft.
10:17:19  21         Q.   On this proposal?
10:17:21  22         A.   Yes, sir.
10:17:21  23         Q.   That would have been for Chief Lum to sign off on?
10:17:25  24         A.   Yes, sir.
10:17:26  25         Q.   Do you know if he ever signed off on it?
```

```
10:17:28   1         A.   Yes, sir.
10:17:28   2         Q.   He did?
10:17:29   3         A.   Yes, sir.
10:17:30   4         Q.   Do you know whether or not it was ever transmitted to
10:17:33   5    the county attorney's office?
10:17:33   6         A.   Yes.
10:17:34   7         Q.   It was sent out?
10:17:35   8         A.   Yes.
10:17:36   9         Q.   Or was it delivered, do you know?
10:17:38  10         A.   I put it in our department mail, and then someone else
10:17:42  11    does the delivery of it.
10:17:43  12         Q.   To your knowledge, was there ever a response by the
10:17:46  13    county attorney or Ms. Nakazawa on this proposal?
10:17:50  14         A.   Not to me directly, and I'm not sure if there's any
10:17:54  15    correspondence between the time I did the mail drop-off -- well,
10:18:03  16    to our mail person between the county attorney and Chief Lum.  A
10:18:13  17    couple months ago, I was called in to Acting Chief Arinaga's
10:18:20  18    office, as there was an inquiry from the county attorney's
10:18:25  19    office regarding the status of the strip search proposal.  I'm
10:18:31  20    not sure if this was June or July.  I apologize, but.
10:18:35  21         Q.   Of this year?
10:18:36  22         A.   Yes, sir.  It was a couple months ago.  And at that
10:18:39  23    time, Acting Chief Arinaga -- he could have even forwarded me a
10:18:46  24    letter.  There was a correspondence between the county
10:18:49  25    attorney's office and our department requesting update
```

```
 1         I, PAUL KANOHO, hereby certify that I have read the
 2   foregoing typewritten pages 1 through 69, inclusive, and
 3   corrections, if any, were noted by me, and the same is now a
 4   true and correct copy of my testimony.
 5         Dated at, _____, Kaua`i, Hawai`i, this ____ day
 6   of _____, 2006.
 7
 8                                     _____
 9                                            PAUL KANOHO
10
11   Signed before me this ____ day
12   of _____, 2006.
13
14   _____
15   Witness to Deponent's Signature
16
17
18   CIVIL NO. CV04 00562 SOM BMK, DARLA ABBATIELLO v. COUNTY OF
19   KAUAI; KAUAI POLICE DEPARTMENT, taken on November 8, 2006, by
20   Joy C. Tahara, RPR, CSR
21
22
23
24
25
```

```
 1                      C E R T I F I C A T E
 2
 3    STATE OF HAWAI`I            )
 4                                ) ss.
 5    CITY AND COUNTY OF HONOLULU )
 6              I, JOY C. TAHARA, RPR, CSR 408, Notary Public, State
 7    of Hawai`i, hereby certify:
 8              That on Wednesday, November 8, 2006, at 9:02 a.m.,
 9    before me appeared PAUL KANOHO, the witness whose deposition is
10    contained herein; and that prior to being examined was duly
11    sworn;
12              That I am neither counsel for any of the parties
13    herein nor interested in any way in the outcome of this action;
14              That the deposition herein was by me taken down in
15    machine shorthand and thereafter reduced to print via
16    computer-aided transcription; that the foregoing represents, to
17    the best of my ability, a complete and accurate transcript of
18    the testimony of said witness.
19              DATED:  Honolulu, Hawai`i, November 17, 2006.
20
21                              _____
22                              Notary Public, State of Hawai`i
23                              My commission expires: 10/11/10
24
25
```