IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DARLA ABBATIELLO, | CIVIL NO. CV04 00562 SOM BMK |
| Plaintiff, | AFFIDAVIT OF DARLA ABBATIELLO |
| vs. | |
| COUNTY OF KAUAI, KAUAI POLICE DEPARTMENT, K.C. LUM, WILFRED M. IHU, GORDON ISODA, DEAN PIGAO, IRVIL KAPUA, | |
| Defendants. | |

## AFFIDAVIT OF DARLA ABBATIELLO

1.     I am a Police Officer in the Kauai Police Department ("KPD") and the Plaintiff in this action.

2.     In-mid 2002, I responded to a job posting for a position in the Vice Narcotics Unit.  I was offered, and accepted the position in October 2002.

3.     I understood that my transfer to Vice from Patrol was a promotion, and was a permanent assignment.

4.     My main duties in Vice were to investigate and solve drug trafficking.

EXHIBIT  _D_

5.      In December 2003, I obtained a search warrant to search the vehicle of an individual, Heather Herron, a suspected crystal methamphetamine or "ice" dealer.

6.      I intended to "flip" Heather Herron and use her to arrest Craig Iwase, on whom I had received information that he dealt larger quantities of ice than Heather Herron.

7.      On or about December 10, 2003 Sergeant Kapua, approached me and asked if I knew Heather Herron.  I told him that I k new of her, I but did not divulge that I had a warrant for Heather Herron or that  Heather Herron was a "target."

8.      Between December 10 and December 14, 2003 Sgt. Kapua contacted me by phone several times trying to set up a meeting between myself,  Heather Herron, and Sergeant Kapua.

9.      I was very uncomfortable with Sgt. Kapua's actions because, first, he was not a member of Vice and it was improper for him to be involved in my active investigation.

10.     I was also uncomfortable with Sgt. Kapua's actions because I had heard allegations that he was violent, and had seen him being violent, punching lockers at the police station when he was upset.

2

11.    My understanding of KPD policy was that Vice investigations, including the execution of search warrants, are to be kept stric tly confidential between Vice members.

12.    Irvil Kapua was not a member of Vice at any time while I was in the Vice unit.

13.    In late summer / fall of 2003 Sgt. Kapua approached me about a suspect drug dealer against whom there was an active arrest warrant.  He showed me that he had the warrant hidden under his desk.  He asked me to refrain from arresting her so that he could "work with" her and arrange for her to bring about five pounds of "Ice" onto Kauai.

14.    Sgt. Kapua had an argument with my supervisor over th is incident.  I had previously noticed that he had a history of going to see this drug dealer when she was wanted by police. On or about December 15, 2003, Sgt. Michael Gordon, ordered me to meet with Kapua and Heather Herron I objected, telling Sgt. Micha el Gordon. that I did not want Sgt. Kapua involved in my investigation, and that it was against my plans to have Heather Herron as an informant.

15.    Sgt. Michael Gordon again ordered me to meet with Sgt. Kapua and Heather Herron. I was upset and afraid about t he situation, and I cried.  I

3

felt that involving Sgt. Kapua compromised my investigation and my personal safety.

16.    When I arrived to meet Sgt. Kapua, and Heather Herron, Sgt. Kapua had already registered her as a confidential informant. The "informant packet" that Kapua had Heather Herron sign, only had Kapua's signature, although normal policy and procedure requires two officers to be present and sign the document.

17.    I didn't know how he was able to do this on a Vice case, since I did not believe that he had the authority to do so pursuant to KPD policy.

18.    Between December 16, 2003 and December 24, 2003, Sgt. Kapua personally approached or called me numerous times to discuss Heather Herron and Craig Iwase. I was uncomfortable dealing with Sgt. Kapua and did not want to discuss my investigation with him.

19.    One morning, Sgt. Kapua was waiting for me at the back of the police station, pulled me aside, and demanded to know if I was telling him everything. He told me that he had been following me and asked why I was avoiding him.

20.    Sgt. Kapua also told me that I did not have to tell my supervisors, Lt. Alejandro Quibilan and Sgt. Michael Gordon, the detail about his working with Heather Herron. I responded that that was against

4

policy and that I did in fact have to re port everything relevant to my supervisors.

