IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DARLA ABBATIELLO, | ) | CIVIL NO. CV04 00562 SOM |
| | ) | BMK |
| Plaintiff, | ) | |
| | ) | AMENDED MEMORANDUM IN |
| vs. | ) | SUPPORT OF MOTION |
| | ) | |
| COUNTY OF KAUAI, KAUAI | ) | |
| POLICE DEPARTMENT, K.C. LUM, | ) | |
| WILFRED M. IHU, GORDON | ) | |
| ISODA, DEAN PIGAO, IRVIL | ) | |
| KAPUA, | ) | |
| Defendants. | ) | Trial Date:  May 8, 2007 |
| _____ | ) | |

AMENDED MEMORANDUM  IN SUPPORT OF MOTION

I.    INTRODUCTION

Plaintiff Darla Abbatiello ("Plaintiff") has set forth specific, independent

and corroborative evidence to support each of her claims against the Defendant in

the form of her Affidavit and other record sources.   However, when deposed, Lum

and Kapua each invoked their Fifth Amendment right to remain silent and refused

to testify.  Under Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d

810 (1976) and its progeny, Plaintiff is entitled to adverse inferences against Lum

and Kapua, which leaves no dispute as to material facts, and which compels

summary judgment in Plaintiff's favor.  Additionally, none of the Defendants in

the case saw fit to depose the Plaintiff; therefore, her sworn Affidavit,

uncontradicted by deposition testimony, must be given full effect.

## II.    FACTUAL STATEMENT

Plaintiff is a Police Officer in the Kauai Police Department ("KPD").

(Plaintiff's Separate and Concise Statement of Facts ("CS") ¶ 1.)  In October 2002,

Plaintiff was promoted to the Narcotics Vice Unit of KPD ("Vice"). (CS ¶ 1.)

At all relevant times to this action, Defendant K.C. Lum ("Lum") was the

Acting Chief of Police or Chief of Police of KPD.  (CS ¶ 2.)  At all relevant times

to this action, Defendant Irvil Kapua ("Kapua") was a Sgt. in KPD, and was not a

member of Vice.  [Ex. D, Declaration of Darla Abbatiello ("Affid." ¶ 12.)]

As a member of Vice, Plaintiff's main duties were to investigate and solve

drug trafficking.  (Affid.¶¶ 1, 4.)  In December, 2003, Plaintiff was investigating

the drug-trafficking activities of an individual, and she obtained a search warrant to

search the residence of Heather Herron ("Herron"), a suspected crystal

methamphetamine or "ice" dealer. (Id. ¶ 5.)  Plaintiff intended to "flip" Herron and

use her to arrest Craig Iwase ("Iwase"), who Plaintiff believed dealt larger

quantities of ice than Herron (Id. ¶ 6.)  Plaintiff had been pursuing Iwase for a long

time.  (Id. ¶¶ 21, 22.)

On or about December 15, 2003, Sgt. Michael Gordon ("Gordon"), who was

a member of Vice, ordered Plaintiff, over her protests, to meet with Kapua and

Herron  (Id. ¶ 14.)  Before the meeting between Kapua, Plaintiff, and Herron,

Kapua had registered Herron as a confidential informant, although he had no

authority. (Id. at  ¶¶ 16, 17.)   Pursuant to KPD policy, Vice investigations,

including the execution of search warrants, are to be kept strictly confidential

between Vice members.  (Id.at ¶¶ 11, 12, 16, 17.)  Kapua had previously been

investigated for a violation of Standard of Conduct B3, Security of Departmental

Business. (Ex. K, Internal Investigation Report; CS ¶18.)

Between December 16, 2003 and December 24, 2003, Kapua personally

approached or called Plaintiff numerous times to discuss Herron and Iwase.

(Affid.¶ 18.)  One morning, Sgt. Kapua waited for Plaintiff at the back of the

police station, and demanded to know if she was "telling him everything".  He told

Plaintiff that he had been following her. (Id. ¶ 19.)  Kapua also told Plaintiff that

she did not have to tell her supervisors, Quibilan and Gordon, the detail about his

working with Herron.  Plaintiff responded that that was against policy and that she

did in fact have to report everything relevant to her supervisors. (Id. ¶ 20.)

Plaintiff asked Herron to make a controlled buy from Iwase.  Kapua later called

Plaintiff to tell her that Herron had called Kapua because she was upset that

Plaintiff had asked her to do this.  (Id. ¶ 21.)  At this point, Plaintiff informed

Kapua that Iwase was her main target and that she wanted to use Herron as an

informant against Iwase.  (Id. ¶ 22.)  Kapua responded that Iwase was "nothing"

and "small time." (Id. ¶ 23.)  Several months later after the events described here,

Iwase was arrested with nearly a half a million dollars worth of methamphetamine

following a Federal drug task force investigation.  (Id. 28.)   Since Herron proved

to be an unproductive confidential informant, Plaintiff returned to her original plan,

and on December 26, 2003, she served the search warrant on, and arrested Herron.

(Id. ¶¶ 29, 30.)  After her arrest, Herron admitted to Plaintiff that she sold crystal

methamphetamine with Iwase, and that Iwase paid Kapua six thousand dollars

($6,000.00) through a third person to protect both  Herron and Iwase. (Id.  ¶ 33; CS

¶3.)  Herron also stated that Kapua received money from other drug dealers in

exchange for providing them with information. [Ex. E, deposition transcript of

Alejandro Quibilan ("Quibilan Deposition" at 27:8-15.)

Plaintiff had heard that Kapua had a violent temper, and had seen him on

numerous occasions punching lockers at the police station. (Affid. ¶ 10.)  In fact,

Kapua has had more than five (5) internal complaints lodged against him [Ex. O,

KPD's Response to First Request for Admissions ("KPD RA1") at 13.], and had a

complaint filed against him for entering and searching a residence without consent

or a search warrant (Ex. Q, Kauai Police Commission Complaint documents).

Former KPD Chief Wilfred Ihu (another defendant in this case) admitted that he

had heard of allegations that Kapua had punched lockers at the police station. [Ex.

C, Deposition Transcript of Wilfred Ihu ("Ihu Deposition") at 21:4-16.]

