LAW OFFICE OF DANIEL G. HEMPEY
DANIEL G. HEMPEY            7535
ELIF Z. YARNALL            8293
3175 Elua Street, Suite C
Lihue, Hawaii 96766
Telephone No. (808) 632-0000
Facsimile No. (808) 632-2332
hemplaw@hawaii.rr.com

BRONSTER CRABTREE & HOSHIBATA
MARGERY S. BRONSTER                4750
JOHN HOSHIBATA                     3141
JEANNETTE HOLMES CASTAGNETTI    7211
2300 Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813
Telephone No. (808) 524-5644
Facsimile No. (808)599-1881
mbronster@bchlaw.net
jhoshibata@bchlaw.net
jcastagnetti@bchlaw.net

Attorneys for Plaintiff
DARLA ABBATIELLO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DARLA ABBATIELLO, | ) CIVIL NO. CV04 00562 SOM BMK |
| | ) |
| Plaintiff, | ) PLAINTIFF'S MEMORANDUM IN |
| | ) OPPOSITION TO DEFENDANTS |
| vs. | ) COUNTY OF KAUAI, KAUAI |
| | ) POLICE DEPARTMENT, WILRED |
| COUNTY OF KAUAI, KAUAI | ) M. IHU, GORDON ISODA AND |
| POLICE DEPARTMENT, K.C. LUM, | ) DEAN PIGAO'S MOTION FOR |
| WILFRED M. IHU, GORDON | ) SUMMARY JUDGMENT ON, OR IN |
| ISODA, DEAN PIGAO, IRVIL | ) THE ALTERNATIVE DISMISSAL |
| KAPUA, | ) OF COUNTS I AND II OF THE |

|                       |     |                                      |
|-----------------------|-----|--------------------------------------|
|                       | )   | FIRST AMENDED COMPLAINT,             |
| Defendants.           | )   | FILED ON DECEMBER 12, 2006;          |
|                       | )   | CERTIFICATE OF WORD COUNT;           |
|                       | )   | CERTIFICATE OF SERVICE               |
|                       | )   |                                      |
|                       | )   | Date:   February 6, 2006             |
|                       | )   | Time:   9:00 a.m.                    |
|                       | )   | Judge:  Honorable Susan Oki Mollway  |
|                       | )   |                                      |
|                       | )   | Trial Date:  May 8, 2007             |
| _____ | )   |                                      |

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS COUNTY OF KAUAI, KAUAI POLICE DEPARTMENT,
WILRED M. IHU, GORDON ISODA AND DEAN PIGAO'S
MOTION FOR SUMMARY JUDGMENT ON, OR IN THE
ALTERNATIVE DISMISSAL OF COUNTS I AND II OF THE
FIRST AMENDED COMPLAINT, FILED ON DECEMBER 12, 2006

Plaintiff Darla Abbatiello ("Abbatiello"), by and through her counsel, Law

Office of Daniel G. Hempey and Bronster, Crabtree & Hoshibata, respectfully

submits Plaintiff's Memorandum in Opposition to Defendants County of Kauai,

Kauai Police Department, Wilred M. Ihu, Gordon Isoda and Dean Pigao's Motion

for Summary Judgment On, or in the Alternative Dismissal of Counts I and II of

the First Amended Complaint, Filed on December 12, 2006; and the separate

Joinders to Defendants' Motion for Summary Judgment filed by Defendant K.C.

Lum on December 21, 2006, and filed by Defendant Irvil Kapua on January 3,

2007.

## I.     INTRODUCTION

In December  2003, Abbatiello became aware of allegations that Defendant Irvil Kapua ("Kapua"), a superior officer, was receiving, money for protection and "tip-offs" of Vice search warrants.

Contrary to Defendants' claim that Abbatiello <u>only</u> reported Kapua's misconduct in her capacity as a police officer (Defendants' CS ¶ 36), Abbatiello reported the alleged criminal acts as a concerned citizen.  Abbatiello not only reported them to her supervisors and other officers at KPD, but also to the FBI and the State of Hawaii Organization of Police Officers ("SHOPO").  Abbatiello felt deeply about corruption, and she reported Kapua's misconduct because she felt that the community was entitled to a police department free of corruption.  Abbatiello's hatred of corruption mirrors public concern, and her the fact that she was a police officer did not cause her to act any differently than she did as a citizen. (CS ¶ 29.)

When Kapua learned about Abbatiello's report, he immediately began a campaign of intimidation and harassment against her which caused her to fear for her personal safety and her life.  Contrary to Defendants' assertions, retaliation against Abbatiello began well before she was transferred. ( Defendants' CS ¶ 37.) As described in the First Amended Complaint ("Complaint"), Kapua's unlawful actions against Abbatiello included, among other things, repeatedly screaming

obscenities at her on KPD premises and in public, intimidating her, and threatening her with physical harm. (CS ¶ 37.)

Because of Kapua's harassing and threatening actions against Abbatiello, Abbatiello applied for and was granted a Temporary Restraining Order ("TRO") that prohibited Kapua from all contact with Abbatiello at KPD and mandated that Kapua surrender his firearms to KPD. (CS ¶ 46.) KPD has not taken steps to ensure Kapua stay away from Abbatiello, nor has KPD enforced the requirement of the TRO that Kapua relinquish his firearms. (CS ¶ 46.)

In April 2004, Abbatiello discovered that someone had written a death threat in her office dictionary at KPD. (CS ¶ 49.) Abbatiello also discovered that her service weapon was missing from her KPD office. Abbatiello reported these incidents to her superior officers. (CS ¶ 49.)

Despite being promptly notified of these incidents and Kapua's actions, the individual defendants, KPD and the County failed and/or refused to take action to protect Abbatiello from the hostile and violent work environment or to reprimand, punish or discipline Kapua for his actions, even though his actions clearly violated specific KPD Standards of Conduct. (CS ¶ 51.)

Defendants incorrectly contend that the retaliation against Abbatiello ended in 2005. (Defendants' CS ¶ 38.) Defendants continue to retaliate against Abbatiello. (CS ¶ 38.)

After Abbatiello complained, KPD ordered Abbatiello to stay away from Kapua and ordered her to take an unnecessary, circuitous route in and out of the Vice office.  (CS ¶ 48.)  Kapua was not asked or ordered to do anything.