21.    At one point, I asked Heather Herron to make a controlled buy from Craig Iwase  Sgt. Kapua later called me to tell me that Heather Herron had called Sgt. Kapua because she was upset that I had asked her to do thi s.

22.    I responded by telling Sgt. Kapua that Craig Iwase was my main target and that I wanted to use Heather Herron as an informant against Craig Iwase.

23.    Sgt. Kapua called me and told me to meet him at his office.  I did so, and he closed the door.  He said th at Craig Iwase was "nothing" and "small time."

24.    In that meeting Sgt. Kapua also asked me to procure Vice funds to pay off some of Heather Herron's debt to another suspected drug dealer. He told me not to tell anybody.  This request was not permitted pursua nt to KPD policy.  I was afraid and I left the meeting.

25.    I then went to my supervisor and reported what Sgt. Kapua had said.

26.    Sgt. Kapua also told me at this time that another drug dealer had told Craig Iwase that Heather Herron was working for Sgt. Kapua.  I

was upset by this information as it totally compromised my investigation and defeated all the progress I had made over a long period of time.

27.    I reported this breach in my investigation to Lt. Alejandro Quibilan.

28.    Several months later, I assisted a Federal drug task force with the arrest of Craig Iwase. He was found with nearly a half a million dollars worth of methamphetamine. I did not consider this to be "small time". This arrest was consistent with information that I had been getting from other agencies on Oahu that he was a major drug dealer.

29.    Heather Herron did not provide any information or do any controlled buys as a confidential informant. She would not even answer my calls to her cell phone, so I decided to return to my original plan to "flip" her.

30.    On December 26, 2003, I served the search warrant on Heather Herron and arrested her.

31.    Just minutes after I arrested Heather Herron, I learned that Craig Iwase arrived at the scene and asked another officer "Are you Irvil Kapua?" I could not think of any legitimate way in by which Craig Iwase could have known that I had arrested Heather Herron or the location of the

arrest. It appeared to me that someone must have tipped Craig Iwase off that I was arresting his girlfriend.

32.     After her arrest, I read to Heather Herron her constitutional rights. Another Vice officer was also present during the interview because he was investigating Heather Herron on several charges as well.

33.     After being read her rights, I questioned Heather Herron relating to the drug promotion charges against her. During this interview, Heather Herron admitted that she sold crystal methamphetamine with Craig Iwase. Heather Herron then also stated that Craig Iwase paid Sgt. Kapua six thousand dollars ($6,000.00) through a third person to "protect" both Heather Herron and Craig Iwase.

34.     I was distressed after receiving this information because I had heard that Sgt. Kapua has a violent temper and was afraid of what he might do to me. I knew I had to report these allegations, both from my professional duty and morally as a citizen, but I was afraid. At around this time, there was considerable talk of possible corruption within the KPD.

35.     I had heard that Sgt. Kapua had numerous internal complaints lodged against him related to violence.

36.    I had heard that Sgt. Kapua threatened two police dispatchers with his hand on his gun and that they had gone out on stress leave because of him.

37.    I have seen Sgt. Kapua get upset on several occasions and I have seen him swearing while punching lockers at the polic e station.

38.    I had heard from other officers that Sgt. Kapua had a violent temper.

39.    I had to report the allegations by Heather Herron because I felt it was a matter of public concern and importance.

40.    On December 28, 2003, because of the stress of the situation  at work and my fear of Sgt. Kapua, I was admitted to Kauai Veterans Memorial Hospital Emergency Unit.  I had been suffering sleeplessness, diarrhea, dehydration, severe coughing, stomach pains and other physical stress-related symptoms.  I was recommended by my doctor to stay in the hospital overnight, and was I was injected with intravenous fluids.  I was in the hospital for approximately ten hours.

41.    I was out on stress/sick leave from work for the next two days.

42.    On January 2, 2004, I returned to work and  reported to my supervisor, Lt. Alejandro Quibilan what Heather Herron had told me about Sgt. Kapua and the alleged corruption.