Because of her fear of Kapua and possible retaliation, after Herron's allegations about Kapua, Plaintiff became severely distressed and was admitted to Kauai Veterans Memorial Hospital Emergency Unit ("hospital"). (Affid. ¶ 40.) Due to stress, Plaintiff had been suffering sleeplessness, diarrhea, dehydration, severe coughing, stomach pains and other physical stress-related symptoms.  (Id; CS ¶11)  Plaintiff was in the hospital for approximately ten hours, and injected with intravenous fluids.  (Affid. ¶40.)  She was out on stress/sick leave for two days.  (Id. ¶ 41.)  When she returned back to work, Plaintiff reported to her supervisor, Lt. Alejandro Quibilan ("Quibilan"), what Herron had told her about Kapua and the alleged corruption.  Lt. Quibilan then interviewed Herron. (Id. ¶¶ 42, 43.)

Plaintiff and Lt. Quibilan met with and reported Herron's allegations directly to Acting Chief Ihu and Assistant Chief Gordon Isoda. (Id. ¶¶ 44, 45.)  Upon Ihu's orders, Plaintiff put the allegations in writing. (Id. ¶ 46.)  During this first meeting, Plaintiff and Lt. Quibilan asked Acting Chief Ihu to order Kapua to stay away from Plaintiff and from Vice investigations. (Id. ¶ 45.)

On January 19, 2004, Plaintiff reported the information she had received about Kapua's activities in writing to Lt. Quibilan, who forwarded the report up the chain of command. (Ex. E, Quibilan Deposition at 28:2-10; CS ¶5.)  Chief Ihu admitted to receiving this report.  (Ex. C, Ihu Deposition at 14:15-16.)

Plaintiff made her reports to her supervisors and superior officers for several reasons. One was her professional duty. Another was as a resident and citizen concerned about corruption and allegations of corruption. (CS ¶ 4.)

At about this time, Ihu supposedly ordered Kapua to stay away from Plaintiff. (Ex. C, Ihu Deposition at 25:14 to 26:1.) Kapua expressed animosity to Ihu about Plaintiff. (Id. at 28:5-7.)

Eventually, Wes Kaui ("Kaui") was assigned by Chief Ihu to perform a criminal investigation, and Roy Asher ("Asher") was assigned by Chief Ihu to perform an administrative investigation. [Ex. R, Deposition transcript of Wes Kaui ("Kaui Deposition") at 10:20-25; Ex. C, Ihu Deposition at 15:12-17; Ex. S, Ihu Memo dated 2/9/04; Ex. C, Ihu Deposition at 15:12-23.] Kapua refused service of a notice of an internal investigation of the allegations against him. [Ex. I, Kapua Response to First Request for Admissions ("Kapua RA1") at 25, 26; Ex. XX, "Police Report KPD-1A-04-01 by Roy Asher"].

The FBI was contacted and became involved in the criminal investigation. (Ex. C, Ihu Deposition at 16:5-13) Plaintiff reported all her knowledge to the FBI. (Affid. ¶ 48.) After Plaintiff reported the allegations made by Herron, Kapua publicly and privately called her derogatory names and threatened her. Kapua referred to Plaintiff as a "bitch" and a "cunt" in the workplace. (CS ¶¶ 6, 8.) In

6

one instance, Kapua shouted "fuck" or "fuck you" to her in a public restaurant while she was with Lt. Quibilan. (CS ¶ 7.)  Plaintiff was very upset by this and directly verbally told Chief Ihu about the incident in the restaurant. (Ex. C, Ihu Deposition at 13-15.)

Kapua's conduct of shouting "fuck" or "fuck you" at Plaintiff in a restaurant is a violation of KPD Standards of Conduct. (Ex. C, Ihu Deposition at 24-25.) Despite this, and Plaintiff's report, no investigation of the restaurant incident was done.  Lt. Quibilan, witness to the incident, was never interviewed about it. (Ex. E, Quibilan Deposition at 19.)

On another occasion, after Plaintiff reported Herron's allegations about Kapua, Kapua approached her while she was alone in a stairwell at the police station and called her a "bitch" and/or a "cunt".  (CS ¶ 8.) This terrified Plaintiff. [Id; Affidavit at 55; Ex. E, Quibilan Deposition at 20-22; Ex. P, Deposition of Gordon Isoda ("Isoda Deposition") at 55:19 to 56:4;  Ex. T, Deposition of Dean Pigao ("Pigao Deposition") at 36:25 to 37:8; Ex. C, Ihu Deposition at 28:17 to 29-2.] Kapua told his superiors that he had called Plaintiff a "bitch" and/or a "cunt". (Ex. P, Isoda Deposition at 55:19 to 56:4; Ex. T, Pigao Deposition at 36:25 to 37:8; Ex. C, Ihu Deposition at 28:17 to 29-2.), and his superiors knew and understood that he did this as a reaction to Plaintiff's report of the allegations by Herron (Id.).

Plaintiff reported this incident to Lt. Quibilan and directly told Chief Ihu on more than one occasion that she was afraid of Kapua. (Ex. E, Quibilan Deposition at 20-22; CS ¶¶ 9,10.)

After Plaintiff's report of the allegations by Herron, it was generally known at KPD that Kapua did not like Darla.  [Ex. YY, deposition transcript of Lawrence Stem ("Stem Deposition") at 58:17 to 59:16.]  Fellow officers began to avoid being around Plaintiff because they were worried about what Sgt. Kapua might do to them. (Affid.¶¶ 59, 69.)  Because of Kapua's actions and Plaintiff's fear for her safety, Plaintiff broke down and cried in the office of her supervisor at Vice several times. (Ex. E, Quibilan Deposition at 58:17 to 59:16.)

Due to her fear for her safety and the difficulties involved in working in the same building as Kapua, Plaintiff began to consider a temporary transfer out of Vice, and discussed it with her direct supervisor, Lt. Quibilan. (CS ¶ 12.)  Plaintiff discussed this possibility separately with SHOPO representative Bryson Ponce and Chief Ihu. (Ex. C, Ihu Deposition at 29:11-22; Affid. ¶ 62.)  She told both men that she was afraid of Sgt. Kapua and possible further retaliation from him. (Id.)  Both men told her that such a transfer should be acceptable.  (Id.)  Neither man mentioned that it would be "permanent" or that she would receive a reduction in pay. (Id.)