Abbatiello was forced to request a transfer from Vice (in Lihue) to Patrol (in Waimea) in order to avoid working in the area and proximity of Kapua.  What Abbatiello had believed to be a  temporary, lateral transfer turned out to be a permanent transfer and demotion in rank and pay grade, another example of retaliation by KPD and/or the County. (CS ¶ 47.)

Abbatiello has been unable to work overtime in cellblock as she has regularly done for many years because of  KPD's refusal to ensure that Kapua would not be in cellblock when Abbatiello was on cellblock duty. On at least one occasion,  when Abbatiello was working in cellblock, Kapua was present to relieve her from cellblock duty.  Abbatiello felt threatened by Kapua, and requested that further contact be avoided.  A supervisor responded by writing a note on the cellblock sign-in log that Abbatiello could no longer work in cellblock until further notice.  (CS ¶ 39.)

On or about April 24, 2005, KPD ordered Abbatiello to participate in an illegal strip search and photographing of two naked females who had already been searched with negative results.  At that time, there was no KPD general order or other regulation which permitted such intrusive and degrading photographing.

5

The next day, Abbatiello reported the retaliatory incident to her superior officers. KPD took no remedial action, nor did it take any disciplinary action against the Vice officers who ordered her to perform the illegal search.   As explained below, Defendant Lum delivered a backdated draft general order to the officer-in-charge which would have, if adopted, permitted photographing of naked women at the time Abbatiello was ordered to do so.  (CS ¶ 50.)   That draft general order, viewed suspiciously by the officer in charge of reviewing draft orders, was never implemented. (CS ¶ 50.)

 Abbatiello was stripped of her "FTO" ("Field Training Officer") duties, which carried greater responsibilities and a higher pay grade than a patrol officer, as additional retaliation for reporting Kapua.  While the excuse given her by KPD was that she lacked a certain qualification, KPD had allowed Abbatiello to work as an FTO for more than one year without the qualification, and only after she reported the allegations of misconduct was she removed from the FTO program. (CS ¶ 45.)   Furthermore, at least two other FTOs who lacked the same qualification were allowed to continue working as FTOs.  (CS ¶ 45.)    Thus, the alleged lack of qualification was a mere pretext for Abbatiello's removal and demotion from an FTO position.

The failures of the individual defendants, KPD and the County to take any effective action to mitigate and ameliorate the harassing, threatening and violent

situations described above constituted unlawful discrimination and retaliation against Abbatiello, affecting the terms, conditions, location and privileges of her employment.

As a direct result of Abbatiello's exercise of her protected First Amendment speech,   Abbatiello has suffered and continues to suffer, negative job actions, loss of income, physical harm and severe mental and emotional distress, which has required hospitalization, outpatient medical care, and other medical and psychological intervention.

Kapua's and Lum's acts, and the acts and omissions of the other KPD defendants, including KPD itself and the County, are the bases for Abbatiello's Complaint, and she is legally entitled to damages she claims and will prove at trial.

## II.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Defendants, as the moving parties, have both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  In order to meet their burden, Defendants must either produce evidence negating an essential element of Abbatiello's claim or defense, or show that Abbatiello does not have enough evidence of an essential element to prevail at trial.  Id. (citing High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d

563, 574 (9th Cir. 1990)); *see* <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 160, 90

S. Ct. 1598, 23 L.Ed.2d 142 (1970); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In order to carry its ultimate burden of

persuasion on the motion, the moving party must persuade the court that there is no

genuine issue of material fact.  <u>Fritz</u>, 210 F.3d at 1102; *see also* <u>Jaress & Leong v.</u>

<u>Burt</u>, 150 F. Supp.2d at 1058, 1062 (D. Haw. 2001).

 If a moving party fails to carry its initial burden of production, the

nonmoving party has no obligation to produce anything, even if the nonmoving

party would have the ultimate burden of persuasion at trial.  <u>Fritz</u>, 210 F.3d at

1102-3; <u>Sensible Traffic Alternatives and Res., Ltd. v. Fed. Transit Admin. of the</u>

<u>U.S. Dep't of Transp.</u>, 307 F. Supp.2d 1149, 1156 (D. Haw. 2004).

 When "direct evidence" produced by the moving party conflicts with "direct

evidence" produced by the party opposing summary judgment, "the judge must

assume the truth of the evidence set forth by the nonmoving party with respect to

that fact."  <u>Sensible Traffic</u>, 307 F. Supp.2d at 1156 [(*citing* <u>T.W. Elec. Serv., Inc.</u>

<u>v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987)].  All evidence

and inferences must be construed in the light most favorable to the nonmoving

party.  <u>Id.</u>

 Defendants claim that they are entitled to summary judgment on Counts I

and II of the Complaint, "because Abbatiello is unable to prove any violation of

her First Amendment rights" and because of "qualified immunity".  As discussed below, Abbatiello has presented credible evidence and controlling legal authority in support of the claims contained in Counts I and II.

Defendants claim that they are entitled to summary judgment based upon the Hawaii Workers' Compensation Act ("WCA") as to Counts V and VII.  As discussed below, the WCA does not preclude Abbatiello's claims as to Counts V and VII.

B.    Motion to Dismiss

Defendants purport to rely on Fed.R.Civ.P. 12(b)(6) to dismiss Counts I and II.  Defendants' Memorandum at 1.  Rule 12(b)(6) states:

> If in a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

"A motion to dismiss made pursuant to Rule 12(b)(6) must be filed before the answer or other responsive pleading is filed."  Black v. City and County of Honolulu, 112 F.Supp.2d 1041, 1046 (D. Haw. 2000)(citing Fed.R.Civ P.12(b) and Aetna Life Ins. Co. v. Alla Med. Services, Inc., 855 F.2d 1470, 1474 (9th Cir. 1988).

A motion to dismiss filed after an answer must be regarded as a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c); E.E. Black Ltd. v. Price-McNemar Construction Co., 320 F.2d 663,666 fn 1 (9th Cir 1963). "Under Fed.R.Civ.P. 12(c), the district court views the facts as presented in the pleadings in the light most favorable to the plaintiffs, accepting as true all the allegations in their complaint and treating as false those allegations in the answer that contradict the plaintiff's allegations." Lind v. Grimmer, 859 F.Supp. 1317, 1322 (D. Haw. 1993), aff'd 30 F.3d 1115, cert. denied 513 U.S. 1111, 115 S. Ct. 902, 130 L. Ed.2d 786 (citing Hoeft v. Tucson Unified School Dist., 967 F.2d 1298, 1301 (9th Cir.1992); Hal Roach Studios v. Richard Feiner & Co., 896 F.2d 1542, 1550 (9th Cir.1989)) and Western Reserve Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985).