43.    Lt. Alejandro Quibilan and I, then went to cellblock so that Lt. Alejandro Quibilan could interview Heather Herron himself.

44.    I met with Lt. Alejandro Quibilan, Acting Chief Ihu and Acting Chief Gordon Isoda and verbally reported Heather Herron's allegations.

45.    I requested and met then acting Chief Ihu on several occasions about this situation. I also expressed my fear of retaliation , and requested that Sgt. Kapua be ordered to stay away from me and from all Vice investigations. Lt. Alejandro Quibilan concurred with my request.

46.    Chief Ihu ordered me and Lt. Alejandro Quibilan make our report in writing, which I did and submitted on Ja nuary 19, 2004 to Lt. Alejandro Quibilan.

47.    In early February 2004 agents from the FBI contacted me about Sgt. Kapua and asked me what happened. They said they could protect me.

48.    At a later date, I met with the FBI agents and again reported the allegations by Heather Herron and all other relevant information to the FBI.

49.    By this time, no one at KPD had, to my knowledge, ordered Sgt. Kapua to stay away from me. My supervisor told me that his supervisors did not order Kapua to stay away from me.

50.    At and around this time, I was frequently noticing Sgt. Kapua around me. He would drive by and stare me down. He would stop his

9

vehicle to stare at me. One time when he was walking he saw me, turned around, and walked backwards, staring me down the whole time.

51.     On or about January 9, 2004, while I was alone in a stairwell at the police station, Sgt. Kapua entered the stairwell and screamed at me, calling me "bitch!" I was terrified being alone with him, and tried to leave as quickly as possible. He hit his chest and yelled that I'd better get my facts straight before I investigate him. He threatened that "I have already taken down two officers" He continued to yell at me as I left the stairwell.

52.     I was very shaken up after this happened, and I immediately reported this to my supervisor, Lt. Alejandro Quibilan.

53.     Sometime later, I was told that Sgt. Kapua had refused service of a notice of internal investigation against him, and that he was in a state of rage. I was told by at least three different officers that Sgt. Kapua had been throwing things, screaming and calling me a "bitch" and a "cunt" in the workplace.

54.     On January 19, 2004, I was having lunch at the L&L restaurant with Lt. Alejandro Quibilan and Sgt. Kapua entered the restaurant with his wife, another police officer. When he was nearby to me, Sgt. Kapua yelled "Fuck you!" at me.

10

55.     I was shocked, frightened, and embarrassed. We were in a public place, and there were other people around, citizens. I wanted to leave immediately, and Lt. Alejandro Quibilan and I left the restaurant.

56.     I immediately reported the incident to acting Chief Ihu. I again told the Chief that I was scared and that I wanted Sgt. Kapua to stay away from me.

57.     A few days later, Wes Kaui told me that Sgt. Kapua had bragged about swearing at me in a restaurant. He asked me if I had spoken to the FBI about whistleblower protection.

58.     On another occasion after I reported Heather Herron's allegations to KPD and the FBI, I was in the Police Department parking lot speaking with a fellow officer when Sgt. Kapua and his wife drove into the lot. She stared at me, and I looked away. The officer stated "I'm leaving before I get killed." Sgt. Kapua then arrived in his vehicle and stared me down.

59.     On several occasions after I reported the allegations to KPD and the FBI, officers told me that they did not want to stand next to me for fear "of being killed." I understood this to mean that they were afraid that because they were standing next to me, Sgt. Kapua might retaliate against them.

11

60.    In addition to all this, I had reason to believe that criminal suspects were being "tipped off" before my search warrants were executed.

61.    Because of Sgt. Kapua's violent behavior toward me, my fear of further retaliation by him, and the stress that this was causing me, I began to consider asking for a temporary transfer out of Vice, so that I could avoid Sgt. Kapua totally.

62.    I discussed this possibility separately with SHOPO representative Bryce Ponce and Chief Ihu. I told both men that I was afraid of Sgt. Kapua and possible further retaliation from him. Both men told me that such a transfer should be acceptable. Neither man mentioned that it would be "permanent" or that I would receive a reduction in pay.

63.    I am informed and believe that then acting chief, Ihu ordered an internal investigation into the allegations that the arrested drug suspect made against Sgt. Kapua.