On March 31, 2004, due to the stress caused by Kapua's actions, Plaintiff requested in writing a temporary transfer to the Patrol Services Bureau in the District of Waimea "until this matter can be resolved." (Affid. at ¶ 65.) Plaintiff was transferred on approximately April 2, 2004. (Ex. V, Ihu 4/2/04 memorandum). Although she did not find this out until later, Plaintiff's rank was changed from Police Officer II at a salary range of PO-9 to a Police Officer I at a salary range of PO-7. (Ex. W, 5/6/04 Notice from Director of Personnel Services; Affid. ¶¶ 67, 98; CS ¶ 13.) This represented a substantial demotion, reduction in pay, and loss of income for Plaintiff. (Affid. ¶ 68.)

After her transfer to patrol, Plaintiff expressed her desire to return back to Vice, but despite this desire, Plaintiff did not feel safe working in proximity to Kapua again. (Ex. E, Quibilan Deposition at 75:14-21; Ex. Y, Abbatiello 9/14/04 Memo; Affidavit at ¶¶ 61, 65, 66, 71.)

On or about April 18, 2004, Plaintiff found a death threat in her personal dictionary on KPD premises. She saw that three red arrows had been drawn on the dictionary and pointing to the word "DEATH" in the dictionary. Next to the definition of "DEATH", her name was written in red ink with an arrow pointing to the definition. (CS ¶ 14.) Plaintiff reported the death threat to her supervisors, and to the FBI. (Id.) The FBI questioned and took handwriting samples of numerous officers in connection to the death threat incident. (Affid.¶ 75, 76.) There were

rumors among KPD officers that Kapua wrote the death threat in Plaintiff's dictionary. [Ex. AA, deposition transcript of Eric Caspillo ("Caspillo Deposition") at 38.]

On or about May 6, 2004, Lum became Acting Chief of KPD.  (Ex. B, Lum Answer to Complaint at  ¶ 4b.)  Prior to becoming Acting Chief, Lum was briefed by Wilfred Ihu about the Kapua investigation, and told it was important that he talk to Kaui and Asher about their investigations. (Ex. C, Ihu Deposition at 56:22 to 57:18; Id. at 57:8-11; CS ¶ 19.)  Shortly after Lum became Chief, Sgt. Wes Perreira ("Perreira") approached Plaintiff at headquarters and told her that she had better do everything right because "they" are watching everything she did because she reported the allegations against Kapua.  (Affid. ¶ 72.)

On May 6, 2004, Plaintiff received formal notice from the Kauai County Department of Personnel Services that she had been demoted to PO 7.  (Ex. W, 5/6/04 Notice from Director of Personnel Services.)  Prior to this date, Plaintiff was never informed that her pay would be decreased nor did she ever receive notice that she was being demoted to PO 7.  (Affid. ¶¶ 65, 66, 67.)

Even after she transferred to the Waimea substation, Plaintiff sometimes needed to go to the Lihue headquarters for work.  When she did so, she always tried to avoid seeing and being seen by Kapua.  On more than one occasion, Plaintiff took a roundabout course to avoid passing by Kapua's office, sometimes

asking for someone to accompany her.  (Affid. ¶ 78.)  Plaintiff did this because she
was afraid for her safety.  (Id. at ¶ 78, 79.)

Plaintiff met with Lum on or about June 23, 2004.  (Affid. ¶ 80.)  Sgt.
Perreira was present in this meeting as well.  (Id.)  During this meeting, Kapua
stood outside Lum's door and "stared down" Plaintiff.  (Id., CS ¶ 20.)  Kapua's
behavior was so disruptive to the meeting that Lum was forced to close his office
door.  (Affid. ¶ 80.)  During the meeting on June 23, 2004, Plaintiff expressed her
fear of retaliation against her because of her report of Herron's allegations. (CS ¶
20.)  After the meeting, Plaintiff, Sgt. Perreira, and Lt. Regina Ventura ("Ventura")
passed Kapua's office, and heard Kapua start yelling. (Affid. ¶ 81; CS ¶ 22.)
Kapua told Acting Assistant Chief Pigao that he was upset because Sgt. Perreira
and Lt. Ventura had walked past his office with Plaintiff. (Affid. ¶ 83;  Ex. T,
Pigao Deposition at 13:2-10.)   Later that same day, Acting Assistant Chief Pigao
suggested a policy directly to Plaintiff that she avoid walking by Kapua's office,
by using the back stairwell or a different hallway;  this policy was, in effect, an
instruction and order.  (CS ¶ 21;  Ex. CC, 06/29/04 KPD Memorandum from Pigao
to Lum;  Ex. T, Pigao Deposition at 25:20 to 27:25.)   At this time, Pigao was
Acting Assistant Chief, and, thus, was Plaintiff's and Sgt. Kapua's superior
(although Pigao and Kapua were friends.) (Ex. T, Pigao Deposition at 36:1-7.)

No policy was suggested or put in place that Sgt. Perreira or Lt. Ventura avoid walking by Kapua's office, even though he was also upset with them. (CS ¶ 24; Ex. T, Pigao Deposition at 28:11-23.)  Typically, an officer who worked in Vice was able to use both the front entrance and back entrance to the Vice office. (Ex. AA, Caspillo Deposition at 12:22-24.)

Lt. Ventura expressed to Pigao and to Chief Lum that she felt his policy that Plaintiff should avoid Kapua's office and use the back door was improper.  (Ex. CC, 06/29/04 Pigao Memo;  Ex. T, Pigao Deposition at 25:5-18 and 27:18-20.) Plaintiff was upset by the policy and order requiring her to use the back door to avoid Kapua. (Ex. E, Quibilan Deposition at 46:6-8; Affid. ¶¶ 84, 85, 86.)

At the time Pigao informed Lum, verbally and in a memo, of Pigao's discussion with Plaintiff, Lum neither overruled nor changed Pigao's order to Plaintiff. (Ex. T, Pigao Deposition at 30:5-19.)  As Acting Chief of KPD, Lum was senior in rank to Sgt. Kapua, Plaintiff, and Asst. Chief Pigao. (Ex. RR, Lum RA1 at Adm. 11, 12, 13.)