In other words, a Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a claim. Navarro v. Block, 250 F.3d 729, 731 (9th Cir. 2001). "[T]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). Generally, the issue to be decided on a motion to dismiss is not whether a plaintiff's claims have merit, but whether the moving defendant has shown beyond doubt that the plaintiff can prove

10

no set of facts entitling it to relief.  Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct.

99, 101-02, 2 L.Ed.2d 80 (1957).  Under Rule 12(b)(6), "unless it appears beyond

doubt that plaintiff can prove  no set of facts in support of her claim which would

entitle her to relief," a motion to dismiss must be denied.  Lewis v. Telephone

Employees Credit Union, 87 F.3d 1537, 1545 (9th Cir. 1996) (citation omitted);

*see also* Conley, 355 U.S. at 45-46.  Motions to dismiss generally are viewed with

disfavor under this liberal standard and are rarely granted.  Gilligan v. Jamco Dev.

Corp., 108 F.3d 246, 249 (9th Cir. 1997).

In this case, Defendants seek dismissals of Counts I and II because

"Abbatiello fails to state a violation of the First Amendment as a matter of law".

Defendants' Memorandum at 7.   Defendants' argument rests entirely upon their

erroneous reading of  Garcetti v. Ceballos, 126 S.Ct. 1951 (2006).  Garcetti is not

dispositive of this case.  Garcetti, itself, as well as a well-reasoned line of post-

Garcetti cases, make it clear that the court must look at an employee's specific

duties, facts and circumstances.  In this case, as the facts and circumstances

demonstrate, Abbatiello's reports of unlawful activities by Kapua were not part of

her normal duties as a Vice officer.  Therefore, this case is not controlled by

Garcetti.

Defendants also seek dismissals of Counts V and VII, claiming Abbatiello is

barred under Hawaii's Workers' Compensation Act.  Defendants' Memorandum at

25.  Hawai'i courts have twice affirmatively stated that the WCA does not bar an

employee from asserting negligence causes of action against co-employees.

Defendants also request that this court decline jurisdiction over any

remaining state claims.  Abbatiello's  federal claims should survive these  motions.

Assuming, *arguendo*, that all federal claims are dismissed,  this Court should

nevertheless exercise its discretion to rule upon Abbatiello's state law claims

pursuant to 28 U.S.C. § 1367, as discussed below.

## III.   ARGUMENT

### A.   Abbatiello's Federal Law Claims May Not Be Summarily Dismissed

1.   The Garcetti case does not defeat Abbatiello's First
Amendment Rights; rather, it supports Abbatiello's position
that summary judgment for Defendants is not available.

Defendants' argument that Abbatiello is without First Amendment rights is

based upon an erroneous and overly narrow reading of Garcetti.  Garcetti is not

applicable to this case.  The parties agreed, and the Court made clear, that

Ceballos' (the original plaintiff in Garcetti) "official duties" were not defined, and

it was stipulated and  undisputed that the subject speech was, in fact, made

pursuant to Ceballos' official duties as a deputy District Attorney.  Here, the

opposite is true, and the very nature of Abbatiello's official duties, what was

reported to whom, in what capacity Abbatiello reported Kapua's alleged corruption

and whether any retaliatory action was taken, raise genuine issues of material fact which preclude the granting of Defendants' motion for summary judgment.

In <u>Garcetti</u>, Ceballos, was a supervising deputy district attorney for the Los Angeles County District Attorney's ("DA's") Office.  The nature of his job and his specific job responsibilities are significant factors in the Court's analysis. One of Ceballos' specific duties was to write "disposition memos".  <u>Garcetti</u> at 1731.  It was Ceballos' handling of one of these disposition memos which resulted in his claims that he was retaliated against by his employer.

The Supreme Court analyzed the question of whether, when Ceballos made statements concerning a specific disposition memo and employment action was taken against him as a result, Ceballos was a public employee making a statement pursuant to his official duties, or whether Ceballos made a statement speaking as a citizen about matters of public concern.  The Supreme Court ruled that, since Ceballos was<u> tasked with the specific job of writing disposition memos</u>, he wrote the critical disposition memo <u>pursuant to his employment duties</u>.  The Court stated:

> We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.... The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee is actually expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.
> <u>Id.</u> at 1961-62.

      2.     Abbatiello's reports concerning Kapua were made as a public citizen; <u>Garcetti</u> is distinguishable on the facts.

Abbatiello's reporting of Kapua's illegal conduct was not one of Abbatiello's official duties. (CS ¶ 42.) Abbatiello reported the corruption at KPD to her supervisors, the FBI, and the police union ("SHOPO"). CS ¶ 54. She was not a supervisor charged with the duty of overseeing defendant Kapua's work or conduct. (CS ¶ 43.) Kapua was neither under Abbatiello's supervision, nor was he a Vice officer engaged in official Vice division duties. (CS ¶ 43.) Abbatiello was an undercover Vice officer, whose specialized duty was the investigation of illicit drug use and sale by criminal elements. (CS ¶ 42.) Her official duties did not include the investigation and reporting of rogue cops. (CS ¶¶ 42,43.) In fact, Abbatiello was told by then Acting Assistant Chief Pigao that she didn't need to report the corruption by Kapua. (CS ¶ 41.)

Abbatiello is a public employee who was presented with information and who spoke as a citizen on a matter of public concern – government corruption. Her reports to her supervisor, SHOPO and the FBI clearly distinguish her case from Ceballos in <u>Garcetti</u>, where Ceballos had the specific duty to review an affidavit which he used as a basis for a disposition memorandum recommending dismissal of an employee. This is a far cry from Abbatiello's report of public corruption to agencies other than her employer.

A number of other, post-<u>Garcetti</u> cases demonstrates the significant restrictions which the federal courts have placed upon the limitations of public employees' exercise of their First Amendment rights.