64.    I later heard that after K.C. Lum became chief, he ordered that the investigation into the allegations against Kapua was to be terminated as "unsubstantiated" without making any inquiry in Kapua's finances.

65.    On March 31, 2004, I submitted my request for a temporary transfer to the Patrol Services Bureau in the District of Waimea, "until this

matter can be resolved." This was very difficult for me to do, as I got a lot of satisfaction from my job and really loved my job as a Vice officer.

66.     I discussed the transfer with my Vice supervisor, Lt. Alejandro Quibilan, and we both discussed it as a temporary transfer.

67.     I found out later, after I had transferred, that my rank had been changed from Police Officer II at a salary range of PO-9 to a Police Officer I salary at a Range of PO-7.

68.     This demotion and salary cut were substantial for me.

69.     In the following months, there was considerable tension and hostility in the workplace. There still is.

70.     In or about May 2004 K.C. Lum was appointed as KPD chief.

71.     Lum was aware of the situation between Sgt. Kapua and I but he did not take any meaningful action against Kapua for what he did to me. I remained afraid to go to work each day.

72.     Shortly after K.C. Lum became chief, Sgt. Wesley Perreira. approached me at headquarters and told me that I had better make sure my hair was up and that I do everything right because "they" are watching everything I do because I reported the allegations aga inst Sgt. Kapua.

73.     On or about April 18, 2004, I was told by a fellow officer to check my desk dictionary which had been located in Vice. When I looked at

13

my dictionary, I saw that three red arrows drawn on the dictionary and pointing to the word "DEATH" in the dictionary. Next to the definition of "DEATH", my name was written in red ink with an arrow pointing to the definition.

74.    I was terrified by this death threat.

75.    I reported the death threat to my supervisor and to the FBI.

76.    I am aware that the FBI questioned numerous KPD officers and took handwriting samples from them.

77.    I am not aware of any internal KPD investigation of the death threat.

78.    After my transfer to patrol, when I had to go to the Vice office or the Lihue Police station, I would do my best to avoi d Sgt. Kapua. This included avoiding walking past his office, even if it was out of my way.

79.    I sometimes would ask a fellow officer to accompany me when I had to enter the Lihue police station because I was afraid of seeing or being seen by Sgt. Kapua.

80.    On or about June 23, 2004, I met with Chief Lum and Lieutenant Wes Perreira in Chief Lum's office. During this meeting, Sergeant Kapua stood outside Chief Lum's door and stared at me. I felt very

14

uncomfortable. Sgt. Kapua's behavior disrupted and interfere d with our meeting, and Chief Lum closed his office door.

81.    After the meeting, Lieutenant Wes Perreira., Lieutenant Regina Ventura, and I passed Sergeant Kapua's office and I heard Kapua screaming and yelling.

82.    I was told later that Sgt. Kapua had punched t he wall in his office because he was so upset at seeing me.

83.    Later that day, Assistant Chief Dean Pigao told me that I was to stay away from Sergeant Kapua and to avoid walking past Kapua's office. A.C. Pigao told me that Sgt. Kapua had been yelling and an gry because I had walked by. The stress of all this caused me to be very upset and I cried in front of A.C. Pigao.

84.    I had been doing my best, out of fear for my personal safety to avoid the man who had called me names, screamed at me, and possibly made a death threat against me. I was upset because I passed his office once, and the supervisors ordered me to stay away from him.

85.    I understood A.C. Pigao's instructions to be an order.

86.    Chief Lum knowingly and purposefully failed to take any actions to disciplin e Sgt. Kapua or protect me from violence and retaliation in the workplace.

15

87.    Before I reported Heather Herron's allegations, I had frequently requested and been assigned cellblock duty in the past for overtime pay.

88.    I desired to work cellblock duty because I earned extra compensation for performing this duty.

89.    Cellblock duty includes intake of arrestees in KPD's cellblock facility.

90.    On at least one occasion following my complaints against Kapua, when I worked in the cellblock, Sergeant Kapua relieved me from cellblock duty.