Lum has taken no disciplinary action against Kapua.  (CS ¶ 25.)

Before reporting Herron's allegations, Plaintiff had frequently requested and been assigned cellblock duty in the past for overtime pay. (Affid. ¶ 87.)  Plaintiff desired cellblock duty because she earned extra compensation for performing this duty.  (Id. ¶ 88.)  Cellblock duty included intake of arrestees in KPD's cellblock

facility. (Id. ¶ 89.)  On at least one occasion following her complaints against Kapua, when Plaintiff worked in the isolated cellblock area, Kapua relieved her from cellblock duty. (Id. ¶ 90.)  Plaintiff felt threatened when this occurred, and requested that such contact be avoided.  (Id. ¶ 91.)  A supervisor responded to Plaintiff's request by writing a note on the cellblock sign-in log that Plaintiff could no longer work in cellblock until further notice.  (Id.)  Kapua continued to request and be assigned to cellblock duty.  (Id. ¶ 92.)  Because of Kapua's presence, Plaintiff has been unable to work in the cellblock.  (Id. ¶ 93.)  After June 23, 2004, Plaintiff has not worked in KPD cellblock.  (CS ¶ 30.)  Since Plaintiff has been unable to work in the cellblock because of Kapua's presence in cellblock, Plaintiff has suffered and continues to suffer a loss of compensation. (Id.)

Prior to April 29, 2004, KPD was governed by the County of Kauai's policy on workplace violence, and had no policy of its own.  (CS ¶ 16.)  On April 29, 2004, Acting Chief Ihu enacted KPD General Order 2004-2, regarding workplace violence.  (CS ¶ 15.)  KPD Standards of Conduct set forth the required disciplinary action for violations of the Standards of Conduct.  KPD Standard of Conduct VI-B 3, Security of Departmental Business, was in effect during the period from December 2003 to September 2004 and is still in effect at the present time. (Ex. O, KPD RA1 at Adm. 36, 37.)  KPD Standard of Conduct VI-B 6, Commission of any Criminal Act, was in effect during the period from December 2003 to September

2004 and is still in effect at the present time. (Id. at Adm. 38, 39.) KPD Standard of Conduct VI-B 1, Physical Abuse, was in effect during the period from December 2003 to September 2004 and is still in effect at the present time. (Id. at Adm. 40, 41.)

KPD Standards of Conduct VI-B 1, 3, and 6 are all Class B Standards. (Id. at Adm. 42, 43, 44.) The minimum disciplinary action for a violation of KPD Class B Standard of Conduct is suspension of one working day. (Id. at Adm. 45.)

KPD Standard of Conduct VI-C 1, Solicitation and Acceptance of Gift, Gratuities, Fees, Rewards, Loans, Etc., was in effect during the period from December 2003 to September 2004 and is still in effect at the present time. (Id. at Adm. 46, 47.) KPD Standard of Conduct VI-C 4, Conduct Toward Superior and Subordinate Officers and Associates, was in effect during the period from December 2003 to September 2004 and is still in effect at the present time. (Id. at Adm. 48, 49.)

KPD Standards of Conduct VI-C 1 and 4 are Class C Standards. (Id. at Adm. 50.) The minimum disciplinary action for a violation of KPD Class C Standard of Conduct is written reprimand, and the maximum disciplinary action for a violation of KPD Class C Standard of Conduct is dismissal. (Id. at Adm. 51, 52.)

14

Kapua's conduct has violated each one of these Standards.  However, there is no record and certainly no testimony, that he has received any of the disciplinary actions required under the Standards. (CS ¶ 17.)

On or about April 24, 2005, while on duty, Plaintiff was ordered by Perreira, a  supervisor in Vice, to assist in a strip search of two female arrestees and to photograph each of them in a naked condition.  (CS ¶ 26.)  Plaintiff and one other female officer, Vicki Fonoimoana ("Fonoimoana"), assisted in the searches of the arrestees with negative results for illegal substances or contraband.  (Id., Affid.¶ 99.)  Plaintiff believed that photographing two naked female arrestees who had already been searched with negative results was unnecessary, humiliating and improper. (CS ¶ 26; Affid.¶ 100.)  Plaintiff told  Perreira that the two females should not be photographed naked and that she would not do it. (Id.)  The Vice supervisors later told Plaintiff that they had called the County Prosecutor, Richard Minatoya, who had told them that it was okay to strip search and take nude photographs of the two female arrestees.  (CS  ¶ 26; Affid.¶ 101.)  Sgt. Fonoimoana took the photographs of the two female suspects naked.  (CS ¶ 26; Affid. ¶ 102.)

As of April 24, 2005 when the strip search incident occurred, there was no KPD General Order or policy governing strip searches and body cavity searches. (CS ¶ 27.)  The next day, Plaintiff verbally reported the incident, and her refusal to

participate in it to Sgt. Dan Abadilla and Quibilan, and made her written report on May 2, 2005. (Affid. ¶ 103.)

On or about May 9, 2005, Plaintiff reported the above-referenced incident in writing to the Kauai County Police Commission.  (Affid. ¶ 104; Ex. EE, Daniel Hempey letter dated 5/9/05.)  Plaintiff also reported the strip search incident to the FBI.  (Id. ¶ 105.)  Plaintiff was never interviewed for any kind of internal KPD investigation into her complaint.

On or about October 27, 2005, Plaintiff was served with a Kauai Police Commission complaint against her and other officers by complainant Marilyn Prem, alleging that she had been arrested, a body cavity search had been conducted, and photographs had been taken of the search. (Ex. OO, First Amended Complaint.)  Marilyn Prem was one of the two female arrestees who were searched and photographed on April 24, 2005.  (Ex. YY, Stem Deposition at 12-13.)  On or about October 28, 2005, Plaintiff received a letter from the Kauai Police Commission advising her that a Police Commission investigator would be investigating her. (Ex. PP, 10/28/05 Kauai Police Commission letter.)  To date, neither Defendants Lum, KPD, nor the County have responded to Plaintiff's May 2 and May 9, 2005 complaints concerning the order that she photograph the naked female arrestees.