<u>Thompson v. City of Tucson Water Department</u>, 2006 WL 3063500 (D. Ariz. 2006), is a particularly instructive case. Plaintiff Thompson was employed by the Tucson Water Department, but not such that her normal job duties - she was a water treatment plant operator[1] - included investigating and reporting Tucson Water's handling, transportation and disposal of hazardous waste. Thompson investigated and reported these very actions when she was presented with information that a sulfuric acid leak occurred and that her immediate supervisor ("Ring") issued orders which resulted in the re-introduction of the hazardous waste back into the city's drinking water system. After Thompson reported this misconduct to her supervisors and to various other governmental agencies, Ring was investigated. In retaliation against Thompson, Ring behaved much as Kapua did in this case, against Abbatiello.

> While Thompson was in the control room with other employees at work, Ring angrily stomped into the room flailing his arms, got into Thompson's face, slammed a huge book right next to her, stared directly at her and said who is the fucking idiot that called the fire

---

[1] Thompson's duties as a plant operator included taking samples of water, conducting lab analysis of water samples, monitoring water sites and levels and monitoring the water treatment equipment. <u>Id</u>. at 1.

department ...  [I]t became a daily issue when she would cross paths [with Ring] noting his anger and his animosity ... Thompson missed numerous days at work because it "was very stressful because I kept telling [Tucson Water management] that [Ring] was running around like a nut, screaming a fucking idiot called the fire department, slamming huge notebooks around me, being very, very physical in my face.. I [had] to be careful to watch my back... [w]e work around a very dangerous place".

Id. at 4.

The Thompson court stated that, "[u]nder [the Ninth Circuit's] clearly established law, a clear distinction is drawn between the value of individual personnel disputes and grievances that is of little or no relevance to the public's concerns with the operation of government, versus information relevant to the public's concerns and evaluation of the government such as threats to safety and welfare, abuse of power, fraud, corruption, unethical behavior, incompetence, misuse of resources, mismanagement, government inefficiency, and waste." (Citations omitted.)  Id. at 9.  The Thompson Court then carefully analyzed Garcetti, which had been recently decided:

The Court notes that in Defendant's Reply Brief, he cites two recent U.S. Supreme Court cases, and argues that these two cases supposedly overturn or disapprove of a substantial portion of the Ninth Circuit case law pertaining to First Amendment retaliation, and that these cases apply directly to the circumstances of this case. Burlington Northern & Sante Fe Railway Co. v. White, 126 S.Ct. 2405 (June 22, 2006); Garcetti v. Ceballos, 126 S.Ct 1951 (May 30, 2006).  A review of these cases shows, however, that Defendant once again dramatically overstates the breadth of these cases... As to Garcetti, the case is simply irrelevant to this case.  In Garcetti, the Supreme Court held that an employee is not entitled to First Amendment protection

**where his speech is specifically related to the official duties he must perform as part of his job**. *See* <u>Garcetti</u>, 126 S.Ct. At 1959-1960...  In this very narrow situation, the Supreme Court held that: "Plaintiff wrote his disposition memo because that is part of what he ... was employed to do ... The significant point is that the memo was written pursuant to [Plaintiff's] official duties...".  (Citation omitted.) ...  **Contrary to Garcetti, Thompson was not employed as an operator by Tucson Water such that her normal job duties would include investigating and reporting violations to the fire department pertaining to Tucson Water's dangerous handling, transportation, and disposal of hazardous waste**; <u>Garcetti is inapposite to this case</u>.
(Emphasis added.)

The <u>Thompson</u> court also held that there was no question that the retaliatory actions were sufficient to support a First Amendment retaliation claim and that Ring was not entitled to qualified immunity.  *See* discussion, below.

In another post-<u>Garcetti</u> case, the federal district court in Indiana found that there was a clear factual dispute of whether the plaintiff's complaints about a defendant's work hours were made pursuant to the plaintiff's ordinary duties. <u>Kodrea v. City of Kokomo, Indiana</u>, 2006 WL 1750071 (S.D. Ind.).  The Court was unable to conclude that plaintiff's complaints were made simply as an employee rather than a concerned citizen and, accordingly, held that it must resolve any doubt in favor of the plaintiff for purposes of summary judgment.  Defendants' motion for summary judgment was denied.

In another Seventh Circuit (post-<u>Garcetti</u>) case, <u>Rohr v. Nehls</u>, 2006 WL 2927657 (E.D. Wisc.), the Court dealt with a plaintiff who reported to the

17

Wisconsin attorney general's office and the chairman of a county board that a

sheriff had improperly interfered with an investigation.  The Court stated that:

> Nehls' analogy to Garcetti collapses, however, because in this case it
> is clear that Rohr's complaints were not made while he was acting in
> his official capacity... Rohr's complaints, though they involved his
> employment, were simply not the work product of the sheriff's
> department in the same way Ceballos' memo might have "belonged"
> to the district attorney's office in Garcetti.
> Id. at 7.

In still another post-Garcetti case, the federal district court in Pennsylvania

distinguished Garcetti because there it found a genuine dispute as to whether the

plaintiff's speech was made as a citizen or an employee. The plaintiff police officer

submitted an affidavit that, as a Patrol Division corporal and not an Internal Affairs

investigator, he had no official job duties to ferret out, investigate or prosecute

corruption or other wrongdoing within the rank and file officers.   The Court

denied the defendants' motion for summary judgment because of the factual

dispute.   Skrutsky v. Marut, 2006 WL 2660691 (M.D. Pa.)

Another post-Garcetti case, this from the Second Circuit, is also instructive.