91.    I felt threatened when this occurred, and requested that such contact be avoided.  A supervisor responded by writing a note on the cellblock sign-in log that I could no longer work in cellblock until further notice.  I believe that this was done at K.C. Lum's direction.

92.    I know that Kapua continued to request and be assigned to cellblock duty during the time I was could not work in cellblock.

93.    Because of Kapua's presence in cellblock, I have been fearful and unable to work in the cellblock.  I have suffered a loss of income as a result.

94.    In the fall of 2004 I went into Vice to retrieve my extra police weapon.  I had kept my things in the Vice office because I thought that my

16

transfer to patrol was temporary. This was a new gun and it was kep t in a locked file cabinet in the locked Vice office. The gun was missing. It appears to have been stolen. I reported this to Chief Lum and the FBI.

95.    In late 2004 I obtained a temporary restraining order against Sgt. Kapua. This order remains in effect today. It is my understanding that according to policy and practice at KPD, an officer and anyone who lives with him must surrender their firearms during the period in which the restraining order is in effect.

96.    I believe that K.C. Lum permitted Sgt. Kapua's wife, also a police officer at KPD, to bring her gun home anyway, where she lives with Sgt. Kapua, without restriction despite the fact that I had obtained a restraining order. I later learned from the FBI that Irvil Kapua was carrying a gun at the time of a search of a Kauai doctor's office – when my restraining order was in effect.

97.    I believe that Chief Lum permitted a gun in the Kapua household in part out of his fear of Sgt. Kapua, and in part to retaliate against me for reporting the allegations tha t were made against another police officer (Kapua).

98.    Several months after my transfer to patrol, I learned that the transfer and demotion were permanent.

17

99.    On or about April 24, 2005, while on duty, I was ordered by Wes Perreira to assist in a search of two female arrestees and to photograph each of them while they were naked.  Lieutenant Wes Perreira told me that he had a warrant to conduct the searches.

100.    I refused to take photographs of naked female arrestees, believing that it was not proper police practice,  and that it was illegal, degrading and unnecessarily humiliating.

101.    The vice supervisors later told me that they had called the County Prosecutor, Richard Minatoya, who had told them that it was O.K. to strip search and take nude photographs of the two fema le arrestees.

102.    I assisted in strip searches of the arrestees with negative results for illegal substances or contraband.  Another female officer, Vicki Fonoimoana, then took photographs after the search of the naked female subjects.

103.    The next day, I verbally reported the incident, and my refusal to participate in it to Sergeant Dan Abbadilla and Lt. Alejandro Quibilan, and made my written report on May 2, 2005.

104.    Approximately one two weeks after my verbal report, and one week after my written report, on or about May 9, 2005, I reported the above-

18

referenced incident, through my attorneys, in writing to the Kauai County Police Commission.

105.   I also reported the incident to the FBI.

106.   On or about May 25, 2005, I was told by Lt. Roy Asher that I was being removed from my position as Field Training Officer ("FTO") for KPD.

107.   Being an FTO provided me with additional compensation over my regular pay as a patrol officer.  Being removed from the FTO status resulted in loss of this compensation.

108.   I believe that I was removed from my FTO position as retaliation against me for objecting to and reporting the strip search incident in late April 2005 to the Chief, Police Commission and to the FBI.

109.   Chief Lum later attempted to create a policy that would govern strip-searches, and the photographing of naked arrestees at KPD.  He ordered that the policy be drafted to permit photographing naked arrestees. After he created the policy, he then attempted to back -date the newly drafted KPD strip search policy so as to appear that it was in ef fect before the April 2005 incident.

110.   He did this in retaliation against me for objecting to and reporting the strip search incident in late April 2005 to him, the Police Commission and to the FBI.

111.   I declare under penalty of law that the foregoing is true  and correct.  I understand that this Declaration has the same force and effect as if

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

sworn under oath, and the penalties of perjury apply.


DATED: Lihue, Hawaii, _____Jan o8_____, 2007.



_____
DARLA ABBATIELLO




Subscribed and sworn before me

This _8th_ day of _January_, 200 **7**.


_____
Notary Public, State of _Hawaii_

Print Name: _Jay H. Watanabe_

My commission expires: _August 28, 2009_