On or about May 25, 2005, Lum ordered that a new KPD policy regarding strip searches of arrestees be drafted.  [Ex. MM, Deposition of Paul Kanoho ("Kanoho Deposition") at 15:20 to 16:2.]  This policy was almost identical to a similar policy adopted by the Hawaii County Police Department.  (Ex. KK, Hawaii County Police Department Strip and Body Cavity Searches;  Ex. LL, Draft KPD Strip and Body Cavity Search Policy at page 3, sec. 4e.)  The only substantive difference was an added provision that KPD officers must photograph the search at every stage of the arrest process. (Id.)  Lum added or ordered this new provision to the policy that KPD officers must photograph the search at every stage of the arrest process. (Ex. MM, Kanoho Deposition at 32-34.)

Lum added an "effective date",  actually a back-dating of the strip search policy, to approximately one month before the illegal strip search incident in which Plaintiff was ordered to photograph naked female arrestees. (CS ¶ 28; Ex. LL, supra; Ex. MM, Kanoho Deposition at 42:21 to 45:16.)  It is not normal practice for the Chief to put an "effective date" on a draft General Order. (Ex. MM, Kanoho Deposition at 42:21 to 45:16.)

Another instance of retaliation involved Plaintiff's status as Field Training Officer ("FTO").  On or about May 25, 2005, Lt. Asher told Plaintiff that she was being removed from her position as an FTO for KPD. (Affid. ¶ 140;  CS ¶ 29.)  This was confirmed on May 25, 2005, by internal KPD e-mail. (Ex. FF, 5/23/05

17

and 5/26/05 e-mail string.)  The reason given for her removal from her FTO position was that she was not trained in Standard Field Sobriety Testing ("SFST") procedures.  (Ex. GG, 7/5/05 letter from Deputy Chief H. Venneman.)  In fact, Plaintiff had been certified to conduct the SFST. (Ex. HH,  7/22/05 Abbatiello letter.)  Plaintiff was informed that she would not be re-instated until she attended a four-day training course. (Ex. GG, supra.)  This training course was then scheduled during Plaintiff's annual vacation, and she was informed that she would not be allowed to attend the training during her vacation. (Ex. II, Training Order 05-070.)

Plaintiff's assignment to FTO duties carried with it increased or additional compensation, and her removal from her FTO position has resulted in a loss of compensation to her. (CS ¶ 29; Affid. ¶ 107.)

Although Kapua admitted to calling Abbatiello a "bitch" and a "cunt" in the workplace, clear violations of Standards of Conduct B1 and C4, Defendant Lum has not taken any disciplinary action against Defendant Kapua. (Affid. ¶ 86.)

At his deposition by Plaintiff, Defendant Lum invoked his Fifth Amendment right to silence and privilege against self-incrimination on all relevant questions to this lawsuit. (CS ¶ 31.)

At his deposition by Plaintiff, Defendant Kapua invoked his Fifth Amendment right to silence and privilege against self-incrimination on all relevant questions to this lawsuit. (CS ¶ 32.)

III.    ARGUMENT

    A.    STANDARD OF REVIEW

Fed. R. Civ. P. 56(c) provides that summary judgment shall be granted where there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment must be granted "forthwith," unless the court determines that further time for discovery should be allowed. T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) citing Fed.R.Civ.P. 56(f).

> A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

> "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." T.W. Elec. Service, Inc., supra, 809 F.2d at 630 (citations omitted).

/

/

/

B.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT
       AGAINST DEFENDANTS LUM AND KAPUA.

1.    Defendant Kapua Has Failed To Offer Any Evidence To Create
       an Issue of Any Material Fact.

The basic facts that prove each of Plaintiff's claims against Defendant

Kapua are the same: Herron made statements to Plaintiff alleging that Kapua was

involved in police corruption.  Plaintiff reported these allegations out of her

concern as a citizen and resident, and as part of her professional duty.  In

retaliation, Kapua publicly and privately called her derogatory names, threatened

her, and caused her to suffer great fear and stress.  Kapua referred to Plaintiff as a

"bitch" and a "cunt" in the workplace.  He shouted "fuck" or "fuck you" to her in a

public restaurant while she was with Lt. Quibilan  He threatened her while she was

alone in a stairwell.   He even possibly made a death threat to her.  He caused other

officers to be afraid to associate with her.

Plaintiff has put forth specific and reliable evidence to support each of these

facts.

Defendant Kapua offered <u>no</u> evidence to create a dispute of these material

facts in his written discovery responses or his deposition (in which he invoked his

Fifth Amendment rights against self-incrimination).

2.    Defendant Lum Has Failed To Offer Any Evidence To Create
an Issue of Any Material Fact.

The basic facts that prove each of Plaintiff's claims against Lum are the same: Lum knew, or should have known, of threatening and violent behavior by Kapua outlined above.  He also knew of the order or policy implemented by Assistant Chief Pigao that Plaintiff was to avoid Kapua and use the back entrance when coming to and from the Lihue police station.  Lum allowed Plaintiff to be disallowed from cellblock duty and earning the compensation that comes with it. He was Chief or Acting Chief when Plaintiff was removed from her FTO position, which also led to a loss of compensation for her.  Lum failed to make the workplace safe for Plaintiff to be able to return to her position in Vice.  And finally, Lum failed to respond when Plaintiff filed a complaint about an order to perform the strip search and photographing of two naked female arrestees. Furthermore, Lum backdated a new KPD policy which would have allowed such strip searching and photographing.

Plaintiff has put forth specific and reliable evidence to support each of these facts.

Lum offered no evidence to create a dispute of these material facts in his written discovery responses or his deposition (in which he invoked his Fifth Amendment rights against self-incrimination).

21

3.    Furthermore, Each Defendant's Invocation of His Fifth Amendment Privilege Entitles Plaintiff to An Adverse Inference.

Not only does the Defendants' silence fail to create genuine issues of material facts, it also entitles Plaintiff to an adverse inference on these material facts.

"[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  Baxter v. Palmigiano, 425 U.S. 308, 317, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976).

> A defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege.   Not only is it permissible to conduct a civil proceeding at the same time as a related criminal proceeding, even if that necessitates invocation of the Fifth Amendment privilege, but it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding.
>
> Keating v. Office of Thrift Supervision, 45 F.3d 322, 326 (9th Cir. 1995) citing Baxter, supra, 425 U.S. at 318, 96 S.Ct. at 1557.