In Barclay v. Michalsky, 451 F.Supp.2d 386 (D. Conn. 2006), defendants argued

that Garcetti was controlling because plaintiff nurse's complaints to her

supervisors regarding fellow employees sleeping on the job were made pursuant to

her official duties where a "work rule" specified that such behavior endangered the

safety and welfare of persons and where another "work rule" stated that employees

18

had a duty to report violations of existing work rules, policies, procedures or regulations.  The Barclay court held that, notwithstanding the work rule requiring reporting of violations, material issues of fact existed as to whether plaintiff's complaints were made in the context of her job responsibilities.  The Court found it decisive that the plaintiff had never received any training about the specific work rules or about reporting work rule violations.  The Court also noted that the defendants did not demonstrate that reporting potential work rule violations was particularly within the province of plaintiff's professional duties, more so than other company employees.  The Court then concluded that the record did not establish that plaintiff's reports concerning the use of excessive force and restraints and employees sleeping on duty was part of the discharge of her duties as a nurse and stated, therefore, that Garcetti was not controlling.  Similarly, as in Barclay, Abbatiello was never informed that investigating or reporting misconduct by other KPD employees was one of her job duties, nor was she trained to investigate or report such misconduct.  (CS ¶ 42 **.)**

    3. The Freitag case cited by Defendants clearly supports
      Abbatiello.

  Defendants cited the recent Ninth Circuit case of Freitag v.Ayers, 468 F.3d 528 (9th Cir. 2006) as authority they claim follows and supports the Garcetti case. The opposite is true.  Freitag was a corrections officer who alleged that her

government employers retaliated against her by failing to stop male prisoners'

sexual harassment of her in the workplace.  The federal district court entered a jury

verdict for Freitag, and she appealed.  The Ninth Circuit held that:

> substantial evidence supported the determination that Freitag was
> subjected to a hostile work environment, Id. at 540;

> substantial evidence supported the determination that the department
> of corrections failed to take prompt, corrective and reasonable action
> to address inmate sexual misconduct, Id. at 540-541;

> officials were aware of Freitag's complaints about the ongoing sexual
> harassment and her complaints about the department's failure to
> adequately address the harassment, Id. at 542; and

> officials took adverse action against Freitag as a result of her
> complaints as required to establish her First Amendment retaliation
> claim, Id. at 545-546.

Defendants cited Freitag in an attempt to demonstrate that "internal forms

prepared by Freitag" were, under Garcetti, not constitutionally protected.

Defendants failed to acknowledge the written reports that Abbatiello made to

outside agencies, such as SHOPO and the FBI.  The Freitag court specifically

stated:

> Whether Freitag's April 15, 1999, letter to Terhune (Director of the
> California Department of Corrections) is protected under the First
> Amendment is a closer question.  We are unsure whether prison
> guards are expected to air their complaints regarding the conditions in
> their prison all the way up to the Director of the CDCR at the state
> capitol in Sacramento.  We are not aware, for example, what the union
> contract provides with respect to the persons to whom such grievances
> may or must be presented.  The district court, having presided over
> this and related litigation for several years, may be in a better position
> to make the relevant factual determination and, accordingly, we

remand to it the issue of whether the Terhune letter is covered under the First Amendment. Id. at 546.

The Ninth Circuit remanded the case to the district court to make a factual determination of whether the Terhune letter constituted protected speech. Id.

Although the Freitag court supports much of Abbatiello's case with respect to the merits, it clearly held that to whom a plaintiff reports complaints is a genuine question of material fact. Id.

      4.    Defendants conspired to retaliate against Abbatiello after she reported corruption as a public citizen.

It was well known throughout KPD that there was a culture of retaliation against officers who turned on other officers. (CS ¶ 40.)  Chief Lum and Pigao had more than one conversation about Kapua and Abbatiello, including the order that Abbatiello use the backdoor to Vice and avoid Kapua. (CS ¶ 48.)  Ihu and Lum had multiple discussions regarding Abbatiello and Kapua. (CS ¶ 53.)

B.    There Is No Qualified Immunity for Defendants

The standard for determining whether there is a defense of qualified immunity is whether or not Defendants' conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Defendants argue they are entitled to qualified immunity because the law governing defendants' actions was not clearly established at the time of the retaliation against Abbatiello.  However,

21

Defendants are only entitled to qualified immunity if there are no facts, standards, and case law supporting Abbatiello's right to report the corruption.  In fact, there are specific facts, standards, and ample case law to support Abbatiello's claim that a reasonable person would have known that retaliating against her for reporting Kapua was illegal.   It was well known throughout KPD that there was a culture of retaliation against officers who turned on other officers. (CS ¶ 40.)   Furthermore, KPD's own rules and regulations and a written directive from then Acting Chief Ihu, clearly stated that retaliation was prohibited conduct.  (CS ¶ 44.)  As such, Defendants' contention that the rules against retaliation were not clearly established at the time of the relation against Abbatiello are specious.

The Ninth Circuit's <u>Thompson</u> case is especially on point in that the retaliation that the plaintiff suffered included physical intimidation and being sworn at, enough so that the stress made her physically ill.  After Thompson blew the whistle, she was screamed and swore at, physically intimidated, deprived of her duties, and received a poor evaluation. <u>Thompson</u>, 2006 WL 3063500 at 12. Defendant argued that, as applied to the circumstances of his case, the law wasn't clearly established in 1998 in regards to the balancing of Thompson's interest in expressing herself on a matter of public concern versus her employer's interest in promoting workplace efficiency and avoiding disruption.  <u>Id</u>. at 7.  The Court stated that qualified immunity required a three part analysis that considered

whether a violation of a constitutional right has been shown, whether the law was

clearly established at the time the constitutional deprivation occurred, and whether

a reasonable official would recognize that his actions violated clearly established

law.  <u>Id</u>. at 9.  (Citations omitted.)  The Court stated:

> Under this clearly established law, the analysis encompasses the
> totality of the circumstances pertaining to the content, form and
> circumstances of the speech, and a clear distinction is drawn between
> the value of individual personnel disputes and grievances that is of
> little or no relevance to the public's concerns with the operation of
> government, versus <u>information relevant to the public's concerns and
> evaluation of the government such as threats to safety and welfare,
> abuse of power, fraud, corruption, unethical behavior,</u> incompetence,
> misuse of resources, mismanagement, government inefficiency, and
> waste.
> <u>Id</u>. at 9.  (Emphasis added.)