"[I]n civil proceedings adverse inferences can be drawn from a party's invocation of this Fifth Amendment right."   Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1264 (9th Cir. 2000) citing SEC v. Colello, 139 F.3d 674, 677 (9th Cir.1998).

However, an adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer.  Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1264 (9th Cir. 2000) (citations omitted).

> Thus, an adverse inference can be drawn when silence is countered by independent evidence of the fact being questioned, but that same inference cannot be drawn when, for example, silence is the answer to an allegation contained in a complaint.  See Nat'l Acceptance Co. v. Bathalter, 705 F.2d 924, 930 (7th Cir.1983).  In such instances, when there is no corroborating evidence to support the fact under inquiry, the proponent of the fact must come forward with evidence to support the allegation, otherwise no negative inference will be permitted.  See LaSalle Bank, 54 F.3d at 391.

> Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1264 (9th Cir. 2000).

> The tension between when to allow the adverse inference, and when not to allow it, stems from the consideration that because, in a civil proceeding, "the parties are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding."  Serafino v. Hasbro, Inc., 82 F.3d 515, 518 (1st Cir.1996).  Thus, not allowing the negative inference to be drawn "poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth."  SEC v. Graystone Nash, Inc., 25 F.3d 187, 190 (3d Cir.1994)[.]

> Glanzer, supra, 232 F.3d at 1264.

Finally, "[t]he tension between one party's Fifth Amendment rights and the other party's right to a fair proceeding is resolved by analyzing each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the

microscope of the circumstances of that particular civil litigation." <u>Glanzer</u>,

supra, 232 F.3d at 1264 (citation omitted).

As stated above, Plaintiff has put forth positive evidence sufficient to prove

her claims against both Lum and Kapua.  By invoking the Fifth Amendment right

against self-incrimination, Defendants have failed to rebut Plaintiff's evidence.

Not only does this remove any dispute as to any material fact, but under <u>Baxter v.</u>

<u>Palmigiano</u>, 425 U.S. 308, 317, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976) and its

progeny, Defendants' silence entitles Plaintiff to adverse inferences against

Defendants.

   4. Plaintiff is Entitled To Summary Judgment As a Matter of Law
     on her Claims Against Defendants Lum and Kapua.

42 U.S.C § 1983 provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress[.].

 42 U.S.C § 1985(3) provides, in relevant part:

> in any case of conspiracy set forth in this section, if one or more
> persons engaged therein do, or cause to be done, any act in
> furtherance of the object of such conspiracy, whereby another is
> injured in his person or property, or deprived of having and

> exercising any right or privilege of a citizen of the United
> States, the party so injured or deprived may have an action for
> the recovery of damages occasioned by such injury or
> deprivation, against any one or more of the conspirators.

In Pickering v. Board of Ed. of Township High School Dist., 391 U.S. 563,

568 (1968)) the Court set forth the test of whether speech in the workplace is

entitled to protection under 42 USC 1983.

> To be protected, the speech must be on a matter of public concern, and
> the employee's interest in expressing herself on this matter must not
> be outweighed by any injury the speech could cause to "the interest of
> the State, as an employer, in promoting the efficiency of the public
> services it performs through its employees.

The Pickering analysis was expanded to include private communications by

employees with their employers in the case of Givhan v. Western Line Consol.

School District, 439 US 410 (1979).  ("Neither the [1st] Amendment itself nor our

decisions indicate that this freedom is lost to the public employee who arranges to

communicate privately with his employer rather than spread his views before the

public."  At 696.)

In Connick v. Meyers, 461 U.S. 138, 142 (1983), the Supreme Court

explored the "public concern" prong of the Pickering test.  In Connick, the Court

found that, although many of the topics discussed in a fired District Attorney (the

Plaintiff) questionnaire were matters of private dispute by the employee, one topic

25

was of "public concern."   The topic: forced political campaign involvement.
Connick at 149.

Here, Plaintiff states that the issue of potential corruption in the Kauai police department is a matter of public concern, and that she made her internal reports, as well as cooperated with the FBI investigation, out of a sense of duty as a citizen. Plaintiff's concerns were very much akin to the topic in Connick, and are completely inapposite to the issues and the narrow holding involved in Garcetti v. Ceballos, 125 US 1951 (2006), (DA memo which addressed flaws in a search warrant in a pending criminal case).

The issue of violence in the workplace especially within a police department is, similarly, a matter of public concern. Plaintiff's reports of having received death threats, having had her gun stolen from a locked police facility and suffering from numerous hostile stares, swearing, and threats were certainly within her rights as a citizen to talk about and complain about, as a matter of law.  See Gilbrook v. City of Westminster, 177 F3d 839 (1999) ("Indeed firefighters, such as Garrison, are members of the community who are most likely to be informed and have definite opinions about the sufficiency of firefighting services".  At 867, citing from Kannisto v. City and County of San Francisco, 541 F2d 841, 843, making a similar observation about police officers).

Lum's and Kapua's conduct was certainly not aimed at promoting the efficiency of the public service the Kauai Police Department performs either. Plaintiff has alleged that the conduct was aimed at silencing her, punishing her and intimidating her. Defendant's Lum and Kapua have not offered any evidence to suggest that demoting Plaintiff was done to promote efficiency. They have instead, pled the 5th.

Each of the above-described acts were, instead, deliberate acts of retaliation against her for exercising her 1st Amendment right to speak on matters of concern to the public, as well as concern for her own safety.

In <u>Blair v. City of Pomona</u>, 223 Fed 1074 (2000), a police officer revealed corruption within department to a supervisor, and was retaliated against. The Court, in discussing overturning the summary judgment against Plaintiff on issue of protected speech, and custom of deliberate indifference to officers reporting misconduct on the job, states: "The seriousness of such a custom and the need of a civil rights remedy for it is underlined by what has been observed around the country as to the code of silence in police departments [citations omitted]". At 1081.