The <u>Thompson</u> Court went on to state:

> As of 1998, there has been a wealth of case law in the Ninth Circuit
> clarifying what retaliatory actions were sufficient to support a First
> Amendment retaliation claim.  A review of these cases demonstrates
> that the crux of what qualifies as a cognizable retaliatory action for
> purposes of liability for First Amendment retaliation was <u>whether the
> action was likely to deter an employee from exercising her First
> Amendment right to speak on a matter of public concern</u>. <u>Thompson
> v. City of Tucson Water Department</u>, *supra*, 2006 WL 3063500 at 10.
> (Emphasis added.)  *See, also,* <u>Thomas v. Carpenter</u>, 881 F.2d 828,
> 829-831 (9th Cir.1989)

The Court held that the crux of the inquiry is whether the retaliatory action

likely deterred constitutionally protected speech, and concluded that such

retaliatory action need not be particularly great to support a First Amendment

retaliation claim.  Thus, the Court found, in a review of Ninth Circuit case law, the following "very wide array of retaliatory acts legally sufficient to support a First Amendment claim [included] a retaliatory campaign of harassment, removing job responsibilities, interference with work duties ... job transfers without any loss in pay or status, and selective enforcement and application of work rules".  Thompson, 2006 WL 3063500 at 11.  Abbatiello was subjected to a campaign of harassment, her job responsibilities as an FTO were taken away from her, she was forced to transfer with a loss in pay and in status, and she suffered from selective enforcement and application of normal work rules when she, alone, was ordered to avoid Defendant Kapua's office.  Most recently, Abbatiello was passed over for an assignment as acting officer in charge, in favor of a junior officer.  CS ¶ 38.

    The Thompson court concluded that, in light of the clearly established law in 1998, there was no question that the retaliatory actions taken against Thompson were sufficient to support a First Amendment retaliation claim, and that - as a result of the defendant's actions - "a reasonable official would have known that the conduct at issue in this case would violate Thompson's constitutional rights based on the clearly established law at the time."  Id. at 12.  The Court accordingly found that the defense of qualified immunity was not available.  Id.

    Defendants in this case rely upon a forty year old Supreme Court case (Pickering) to attempt to shield themselves in a "qualified immunity" cloak that the

Pickering court itself rejected.  The Supreme Court held that a teacher who wrote a

letter critical of his school board, was protected by the First Amendment.  The

Supreme Court first stated that:

> To the extent that the Illinois Supreme Court's opinion may be read to
> suggest that teachers may constitutionally be compelled to relinquish
> the First Amendment rights they would otherwise enjoy as citizens to
> comment on matters of public interest in connection with the
> operation of the public schools in which they work, it proceeds on a
> premise that has been unequivocally rejected in numerous prior
> decisions of this [Supreme] Court.
> (Citations omitted.)

Defendants' attempts to distinguish Pickering fail.  They argue that the

teacher's employment was only "tangentially and insubstantially involved in the

subject matter of the public communication" and, therefore, he was speaking "as

[a] member of the general public".  Defendants equate Abbatiello's actions in

reporting alleged Kapua's criminal activity as somehow completely different from

the Pickering situation.  As discussed above, this is not the case.  Abbatiello was a

Vice officer, who had no duties or responsibilities with respect to investigating

complaints of public corruption.  In learning about the allegations of Kapua's acts

of public corruption, Abbatiello was acting as any member of the public would: she

reported it to the appropriate authorities, including the FBI.  Abbatiello's reporting

constitutes an "exercise of [her] right to speak on issues of public importance

[which] may not furnish the basis for [her] dismissal from public employment".

Pickering v. Board of Education of Township High School District 205, 88 S.Ct.
1731,1738, 391 U.S. 563, 574 (1968).

The Connick case, a 25 year old Supreme Court case cited by Defendants, is
even less of a help and more of a hindrance to them.  Defendants cite it for the
proposition that when a public employee speaks upon matters only of personal
interest, a federal court is not the appropriate forum to review a negative personnel
action.

> When a public employee speaks not as a citizen upon matters of
> public concern, but instead as an employee upon matters only of
> personal interest, absent the most unusual circumstances, a federal
> court is not the appropriate forum in which to review the wisdom of a
> personnel decision taken by a public agency allegedly in reaction to
> the employee's behavior.  Here, except for the question in
> respondent's questionnaire regarding pressure upon employees to
> work in political campaigns, the questions posed do not fall under the
> rubric of matters of "public concern".
> Connick v. Myers, 103 S.Ct.1684,1685-86, 461 U.S. 138, 138-39
> (1983).

The questions in respondent's questionnaire, which triggered her
termination, included criticisms of the office transfer policy, office morale, the
need for a grievance committee, and the level of confidence in supervisors.  The
Supreme Court agreed that such matters were not of "public concern".  What the
Connick case did do, which Defendants have failed to mention, was to state that
whether an employee's speech addresses a matter of public concern must be
determined by the content, form and context of a given statement, as revealed by

26

the whole record.  In that light, the Court held that respondent's statement – her description of the pressure forced upon employees to work in political campaigns – was a matter of public concern.  Obviously, Connick does not help Defendants, but further supports the fact that Abbatiello's reporting of public corruption was a matter of true public concern, clearly protected by the First Amendment.

In Kodrea v. City of Kokomo, 2006 WL 1750071 (S.D. Ind. 2006), the federal district court admitted an affidavit by a city employee for the purpose of demonstrating that city defendants should have known that employees could not be retaliated against for exercising their First Amendment right to speak out on matters of public concern.  Id. at 2.  This was a post-Garcetti case, and the district court in Indiana easily distinguished Garcetti:

> Unlike the situation in Garcetti, however, there is a factual dispute in this case concerning whether Kodrea's complaints about Campbell's hours and the ASA refund were made pursuant to his ordinary duties. As Kodrea notes, nothing in his job description required him to monitor or report misconduct...  Simply put, there are factual issues about whether Kodrea's ordinary job responsibilities included overseeing Campbell's hours of work and the ASA refunds.  Neither activity appears to have been Kodrea's core function as a recreational program director.  The Court is unable to conclude that Kodrea's complaints were made simply as an employee, rather than a concerned citizen.  Accordingly, the Court must resolve any doubt in favor of Kodrea for purposes of summary judgment and conclude at this stage that Kodrea may have acted as a concerned citizen.

C.   Officer Abbatiello is Not Barred by Hawai'i Workers' Compensation Act From Suing a Fellow Employee for Negligence

Contrary to Defendants' claim, Hawai'i courts have twice affirmatively stated that the Hawai'i Workers' Compensation Act ("WCA") does not bar an employee from asserting negligence causes of action against co-employees.