In <u>Alpha Energy Savers, Inc. v. Hansen</u>, 381 F.3d 917, 928 (9th Cir. 2004), the court stated:

> A public employee's testimony addresses a matter of public concern if it contributes in some way to the resolution of a judicial or administrative proceeding in which discrimination or other significant government misconduct is at issue - even if the speech itself would not otherwise meet the Connick test were we to consider it in isolation.
> . . .
> Specifically, if a witness's testimony directly addresses governmental corruption or discrimination, it can satisfy the public concern test, even if it is offered in the course of a judicial or administrative proceeding that involves only purely private grievances of issues.

Furthermore, the causal link between a protected activity and the alleged retaliatory action "can be inferred from timing alone" when there is a close proximity between the two. Thomas v. City of Beaverton, 379 F.3d 802, 809 (2004), quoting Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002).

Finally, although an employee need not expressly accuse her employer of illegal activity, "she may convey an implicit message of disapproval of the illegality of the activity [racial discrimination against another employee] through her conduct by refusing to facilitate or participate in it." Thomas, supra, 379 F.3d at 809 (emphasis added).

Plaintiff's claims are not refuted by Defendant's Lum and Kapua. Accordingly, the Pickering (391 U.S. 56) test is satisfied, and given the adverse inferences against Lum and Kapua, judgment on Count I should issue as a matter of law.

5.    Count III: Whistleblower's Protection Act.

Haw. Rev. Stat. § 378-62 provides:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because: (1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:

(A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States; or

(B) A contract executed by the State, a political subdivision of the State, or the United States,unless the employee knows that the report is false; or

(2) An employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Under HRS § 378-61, Plaintiff is an employee of KPD and the County of

Kauai:

'Employee' means a person who performs a service for wages or other remuneration under a contract for hire, written or oral, express or implied. Employee includes a person employed by the State or a political subdivision of the State.

Under HRS § 378-61, KPD and the County of Kauai are employers of

Plaintiff:

'Employer' means a person who has one or more employees. <u>Employer includes an agent of an employer or of the State or a political subdivision of the State</u>.

Defendant Lum is therefore an employer of Plaintiff, since as Acting Chief and Chief of KPD, he is an agent of the County and KPD.

Within the meaning of §378-61 et. seq., "Public body" means:

(1) A state officer, employee, agency, department, division, bureau, board, commission, committee, council, authority, or other body in the executive branch of state government;

(2) An agency, board, commission, committee, council, member, or employee of the legislative branch of the state government;

(3) A county, city, intercounty, intercity, or regional governing body, a council, special district, or municipal corporation, or a board, department, commission, committee, council, agency, or any member or employee thereof;

(4) Any other body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body;

(5) A law enforcement agency or any member or employee of a law enforcement agency; or

(6) The judiciary and any member or employee of the judiciary.

Both Plaintiff's reports to KPD, the police Commission, and to the FBI were reports to public bodies within the meaning of HRS 378-62.

By knowingly forcing Plaintiff to put up with threatening and violent behavior from Sgt. Kapua; by allowing her to be ostracized and isolated because

fellow officers were intimidated by Sgt. Kapua; by allowing a directive from Assistant Chief Pigao requiring Plaintiff to avoid Sgt. Kapua's office by using the back entrance and alternative hallways; by failing to provide a safe workplace so that Plaintiff could remain (and return to) her position in Vice; by removing her from cellblock duty and her FTO position and the compensation those provide; by attempting to backdate the strip search policy; and by failing to respond to Plaintiff's reports of various improprieties, Lum discriminated against Plaintiff "regarding the employee's compensation, terms, conditions, location, or privileges of employment", HRS §378-62.

In Crosby v. State Dept. of Budget & Finance 76 Haw. 332, 341, 876 P.2d 1300, 1309 (Haw. 1994), the Hawaii Supreme court held that, "[f]or purposes of state employee's claim under Hawai'i Whistleblowers' Protection Act (HWPA), reassignment of project on which employee was working to co-worker affected "condition of employment." Therefore, Plaintiff's demotion out of Vice to patrol is a "condition of employment" upon which she was discriminated.

This discrimination was all because Plaintiff reported suspected violations of KPD Standards of Conduct and other laws and rules adopted pursuant to law of the State of Hawaii, County of Kauai, and the United States, both to KPD superiors and to outside public bodies, such as the FBI and the County Police Commission.

6.    Count IV: Wrongful Termination in Violation of Public Policy.

Under Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625, 631 (1982), and other case law, "an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy."

"In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme." Id.

The relevant statutory scheme here is the Hawai'i Whistleblower's Protection Act, ("HWPA") HRS §378-61 et seq.  As discussed in see Section 4(c) above, Defendants' actions violate the letter of HWPA.

> Defendant's actions also violate the purpose or policy of HWPA: Legislative history confirms that the HWPA provides protection to employees who report suspected violations of law from "any form of retaliation by their employers." Sen.Stand.Comm.Rep. No. 1127, in 1987 Senate Journal, at 1392 (emphasis added). Specifically, the legislature intended that the HWPA bar "discharge, discrimination and other forms of adverse action···" Sen.Stand.Comm.Rep. No. 833, in 1987 Senate Journal, at 1249 (emphasis added). Furthermore, the HWPA is a remedial statute. See Flores v. United Airlines, Inc., 70 Haw. 1, 12 n. 8, 757 P.2d 641, 647 n. 8 (1988) (citations omitted). As such, the HWPA should be construed liberally to accomplish the purpose for which it was enacted. Id. (citation omitted);

> Crosby v. State Dept. of Budget & Finance  76 Haw. 332, 341-342, 876 P.2d 1300, 1309 - 1310 (Haw. 1994) (emphasis in original).

Plaintiff's transfer and demotion out of Vice is a violation of this public policy expressed in HWPA.

32

7.    Count V: Employer Negligence in Supervision/Retention of Employee.

"The relationship of employer and employee may, under certain circumstances, create a duty on the employer to control the conduct of the employee when the acts complained of are so connected with the employment in time and place as to give the employer a special opportunity to control the employee." Abraham v. S.E. Onorato Garages, 50 Haw. 628, 633-4 (1968).

Under Hawaii law, a plaintiff can establish a claim for negligent supervision, if the plaintiff shows that "the employer knew or should have known of the necessity and opportunity for exercising such control." Abraham v. S.E. Onorato Garages, 50 Haw. 628, 634, 446 P.2d 821, 826 (1968).