In Marshall v. University of Hawai'i, 9 Haw. App. 21, 821 P.2d 937 (1991), the Court held that HRS § 385-5 did not bar an employee from claiming negligent infliction of emotional distress caused by co-workers.  In Marshall, the plaintiff alleged the defendants, the University of Hawai'i and three of its employees, "negligently inflicted emotions distress on him through the investigation and through the delay in reviewing his tenure application."  9 Haw. App. at 35, 821 P.2d at 945.  The Court stated "[a]nother employee of the same employer shall not be relieved of his liability as a third party, if the personal injury is caused by his willful and wanton misconduct."  Id. at 36, 821 P.2d at 945.  The Court in Marshall held that the plaintiff's and defendants' affidavits raised a genuine issue of material fact as to the motivation of the defendant employees' conduct.  Id. at 37, 821 P.2d at 946.  Thus, [s]ummary judgment is only proper on the issue when it has been removed from the case by uncontroverted affidavits or depositions."  Id. Defendants' citation to Ellison v. Northwest Airline, 938 F. Supp. 1503 (D. Haw. 1996) is inappropriate.  The Court in Ellison actually cited the applicable law as stated in Marshall. The Ellison Court, citing Marshall, *supra*, stated:

> H.R.S. § 386-8 provides that another employee of the same
> employers shall not be relieved of his liability as a third party, if
> the personal injury is caused by his willful and wanton
> misconduct.  Hawai'i courts have held that this provision
> preserves a plaintiff's right of action in common law or under
> another statute against a fellow employee individually and
> clearly allows an employee to sue a fellow employee for
> damages resulting from an injury caused by the fellow
> employee's willful and wanton misconduct.
> Ellison, 938 F. Supp. at 1515.

However, the court went on to state "[h]ere, although H.R.S. § 386-8 may allow a claim against [defendant] individually for intentional infliction of emotional distress, it does not allow one for simply negligent infliction of emotional distress."  Id.  But, the Court's holding in Ellison, that a co-employee may not be sued for negligent infliction of emotional distress, did not address Marshall's recognition of plaintiff's claim for negligent infliction of emotional distress using the willful and wanton conduct test.

The Ellison opinion issued on May 8, 1996 was mitigated one month later on June 20, 1996 by the Hawai'i Supreme Court's opinion in Iddings v. Mee-Lee, 82 Hawai'i, 919 P.2d 263 (1996).  In Iddings, the Court held that granting summary judgment against the plaintiff, Iddings, was in error because HRS § 386-8 allows claims against co-employees for willful and wanton misconduct.  82 Hawai'i at 6, 919 P.2d at 268.  The Iddings Court clarified the meaning of willful and wanton misconduct as "conduct which is either intentional or committed under

29

circumstances exhibiting a reckless disregard for the safety of others." Id. at 7, 919 P.2d at 269. "The plain meaning of the words used in the term 'wilful and wanton misconduct' includes reckless conduct that does not require a specific intent to cause injury within its scope." Id. at 6, 919 P.2d at 268. The term "willful" means "with indifference to the natural consequences." Id. at 7, 919 P.2d at 269. The term "wanton" means "recklessly disregardful of the rights or safety of others or of consequences." Id.

The Iddings Court, citing Pleasant v. Johnson, 312 N.C. 710, 325 S.E.2d 244, 249 (1985), stated "[t]herefore we hold that the Workers' Compensation Act does not shield a co-employee from liability for injury caused by his [or her] willful, wanton, and reckless negligence." Id. at 9, 919 P.2d at 271. "Allowing suits between co-employees based upon reckless conduct does not contravene or impair the purpose of Hawaii's workers' compensation scheme." Id. Contrary to Defendants' statement that "[n]egligence actions, by definition, cannot be willful and wanton, and therefore cannot be exceptions to the WCA's exclusivity provision," the Marshall and Iddings courts labeled and qualified willful and wanton misconduct claims as negligence actions. Thus, in accordance with Marshall and Iddings, Counts V and VII are "negligence" causes of action. Abbatiello alleged in Count I that "[t]he actions of Defendants were willful, wanton, malicious, and in such callous and reckless disregard of civil obligations,

30

as to entitle Abbatiello to recover punitive damages." (*See* Complaint, ¶ 102.)

Count V realleges and incorporates paragraphs 1 to 119, inclusive (*See* Complaint,

¶ 120) and therefore alleges that Defendants' conduct was willful and wanton.

Count VII also realleges and incorporates paragraphs 1 to 129, inclusive. (*See*

Complaint, ¶ 129.)  Count VII also specifically alleges "[t]he actions of Defendants

were willful, wanton, malicious, and in such callous and reckless disregard of civil

obligation, as to entitle Abbatiello to recover punitive damages." (*See* Complaint,

¶ 132.)  Both Counts V and VII allege that Defendants' conduct was willful and

wanton, therefore those causes of action fall within the exception of HRS § 396-8

and are not barred by HRS § 386-5.

In Marshall, *supra*, the plaintiff was allowed to pursue a claim of negligent

infliction of emotional distress for co-employees' failure to timely review his

tenure application.  Marshall, 9 Haw. App. at 35, 821 P.2d at 946.  Thus, negligent

infliction of emotional distress claims need not be linked to sexual harassment or

assault.

In addition, a negligent supervision claim such as Count V may also be

asserted.  In Iddings, the plaintiff claimed that the defendant had the ability to

control the patient population.  Iddings, 82 Hawaiʻi at 5, 919 P.2d at 267.  The

plaintiff asserted that "[t]he actions of Defendant Mee-Lee in failing to take steps

to provide for the safety of plaintiff Iddings and other staff members who were

required to work within the Intensive Care Module with individuals who often

were hostile and/or violent constituted negligence and/or willful and wanton

misconduct on the part of Defendant Mee-Lee." Id.

The claim asserted in Iddings is similar to Count V in that Officer Abbatiello

alleges that Defendants Lum and Ihu knew or should have known of the necessity

and opportunity for exercising control over Defendant Kapua but failed to exercise

such control.  (See Complaint, ¶ 121 and 122.)  Defendant Kapua had previously

harassed and threatened two KPD dispatchers on KPD premises. (CS ¶ 52.)

Defendants have failed to prove there is no genuine issue of material fact

with regard to Counts V and VII because they merely assert that such claims are

barred by statute.  Abbatiello has demonstrated that such claims are not barred.  In

addition, Abbatiello has asserted that Defendants' actions were willful and wanton.