Here, KPD, the County, and Lum all knew and should have known the necessity of controlling Kapua.  Kapua has had more than five (5) internal complaints lodged against him, and had a complaint filed against him for entering and searching a residence without consent or a search warrant.  There were rumors among KPD officers that Kapua wrote the death threat in Plaintiff's dictionary.  Kapua had previously been investigated for a violation of Standard of Conduct B3, Security of Departmental Business.  This violation was confirmed.  Kapua referred to Plaintiff as a "bitch" and a "cunt" in the workplace, threatened her while she was alone in a staircase, and shouted "fuck" or "fuck you" to her in a public restaurant

33

while she was with Lt. Quibilan.  Plaintiff reported every incident either through the chain of command or directly to the Chief.

Moreover, Kapua told his superiors that he had called Plaintiff a "bitch" and/or a "cunt", and his superiors knew he did this as a reaction to Plaintiff's report of the allegations by Herron After Plaintiff's report of the allegations by Herron, it was generally known at KPD that Irvil did not like Darla.

Lum witnessed "stare down" Plaintiff, and disrupt a meeting she was having with the Chief. During this meeting, Plaintiff expressed her fear to Lum of retaliation against her because of her report of Herron's allegations.

Furthermore, Lum knew about Kapua's outburst on June 23, 2004 in response to Plaintiff, Sgt. Perreira, and Lt. Ventura walking by his Kapua's office. This outburst prompted A.C. Pigao to instruct Plaintiff to avoid Sgt. Kapua.  It appears that while the Lum and Pigao were aware of Kapua's volatile temper, they chose to require Plaintiff to change, instead of disciplining and controlling Sgt. Kapua.

Given all this, Lum "knew or should have known of the necessity and opportunity for exercising . . . control" over Sgt. Kapua. Abraham v. S.E. Onorato Garages, 50 Haw. 628, 634, 446 P.2d 821, 826 (1968).

However, the records provided by the County show that Lum has taken no formal disciplinary action against Kapua. Again, Lum refused to testify.

34

       8.    Count VI: Intentional Infliction of Emotional Distress.

The elements of the tort of intentional infliction of emotional distress are: 1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another. Hac v. University of Hawaii, 73 P.3d 46 (2003).

Kapua's actions were intentional and caused Plaintiff severe emotional distress. Kapua publicly and privately called her derogatory names and threatened her. Kapua referred to Plaintiff as a "bitch" and a "cunt" in the workplace. He shouted "fuck" or "fuck you" to her in a public restaurant while she was with Lt. Quibilan  He threatened her while she was alone in a stairwell, leaving her terrified. He even possibly made a death threat to her. He caused other officers to be afraid to associate with her leaving Plaintiff isolated and ostracized.

Not only did Kapua realize that his actions would cause emotional distress, it appears that Plaintiff's distress was his goal. In fact, he bragged about calling her "bitch" and "cunt", and swearing at her in the restaurant. This is malicious behavior.

Kapua's actions, in addition to violating workplace violence policies and KPD Standards of Conduct, were outrageous and clearly beyond the bounds of conduct recognized as appropriate by society.

Lum's actions were also intentional and unreasonable. While knowing that Plaintiff was afraid, distressed and fearful, he did nothing to create a safe workplace so that she could return to Vice, a job that she had loved. He knowingly forced Plaintiff to put up with threatening and violent behavior from Sgt. Kapua; he allowing her to be ostracized and isolated because fellow officers were intimidated by Sgt. Kapua; he knowingly allowed a directive from Assistant Chief Pigao requiring Plaintiff to avoid Kapua's office by using the back entrance and alternative hallways; he allowed her to be removed her from cellblock duty and her FTO position and the compensation those provide; and he ignored Plaintiff's reports of improprieties in the strip search incident, and then attempted cover up the improprieties by backdating the strip search policy.

Lum knew that his and Kapua's actions were causing her distress and that she was afraid, because Plaintiff had told him. This behavior from a supervisor, the Chief of Police no less, is reckless, if not intentional, and is beyond the bounds of conduct normally expected from someone with Lum's responsibility.

      9.    Count VII: Negligent Infliction of Emotional Distress.

The elements of the tort of negligent infliction of emotional distress are: (1) that the defendant engaged in negligent conduct; (2) that the plaintiff suffered serious emotional distress; and (3) that such negligent conduct of the defendant

was a legal cause of the serious emotional distress. <u>Calleon v. Miyagi and MTL</u>, 76

Hawai'i 310, 320, 876 P.2d 1278 (1994).

Due to stress, Plaintiff has been suffering sleeplessness, diarrhea,

dehydration, severe coughing, stomach pains and other physical stress-related

symptoms.  Plaintiff was in the hospital for approximately ten hours, and injected

with intravenous fluids. She was out on stress/sick leave for two days.  She has

been forced to seek intense psychological therapy.

      10.    Count VIII: Violation of Rights Under Constitution of State of
               Hawaii.

Article I, section 5 of the Hawaii Constitution provides that "[n]o person

shall be deprived of life, liberty or property without due process of law, nor be

denied the equal protection of the laws[.]"

All of the acts of retaliation entailed above violated Plaintiff's rights secured

under the Hawaii Constitution rights to freedom of speech (reporting corruption as

a citizen), due process of law (having her grievances taken seriously and acting

upon), equal protection of the law (being protected from violent and improper

behavior in the workplace).

These deprivations of her civil rights resulted in loss of compensation at

work through cellblock and the FTO program, and intense mental and emotional

stress caused by constant fear of retaliation and Kapua's and Lum's actual

retaliatory acts.

IV.  CONCLUSION

For all of the foregoing reasons, Plaintiff is entitled to summary judgment on

Counts I – VIII of her First Amended Complaint against Defendant Lum and on

Counts I, II, IV, VI, VII, and VIII against Defendant Kapua.

DATED:  Honolulu, Hawaii, January 12, 2007.


   /s/ John Hoshibata
DANIEL G. HEMPEY
MARGERY S. BRONSTER
JOHN T. HOSHIBATA
JEANNETTE HOLMES CASTAGNETTI
Attorneys for Plaintiff
DARLA ABBATIELLO