Defendants did not offer any evidence to support a claim that the Defendants'

actions were not willful and wanton.  Even if Defendants submitted such evidence,

there would still be an issue of material fact that should be decided at trial.

Therefore, Defendants' motion for summary judgment on Counts V and VII should

be denied.

       D.    This Court Should Exercise Pendant Jurisdiction
                Over The State Law Claims in this Case

The Defendants request that if Abbatiello's federal claims are dismissed, this

Court should decline to exercise federal jurisdiction over the remaining state

claims" (Defendants' Memorandum at 27.)  Assuming, *arguendo*, that all federal

claims are dismissed under Title 28 U.S.C. § 1367, this Court should exercise its

discretion to decide Abbatiello's state law claims.

Title 28 U.S.C. § 1367(c) states:

(c) The district courts may decline to exercise supplemental
jurisdiction over a claim under subsection (a) if –

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or
claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has
original jurisdiction, or

(4) in exceptional circumstances, there are other compelling
reasons for declining jurisdiction.

The object of exercising pendant jurisdiction is the principle of flexibility.

The Ninth Circuit has stated, quoting Carnegie-Mellon Univ. v. Cohill, 484

U.S. 343, 108 S. Ct. 614, 98 L.E.2d 720 (1988):

[A] federal court should consider and weigh in each case, at every
stage of the litigation, the values of judicial economy, convenience,
fairness, and comity in order to decide whether to exercise jurisdiction
over a case brought in that court involving pendent state law claims.
Executive Software North America v. United States Dist. Court, 24
F.3d 1545 (9th Cir. 1994).

"When difficult and unsettled state law issues are not implicated by the pendant claims, it is entirely acceptable under the discretionary principle for a federal court to decide those claims even after dismissing the main claim." <u>Timm v. Mead Corp.</u>, 32 F.3d 273, 277 (7th Cir. 1994). "Even when federal claims are resolved before trial, comity does not automatically mandate dismissal of pendant state claims." <u>Enercomp, Inc. v. McCorhill Publ'g, Inc.</u>, 873 F.2d 536, 545 (2d Cir. 1989). "Trial is simply a convenient benchmark marking the point by which substantial resources have surely been committed. If those resources are expended without a trial, the essential purpose of the doctrine of pendant jurisdiction may be served by retaining the case." <u>Id.</u> (citing <u>Graf v. Elgen</u>, 790 F.2d 1341, 1348 (7th Cir. 1986)). "That the jurisdictional hook is eliminated before trial at best only preliminarily informs the balance; the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable expenditure of judicial resources can and should make the difference in a particular case." <u>Timm</u>, 32 F.3d at 277.

"The substantial investment of judicial time and resources in the case justifies the exercise of jurisdiction over the state claim, even after the federal claim has been dismissed." <u>Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.</u>, 35 F.3d 1226, 1242 (8th Cir. 1994). "If dismissal of the touchstone claim occurs late in the action, knocking the dependant claims down with a belated rejection of

34

supplemental jurisdiction may not be fair." Growth Horizons, Inc. v. Delaware County, Pennsylvania, 983 F.2d 1277, 1285 (3d Cir. 1993).

Recently, this Court, in Matsuda v. Wada, 128 F. Supp.2d 659 (D. Haw. 2000), stated that even if federal claims had been dismissed, it would have retained supplemental jurisdiction of that case. 128 F. Supp.2d at 671. The Court noted it would be "especially unfair to Plaintiff – although Defendant has the right to challenge jurisdiction at anytime – because the case was pending for over two years, the parties did much of their pretrial work, and the defendants had failed to raise a jurisdictional challenge before parties invested "so much energy and time and money into the lawsuit in federal court." Id.

Abbatiello first filed her Complaint on September 14, 2004 and it has been pending for 2½ years. Discovery is nearly complete (the discovery deadline is March 9, 2007) and numerous depositions have been taken. This case is scheduled for trial in 4 months. Dismissal of all state law claims without prejudice would require all parties to discard three years of work and start anew. Therefore, this Court should exercise its discretion in retaining the case even if Abbatiello's federal law claims are dismissed.

In this case, there is no question that - if this Court for any reason fails to retain jurisdiction over this case - Defendants will immediately resort to the argument that Abbatiello's claims are barred by the statute of limitations. Clearly,

35

the letter and spirit of these cases do not support such machinations.

## IV.    CONCLUSION

Abbatiello was and is a police officer and, as such, is required to take action when made aware of alleged criminal acts.  At the time that she reported Defendant Kapua's alleged act of corruption, however, Abbatiello was a Vice-Narcotics officer, and her specific job responsibility was to investigate illicit drug deals and to aid in the criminal prosecution of such crimes.  Abbatiello was not assigned any duties related to public corruption or internal affairs.  Abbatiello reported Kapua's actions as a rogue cop as a concerned citizen acting on a matter of serious public concern:  the abuse of power and public corruption in government.

As a matter of law, the <u>Garcetti</u> case is not applicable for the many reasons stated above.  For the purpose of opposing Defendants' motion for summary judgment, it is sufficient that Abbatiello's actions bring to the forefront a number of genuine issues of material fact.  Did Abbatiello make her report because her job description required it, or did she make it because she was a citizen concerned about a matter of public concern?  Was her report a result of an individual personnel dispute or was it the result of information she obtained that was relevant to the public's concerns about public and government corruption?  Were her actions an expression of her First Amendment rights, or were they performed merely because she happened to be a police officer?  Did the actions (and/or

36

omissions) of Kapua, Lum, other police supervisors, the Kauai Police Department and/or the County of Kauai amount to retaliation against Abbatiello because of her report of Kapua's alleged corruption?  What was the resulting impact and the damage to Abbatiello?

At the very least, Abbatiello's Complaint, her affidavits, numerous records and exhibits, and deposition testimonies raise genuine issues of material fact which may not result in summary judgment for the Defendants.  Thus, the Defendants' motion must be denied.

DATED:   Honolulu, Hawaii, January 19, 2007.

   /S/ John Hoshibata
DANIEL HEMPEY
MARGERY S. BRONSTER
JOHN HOSHIBATA
JEANNETTE HOLMES CASTAGNETTI
Attorneys for Plaintiff
DARLA ABBATIELLO