IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DARLA ABBATIELLO, | ) | CIVIL NO. CV04 00562 SOM BMK |
| | ) | |
| Plaintiff, | ) | MEMORANDUM IN OPPOSITION |
| | ) | TO DEFENDANT K.C. LUM'S |
| vs. | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| COUNTY OF KAUAI, KAUAI | ) | |
| POLICE DEPARTMENT, K.C. LUM, | ) | |
| WILFRED M. IHU, GORDON | ) | |
| ISODA, DEAN PIGAO, IRVIL | ) | Date:    February 20, 2007 |
| KAPUA, | ) | Time:    11:15 a.m. |
| | ) | Judge:  Honorable Susan Oki Mollway |
| Defendants. | ) | |
| | ) | Trial Date:  May 8, 2007 |
| _____ | ) | |

**MEMORANDUM IN OPPOSITION TO
<u>DEFENDANT K.C. LUM'S MOTION FOR SUMMARY JUDGMENT</u>**

## I.    INTRODUCTION

Plaintiff Darla Abbatiello ("Abbatiello") is a public citizen and a member of the Kauai Police Department.  She is a highly-decorated officer and was the first female to be offered and assigned a position with KPD's Vice-Narcotics Division ("Vice").  Abbatiello has set forth claims which include, but are not limited to, claims that her First Amendment rights have been violated, claims that she was subjected to retaliation for exercising her First Amendment rights in reporting that a KPD officer (Defendant Irvil Kapua, "Kapua") was being paid off to protect drug dealers against warrants and arrests, and claims that she has been subjected to

harassment, threats of violence and death against her, demotion in rank and pay, loss of overtime opportunities, and loss of an assignment to be officer-in-charge of her unit.  Also, in retaliation for reporting Kapua, and complaining of his threats against her, Abbatiello was ordered to avoid Kapua by taking a circuitous path around his office at KPD headquarters.

KPD, the County, then KPD Chief Lum, and other County and KPD employees knew of the harassment, threats, hostile work environment, the potential for violent retribution against Abbatiello and the severe emotional distress that she was suffering from as a result of these actions and her work environment.  These defendants had a duty to take affirmative actions to stop these actions and to discipline Kapua and others for subjecting Abbatiello to such horrendous conditions.  These defendants, however, took no action.  In fact, the defendants continue, to this day, to find other means and opportunities to retaliate against Abbatiello for speaking out against one of their own.

Defendant Lum has filed a motion for summary judgment, in which he uses his assertion of his Fifth Amendment right against self-incrimination both as a shield and a sword against Abbatiello.  As discussed below, Lum must not be allowed to avoid the fact-finding process and escape potential liability by the simple expedient of hiding behind the Fifth Amendment.  Lum's claims that he is

2

protected by qualified immunity and that there "is no evidence" to support Abbatiello's claims also fail, as described more fully below.

Lum seeks dismissals of Counts I, II and VIII against him, claiming that Abbatiello fails to state a violation of the First Amendment and related constitutional provisions as a matter of law. (Lum's Memo. at 13-14.) Lum's argument rests entirely upon his erroneous reading of Garcetti v. Ceballos, 126 S.Ct. 1951 (2006). Garcetti is not dispositive of this case. Garcetti, merely affirmed the court's duty to determine whether an employee spoke as a citizen or pursuant to a duty as employee. In this case, Abbatiello's reports of Kapua's unlawful activities were not part of her duties as a Vice officer and were made as a concerned citizen voicing complaints about matters of public concern.

Lum also seeks dismissal of Count III – violation of Hawaii's Whistleblowers' Protection Act – against him. However, as chief of police and having the knowledge he did about Abbatiello's complaints and reports of harassment, threats and intimidation, and not taking any action to ameliorate the situation, it is more than sufficient to create questions of fact concerning his conduct and his intentions.

Lum also seeks dismissals of Counts V and VII, claiming Abbatiello is barred under Hawaii's Workers' Compensation Act ("WCA"). As discussed

below, Hawai'i courts have twice affirmatively stated that the WCA does not bar an employee from asserting negligence causes of action against co-employees.

Lum further seeks dismissal of Count IV, wrongful termination. As explained below, Lum's argument that Abbatiello was never discharged from her employment at KPD does not preclude her claim of wrongful termination.

Lum's argument that Count VI must be dismissed must fail. As explained below, Lum's willful, wanton and outrageous conduct is evidenced by the fact that he has filed a lawsuit against the County of Kauai and other entities and individuals for discrimination and retaliation because Lum understood that an individual had called him a name that he considered to be a derogatory slur. Lum's claim that such conduct was willful and wanton, entitling him to punitive damages, gives lie to his current defense that Abbatiello's experiences were not the product of willful, wanton and careless disregard for her rights.

## II.   BACKGROUND FACTS

In December 2003, Abbatiello became aware of allegations that Kapua, a superior officer, was receiving money for protection and "tip-offs" of Vice search warrants.

Contrary to Lum's claim that Abbatiello only reported Kapua's misconduct in her capacity as a police officer, (Lum's CS ¶ 5), Abbatiello reported the alleged

4

criminal acts as a concerned citizen. (CS ¶¶ 5, 25.)  Abbatiello not only reported

them to her supervisors and other officers at KPD, but also to the FBI and the State

of Hawaii Organization of Police Officers ("SHOPO") (CS ¶ 30.)  Abbatiello felt

deeply about corruption, and she reported Kapua's misconduct because she felt that

the community was entitled to a police department free of corruption.  Abbatiello's

abhorrence of corruption mirrors that of the public's, and the fact that she was a

police officer did not cause her to act any differently than she did as a citizen. (CS

¶¶ 5, 25.)

When Kapua learned about Abbatiello's report, he immediately began a

campaign of intimidation and harassment against her which caused her to fear for

her personal safety and her life.  As described in the First Amended Complaint

("Complaint"), Kapua's unlawful actions against Abbatiello included, among other

things, repeatedly screaming obscenities at her on KPD premises and in public,[1]

intimidating her, and threatening her with physical harm. (CS ¶ 45.) Contrary  to

Lum's assertion that Abbatiello reported her fear of Kapua in her capacity as a

police officer, (Lum's Memo. at 18), Abbatiello reported the repeated threats and

harassment by Kapua in her capacity as a public citizen. (CS ¶ 25.)

---

[1] The obscenities screamed at Abbatiello included "bitch", "cunt" and "fuck".  (CS
¶ 45 and referenced exhibits and admissions )

Because of Kapua's harassing and threatening actions against Abbatiello, Abbatiello applied for and was granted a  Temporary Restraining Order ("TRO") that prohibited Kapua from all contact with Abbatiello at KPD and mandated that Kapua surrender his firearms to KPD.   (CS ¶ 46.)   Lum did not take steps to ensure Kapua stay away from Abbatiello, nor did Lum enforce the requirement of the TRO that Kapua relinquish his firearms.  (CS ¶¶ 44, 46.)

In April 2004, Abbatiello discovered that someone  had written a death threat in her office dictionary at KPD. (CS ¶ 47.)    Abbatiello also discovered that her service weapon was missing from her KPD office.  (CS ¶ 47.) Abbatiello reported these incidents to her superior officers. (CS ¶ 47.)

Despite being promptly notified of these incidents and Kapua's actions, the individual defendants,  KPD and the County failed and/or refused to take action to protect Abbatiello from the hostile and violent work environment or to reprimand, punish or discipline Kapua for his actions, even though his actions clearly violated specific KPD Standards of Conduct. (CS ¶¶ 7-9, 33.)

After Abbatiello complained, KPD ordered Abbatiello to stay away from Kapua and ordered her to take an unnecessary, circuitous route in and out of the Vice office.  (CS ¶ 35.)  Lum never rescinded this order.  (CS ¶ 36.)  Lum contends that Kapua was ordered by his predecessor, Ihu, to stay away from and

"take no action" against Plaintiff.  (Lum's CS ¶¶ 7-9.)   However, this hollow order was neither followed by Kapua nor enforced by Lum or KPD. (CS ¶¶ 7-9, 45.)

Abbatiello was forced to accept a transfer from Vice (in Lihue) to Patrol (in Waimea) in order to avoid working in the area and proximity of Kapua.  What Abbatiello had believed to be a  temporary, lateral transfer turned out to be a permanent transfer and demotion in rank and pay grade, another example of retaliation by KPD and/or the County. (CS ¶ 17.)  Lum contends that there is always a change in pay when an officer moves between a specialized unit and patrol. (Lum's CS ¶ 19.)  However, this is not so.  Lum, Pigao, Kapua and Isoda have all transferred between specialized units and patrol without any change in pay. (CS ¶ 19.)   Abbatiello's position in Vice was filled by Officer Eric Caspillo, thereby preventing her return to Vice and effectively "terminating" her prior position in Vice.  (CS ¶ 23.)

Abbatiello has been unable to work overtime in cellblock as she has regularly done for many years because of Lum and KPD's refusal to ensure that Kapua would not be in cellblock when Abbatiello was on cellblock duty.   On at least one occasion,  when Abbatiello was working in cellblock, Kapua was present to relieve her from cellblock duty.  This was in direct violation of the TRO Abbatiello had against Kapua.  (CS ¶ 46.)    Abbatiello felt threatened by Kapua,

and requested that further contact be avoided.  A supervisor responded by writing a note on the cellblock sign-in log that Abbatiello could no longer work in cellblock until further notice.  (CS ¶ 38.)   However, Lum continued to allow Kapua to work overtime in cellblock to the detriment of Abbatiello.  (CS ¶ 38.)

On or about April 24, 2005, KPD ordered Abbatiello to participate in an illegal strip search and photographing of two naked females who had already been searched with negative results.  At that time, there was no KPD general order or other regulation which permitted such intrusive and degrading photographing.  The next day, Abbatiello reported the retaliatory incident to her superior officers.  KPD took no remedial action, nor did it take any disciplinary action against the Vice officers who ordered her to perform the illegal search.   As explained below, Lum delivered a backdated draft general order to the officer-in-charge which would have, if adopted, permitted photographing of naked women at the time Abbatiello was ordered to do so.  (CS ¶ 48.)   That draft general order, viewed suspiciously by the officer in charge of reviewing draft orders, was never implemented. (CS ¶¶ 22, 48.)

Abbatiello was stripped of her "FTO" ("Field Training Officer") duties, which carried greater responsibilities and a higher pay grade than a patrol officer, as additional retaliation by Lum for reporting Kapua. (CS ¶ 37.)  While the excuse

given her by KPD was that she lacked a certain qualification, KPD had allowed

Abbatiello to work as an FTO for more than one year without the qualification, and

only after she reported the allegations of misconduct was she removed from the

FTO program. (CS ¶ 14.)   Lum's assertion that another officer was removed from

the FTO program for the same alleged reason as Abbatiello is false. (Lum's CS ¶

15).  That officer, Paris Resinto, voluntarily withdrew from the FTO program for

personal reasons.  (CS ¶ 15).  He was <u>not</u> removed from the program by KPD. (CS

¶ 15.)   Thus, the alleged lack of qualification was a mere pretext for Abbatiello's

removal and demotion from an FTO position.

The failure of Lum to take any effective action to mitigate and ameliorate the

harassing, threatening and violent situations described above constituted unlawful

discrimination and retaliation against Abbatiello, affecting the terms, conditions,

location and privileges of her employment.

As a direct result of Abbatiello's exercise of her protected First Amendment

speech,  Abbatiello has suffered and continues to suffer, negative job actions, loss

of income, physical harm and severe mental and emotional distress, which has

required hospitalization, outpatient medical care, and other medical and

psychological intervention.

Kapua's and Lum's acts, and the acts and omissions of the other KPD

defendants, including KPD itself and the County, are the bases for Abbatiello's

Complaint, and she is legally entitled to damages she claims and will prove at trial.

## III.    STANDARD OF REVIEW ON MOTION FOR SUMMARY JUDGMENT

Lum, as the moving party, has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &

Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.2d 1099, 1102 (9th Cir. 2000).  In

order to meet his burden, Lum must either produce evidence negating an essential

element of Abbatiello's claim or defense, or show that Abbatiello does not have

enough evidence of an essential element to prevail at trial.  Id. (*citing* High Tech

Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990));

*see* Adickes v. S.H. Kress & Co., 398 U.S. 144, 160, 90 S. Ct. 1598, 23 L.Ed.2d

142 (1970); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d

265 (1986).  In order to carry its ultimate burden of persuasion on the motion, the

moving party must persuade the court that there is no genuine issue of material

fact.  Fritz, 210 F.3d at 1102; *see also* Jaress & Leong v. Burt, 150 F. Supp.2d at

1058, 1062 (D. Haw. 2001).

If a moving party fails to carry its initial burden of production, the

nonmoving party has no obligation to produce anything, even if the nonmoving

party would have the ultimate burden of persuasion at trial.  Fritz, 210 F.3d at

1102-3; <u>Sensible Traffic Alternatives and Res., Ltd. v. Fed. Transit Admin. of the</u>
<u>U.S. Dep't of Transp.,</u> 307 F. Supp.2d 1149, 1156 (D. Haw. 2004).

When "direct evidence" produced by the moving party conflicts with "direct
evidence" produced by the party opposing summary judgment, "the judge must
assume the truth of the evidence set forth by the nonmoving party with respect to
that fact." <u>Sensible Traffic</u>, 307 F. Supp.2d at 1156 [(*citing* <u>T.W. Elec. Serv., Inc.</u>
<u>v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987)].  All evidence
and inferences must be construed in the light most favorable to the nonmoving
party.  <u>Id.</u>

## IV.    ARGUMENT

### A.    <u>Abbatiello's Federal Law Claims May Not Be Summarily Dismissed</u>

#### 1.    <u>Abbatiello Spoke As A Private Citizen</u>

When Abbatiello spoke about alleged misconduct by other officers,
she spoke as a private citizen.  Therefore, her speech is protected by the First
Amendment.  Contrary to Lum's argument, <u>Garcetti v. Ceballos</u>, — U.S. — , 126
S. Ct. 1951, 164 L.Ed.2d 689 (2006) is not dispositive of this case.

<u>Garcetti</u>'s holding merely reinforced existing law which required the
court to first determine whether speech was made as a citizen or employee.  126 S.
Ct. at 1957 (citing <u>Connick v. Myers</u>, 461 U.S. 138, 147, 103 S. Ct. 1684, 75

L.Ed.2d 708 (1983)).[2]

Prior to Garcetti in 2006, the Eleventh Circuit Court of Appeals already applied the Connick citizen or employee speech test for First Amendment claims.  As early as 1993, the Eleventh Circuit Court of appeals stated in Morgan v. Ford, 6 F.3d 750 (11th Cir. 1993), "A court must therefore discern the purpose of the employee's speech - that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee.  Id. at 754 (*citing* Connick, 461 U.S. at 146).

Not surprisingly, after Garcetti, the Eleventh Circuit continued to use the same analysis.  In Battle v. Bd. of Regents for the State of Georgia, 468 F.3d 755 (11th Cir. 2006), the court, citing Garcetti, 126 S. Ct. at 1958 and Morgan, 6 F.3d at 754, stated "we must first ask whether the employee spoke as a citizen on a matter of public concern."  468 F.3d at 760 (internal quotation marks omitted). The Eleventh Circuit applied the correct First Amendment analysis both before and after Garcetti.  Thus, Garcetti did nothing to change the analysis of First

---

[2]  In Connick, supra, the Supreme Court stated:
> We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Connick, 461 U.S. at 147.

Amendment claims in the Eleventh Circuit.

In <u>Fikes v. City of Daphne</u>, 79 F.3d 1079 (11th Cir. 1996), the Eleventh Circuit reversed the district court's dismissal of an officer's First Amendment claim.  <u>Id.</u> at 1085.  In <u>Fikes</u>, the plaintiff, Officer James Fikes, investigated and reported his findings of other officers' misconduct to the Chief of Police and the Alabama Bureau of Investigation.  <u>Id.</u> at 1081.  Fikes was eventually terminated for reporting the misconduct.  <u>Id.</u> at 1080-1.  Fikes alleged that the Defendants, City of Daphne and individual defendant officers, conspired to discharge him for exercising his free speech on a matter of public concern, in violation of his First Amendment rights.  <u>Id.</u> at 1083.  The Eleventh Circuit reversed summary judgment and held that Fikes' complaint stated a First Amendment claim.  <u>Id.</u> at 1080, 1085.

In distinguishing <u>Fikes</u> from another case, the Eleventh Circuit Court of Appeals stated in <u>Morris v. Crow</u>, 142 F.3d 1379 (11th Cir. 1998), that "Fikes made such a report voluntarily under circumstances in which he had no obligation or responsibility to do so."  142 F.2d at 1382.  The court in <u>Fikes</u> noted that the plaintiff in that case sought to bring to light actual or potential wrongdoing or breach of public trust of government officials."  <u>Id.</u>

As affirmed in <u>Garcetti</u>, the key issue in analyzing First Amendment

claims is whether an employee performed the speech pursuant to the duties of the

job in which he is employed to do.  Garcetti, 126 S. Ct. at 1959-60.

Like Fikes, Abbatiello spoke without any obligation to report

misconduct by other officers, therefore her speech is protected because it was made

as a citizen.  Abbatiello's reporting of Kapua's illegal conduct was not one of

Abbatiello's duties.  (CS ¶ 27.)  Abbatiello reported the corruption at KPD to her

supervisors, the FBI, and the police union ("SHOPO").  (CS ¶ 30.)  She was not a

supervisor charged with the duty of overseeing defendant Kapua's work or

conduct.  (CS ¶ 28.)  Kapua was neither under Abbatiello's supervision, nor was

he a Vice officer engaged in official Vice division duties.  (CS ¶ 28.)  Abbatiello

was an undercover Vice officer, whose specialized duty was the investigation of

illicit drug use and sale by criminal elements.  (CS ¶ 27.)  Her duties did not

include the investigation and reporting of rogue cops.  (CS ¶ 29.)  In fact,

Abbatiello was told by then Acting Assistant Chief Pigao that she didn't need to

report the corruption by Kapua. (CS ¶ 26.)  Defendants do not even allege that

Abbatiello had any obligation to report alleged wrongdoing by Kapua.

Many post-Garcetti cases support public employees' First Amendment

rights to make complaints as public citizens.  The case of Thompson v. City of

Tucson Water Department, 2006 WL 3063500 (D. Ariz. 2006), is  particularly

instructive.  Plaintiff Thompson was employed by the Tucson Water Department,
but not such that her normal job duties - she was a water treatment plant operator[3] -
included investigating and reporting Tucson Water's handling, transportation and
disposal of hazardous waste. 2206 WL 3062500 at *1.  Thompson investigated and
reported these very actions when she was presented with information that a sulfuric
acid leak occurred and that her immediate supervisor ("Ring") issued orders which
resulted in the re-introduction of the hazardous waste back into the city's drinking
water system.  Id. at *2-3.  After Thompson reported this misconduct to her
supervisors and to various other governmental agencies, Ring was investigated.  Id.
at *4.  In retaliation against Thompson, Ring behaved much as Kapua did in this
case, against Abbatiello,

> While Thompson was in the control room with other employees
> at work, Ring angrily stomped into the room flailing his arms,
> got into Thompson's face, slammed a huge book right next to
> her, stared directly at her and said who is the fucking idiot that
> called the fire department ...  [I]t became a daily issue when she
> would cross paths [with Ring] noting his anger and his
> animosity ... Thompson missed numerous days at work because
> it "was very stressful because I kept telling [Tucson Water
> management] that [Ring] was running around like a nut,
> screaming a fucking idiot called the fire department, slamming

---

[3] Thompson's duties as a plant operator included taking samples of water,
conducting lab analysis of water samples, monitoring water sites and levels and
monitoring the water treatment equipment.  Id. at 1.

> huge notebooks around me, being very, very physical in my
> face.. I [had] to be careful to watch my back... [w]e work
> around a very dangerous place".

Id. at *4.

The Thompson court stated that, "[u]nder [the Ninth Circuit's] clearly established law, a clear distinction is drawn between the value of individual personnel disputes and grievances that is of little or no relevance to the public's concerns with the operation of government, versus information relevant to the public's concerns and evaluation of the government such as threats to safety and welfare, abuse of power, fraud, corruption, unethical behavior, incompetence, misuse of resources, mismanagement, government inefficiency, and waste." (Citations omitted.)   Id. at *9.  The Thompson Court then carefully analyzed Garcetti, which had been recently decided, and stated:

> The Court notes that in Defendant's Reply Brief, he cites two
> recent U.S. Supreme Court cases, and argues that these two
> cases supposedly overturn or disapprove of a substantial portion
> of the Ninth Circuit case law pertaining to First Amendment
> retaliation, and that these cases apply directly to the
> circumstances of this case. Burlington Northern & Sante Fe
> Railway Co. v. White, 126 S.Ct. 2405 (June 22, 2006); Garcetti
> v. Ceballos, 126 S.Ct 1951 (May 30, 2006).  A review of these
> cases shows, however, that Defendant once again dramatically
> overstates the breadth of these cases... As to Garcetti, the case
> is simply irrelevant to this case.  In Garcetti, the Supreme Court
> held that an employee is not entitled to First Amendment
> protection **where his speech is specifically related to the
> official duties he must perform as part of his job**.  *See*

16

_Garcetti_, 126 S.Ct. At 1959-1960... In this very narrow situation, the Supreme Court held that: "Plaintiff wrote his disposition memo because that is part of what he ... was employed to do ... The significant point is that the memo was written pursuant to [Plaintiff's] official duties...". (Citation omitted.) ... **Contrary to Garcetti, Thompson was not employed as an operator by Tucson Water such that her normal job duties would include investigating and reporting violations to the fire department pertaining to Tucson Water's dangerous handling, transportation, and disposal of hazardous waste; _Garcetti_ is inapposite to this case**. (Emphasis added.)

Id. at *11.

The _Thompson_ court also held that there was no question that the retaliatory actions were sufficient to support a First Amendment retaliation claim and that Ring was not entitled to qualified immunity. Id. at *12.

In a Seventh Circuit (post-_Garcetti_) case, _Rohr v. Nehls_, 2006 WL 2927657 (E.D. Wisc. 2006), the Court dealt with a plaintiff who reported to the Wisconsin attorney general's office and the chairman of a county board that a sheriff had improperly interfered with an investigation. 2006 WL 2927657 at *2. The Court stated that:

Nehls' analogy to _Garcetti_ collapses, however, because in this case it is clear that Rohr's complaints were not made while he was acting in his official capacity... Rohr's complaints, though they involved his employment, were simply not the work product of the sheriff's department in the same way Ceballos' memo might have "belonged" to the district attorney's office in _Garcetti_.

17

Id. at *7.

In still another post-Garcetti case, the federal district court in Pennsylvania distinguished Garcetti because it found a genuine dispute as to whether the plaintiff's speech was made as a citizen or an employee. Skrutsky v. Marut, 2006 WL 2660691 (M.D. Pa. 2006) at *9-10. The plaintiff police officer submitted an affidavit that, as a Patrol Division corporal, he had no official job duty to ferret out, investigate or prosecute corruption or other wrongdoing within the rank and file officers. Id. at *6. His affidavit stated that these were responsibilities of the department's Internal Affairs division. Id. The Court denied the defendants' motion for summary judgment because of this factual dispute. Id. at *10.

Finally, the defendants in Barclay v. Michalsky, 451 F.Supp.2d 386 (D. Conn. 2006), argued that the Court held that Garcetti was controlling because plaintiff nurse's complaints to her supervisors regarding fellow employees sleeping on the job were made pursuant to her official duties where a "work rule" specified that such behavior endangered the safety and welfare of persons and where another "work rule" stated that employees had a duty to report violations of existing work rules, policies, procedures or regulations. The Barclay Court held that, notwithstanding the work rule requiring reporting of violations, material issues of

fact existed as to whether plaintiff's complaints were made in the context of her job responsibilities.  Id. at 395.  The Court found it decisive that the plaintiff had never received any training about the specific work rules or about reporting work rule violations.  Id. at 395.  The Court also noted that the defendants did not demonstrate that reporting potential work rule violations was particularly within the province of plaintiff's professional duties, more so than any other company employees.  Id. at 396.

The Barclay Court then concluded that the record did not establish that plaintiff's reports concerning the use of excessive force and restraints and employees sleeping on duty was part of the discharge of her duties as a nurse and stated, therefore, that Garcetti was not controlling.  Id. at 396.  Similar to Barclay, Abbatiello was never informed that investigating or reporting misconduct by other KPD employees was one of her job duties, nor was she trained to investigate or report such misconduct.  (CS ¶ 27.)

/

/

/

/

/

2.    <u>Dispute as to nature of speech precludes summary judgment</u>

Any dispute as to whether Abbatiello was speaking as a citizen requires that the Court resolve any doubt in her favor for purposes of summary judgment.  In <u>Kodrea v. City of Kokomo</u>, 458 F.Supp.2d 857 (S.D. Ind. 2006), the court stated:

> Unlike the situation in <u>Garcetti</u>, however, there is a factual dispute in this case concerning whether Kodrea's complaints about Campbell's hours and the ASA refund were made pursuant to his ordinary duties.  As Kodrea notes, nothing in his job description required him to monitor or report misconduct... Simply put, there are factual issues about whether Kodrea's ordinary job responsibilities included overseeing Campbell's hours of work and the ASA refunds.  Neither activity appears to have been Kodrea's core function as a recreational program director.  The Court is unable to conclude that Kodrea's complaints were made simply as an employee, rather than a concerned citizen.  Accordingly, <u>the Court must resolve any doubt in favor of Kodrea for purposes of summary judgment and conclude at this stage that Kodrea may have acted as a concerned citizen</u>. (emphasis added.)

458 F. Supp.2d at 868.

Abbatiello claims that her speech was made as a citizen because her ordinary job duty does not include reporting or investigating misconduct by other officers.  Thus, she was speaking as a citizen.  However, even if there is a dispute as to whether Abbatiello was speaking as a citizen, the issue should be resolved by a jury.  At this point, for summary judgment purposes, any doubt must be resolved

in favor of Abbatiello for purposes of summary judgment.  Therefore, Lum's

Motion to Summary Judgement should be denied.

3.  <u>Defendants conspired to retaliate against Abbatiello after she
reported corruption as a public citizen</u>.

It was known throughout KPD that there was a culture of retaliation

against officers who turned on other officers. (CS ¶ 31.)  Chief Lum and Pigao had

more than one conversation about Kapua and Abbatiello, including the order that

Abbatiello use the backdoor to Vice and avoid Kapua. (CS ¶ 49.)  Ihu and Lum had

multiple discussions regarding Abbatiello and Kapua. (CS ¶ 49.)

Lum claims that the allegations against Kapua were investigated and warranted no

discipline. (Lum's Memo. at 20.) However, the internal investigation was closed

prematurely, the criminal investigation is ongoing, and the reports of harassment

against Abbatiello were never investigated. (CS ¶¶ 12, 42, 43.)

Lt. Roy Asher was a superior officer who was tasked to conduct the

internal investigation but was prevented from conducting a proper and complete

investigation. He had no choice but to close the investigation as  "unable to

substantiate" because his request  for relevant and necessary documents was

ignored. (CS ¶ 13.)  Lt. Asher requested telephone and bank records of Kapua in

order to determine if there was a link between Kapua and the drug dealers.  (CS ¶

39.)  In addition, Lt. Asher indicated that "The internal investigation does not have

Subpoena powers or authority to request the same [Kapua's bank and telephone records]. This results in the Internal Investigation to rely heavily on the Criminal Investigation findings [*sic*]." (CS ¶ 41.) The criminal investigation is still ongoing so the internal investigation was closed prematurely. (CS ¶ 12,42.) Furthermore, Lt. Asher did not interview all crucial witnesses. (CS ¶ 40.) Darren Rose was present with Abbatiello when Herron made the allegations against Kapua and he was never interviewed by <u>anyone</u> at KPD regarding Kapua and the allegations. (CS ¶ 40.) Lt. Quibilan also interviewed Herron and had first-hand knowledge of her allegations against Kapua. However, Asher <u>never</u> spoke to Quibilan during the investigation. (CS ¶ 40.) From these failures, it is clear that the culture of retaliation or dereliction of duty or incompetence, or all three, leads directly to the question of why Lum and KPD failed or refused to take any corrective action to protect Abbatiello from Kapua, why they failed or refused to stop all acts of retaliation against Abbatiello, and why they failed or refused to make her workplace safe from violence or the threat of violence.

Kapua's unlawful actions against Abbatiello included, among other things, repeatedly screaming obscenities at her on KPD premises and in public, intimidating her, and threatening her with physical harm. (CS ¶ 45.) However, these continuous acts of harassment by Kapua were not investigated. (CS¶ 43.)

22

In Sept. 2004, when Lum was Chief, Abbatiello also discovered and reported that her service weapon was missing from her KPD office. (CS ¶ 44, 47.)  No investigation was conducted regarding the gun removed from her KPD office  (CS ¶ 43.)

      B.    <u>Defendants Are Not Entitled To Qualified Immunity</u>

Defendants violated clearly established law, therefore they are not entitled to qualified immunity.  Lum argues he is entitled to qualified immunity because (1) the law governing acts of retaliation were not clearly established at the time and (2) no retaliation occurred.  In addition to the Constitutional and statutory guarantees of free speech, there was ample case law in 2004 which clearly established that retaliation for reporting misconduct by public officials is a violation of the law.  In addition, there are numerous facts which demonstrate retaliation by the Defendants against Abbatiello.

Whether a defense of qualified immunity is available depends on whether Defendants' conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known.  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Skoog v. County of Clackmas</u>, 469 F.3d 1221, 1229 (9th Cir. 2006).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held

23

unlawful." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039

(1987). "If courts consistently avoided the constitutional issue by simply

dismissing suits on the basis of immunity, standards of official conduct would tend

to remain uncertain." Ehrlich v. Town of Glastonbury, 348 F.3d 48, 55 (2d Cir

2003).

   "No reasonable public official in 1992 could have assumed that he

could retaliate against an employee because of the employee's disclosure of

instances of misconduct by a public official." Branton v. City of Dallas, 272 F.3d

730, 740 (5th Cir. 2001)(quoting Shultea v. Wood, 27 F.3d 1112, 1120 (5th Cir.

1994), superceded on other grounds, 47 F.3d 1427 (1995)(en banc)). "Exposure of

official misconduct, especially within the police department is generally of great

consequence to the public." Branton, 272 F.3d at 740. "There is perhaps no subset

of matters of public concern more important, for purposes of First Amendment

protection of speech of public employees, than bringing misconduct to light." Id.

(quoting Davis v. Ector County, 40 F.3d 777, 782 (5th Cir. 1995))(brackets and

internal quotation marks omitted).

   In Thompson v. City of Tucson Water Department, 2006 WL

3063500 (D. Ariz), the court stated "As of 1998, there has been a wealth of case

law in the Ninth Circuit clarifying what retaliatory actions were sufficient to

support a First Amendment retaliation claim." 2006 WL 3063500 *10. The

Thompson court noted that Ninth Circuit case law held "very wide array of retaliatory acts legally sufficient to support a First Amendment claim [included] a retaliatory campaign of harassment, removing job responsibilities, interference with work duties ... job transfers without any loss in pay or status, and selective enforcement and application of work rules".  Id. at *11.

In 2004, when Abbatiello reported alleged misconduct by Kapua, the retaliation and failure or refusal to ameliorate the effects of Kapua's actions against Abbatiello by KPD, the County, Lum, and other County and KPD employees were clearly violations of the First and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §§ 1983 and 1985.  They were also clearly in violation of the First Amendment to the Constitution of the State of Hawaii and Haw.Rev.Stat. § 378-61 et seq.  No reasonable official could have believed otherwise.

Abbatiello was retaliated against by being subjected to a campaign of harassment, removal of job responsibilities as an FTO, forced to transfer with a loss in pay and status, and she suffered from selective enforcement and application of normal work rules when she, alone, was ordered to avoid Kapua's office and to use the back stairs. (CS ¶¶ 17, 35-37.)  Therefore, Defendants are not entitled to qualified immunity because they retaliated against Abbatiello, in violation of

clearly established rights which a reasonable person would have known. (CS ¶ 32.)

    C.    <u>Termination of Employment is Not Required to State a Wrongful Termination Claim</u>

        Lum claims that Count IV, Wrongful Termination, cannot survive summary judgment because Abbatiello has not been terminated. Lum incorrectly states that "an alleged transfer and demotion cannot support Plaintiff's wrongful termination cause of action when Plaintiff was never terminated by the Kauai Police Department." (See Lum's Memo. at 24-25.)

        Termination of employment by KPD is not essential to a wrongful termination claim. "A demotion from one job to a lesser job is a discharge from the first job, and a demotion will support a wrongful discharge claim." <u>Richards v. Detroit Free Press</u>, 173 Mich. App. 256, 259, 433 N.W.2d 320, 322 (1989); <u>McDonald v. Union Camp Corp.</u>, 919 F.2d 1155, 1164 (6th Cir. 1990). In <u>Montgomery Ward & Co., Inc. v. Bozell</u>, 919 F.2d 1276 (7th Cir. 1990), the court also held that a demotion adequately raised the claim of constructive discharge. 919 F.2d at 1281.

        Abbatiello was demoted from a PO-9 Vice position to a PO-7 Patrol position. Abbatiello accepted a <u>temporary</u> transfer until her situation with Kapua could be resolved. (CS ¶ 17.) Despite being told that such a temporary transfer was possible by Ihu, Abbatiello was later informed that there was no such thing as

a temporary transfer and that she was permanently transferred to Patrol at a lower rate of pay.  (CS ¶ 17.)  Abbatiello was then replaced by Officer Eric Caspillo.  (CS ¶ 23.)  Thus, KPD unilaterally terminated Abbatiello from her PO-9 position, demoted her to PO-7 in Patrol Service, and permanently reduced her pay.  This constitutes wrongful termination.  Abbatiello need not be completely terminated from her employment with KPD to state a wrongful termination claim.

In addition, Abbatiello mitigated damages by accepting a temporary transfer rather than terminate her employment with KPD.  In Howard v. Conlin Furniture No. 2, Inc., 272 Mont. 433, 901 P.2d 116 (1995), a plaintiff was terminated from his position as store manager and offered a sales position.  272 Mont. at 435, 901 P.2d at 118.  The court noted that "This case does not involve a lateral transfer, nor a minor change in job description.  This case involves absolute and final termination from a managerial position, followed by an offer of employment in a functionally different, and substantially inferior position with the same employer."  Id. at 438, 901 P.2d at 119.  The court held that refusal to accept the lessor position, at best, affected his duty to mitigate damages.  Id. at 438, 901 P.2d at 120.

By accepting a temporary transfer to Patrol, Abbatiello mitigated her damages after she was forced out of the Vice unit.  It is illogical for Lum to claim

27

that Abbatiello should have completely terminated her employment with KPD,

which would result in increased damages, rather than accept a temporary transfer to

another position until her situation with Kapua was resolved.  Because a demotion

and/or transfer constitutes a claim for wrongful termination, Lum's Motion for

Summary Judgment should be denied.

D.    Abbatiello is Not Barred by Hawai'i Workers' Compensation Act
      From Suing a Fellow Employee for Negligence

Contrary to Lum's claim, Hawai'i courts have twice affirmatively

stated that the Hawai'i Workers' Compensation Act ("WCA") does not bar an

employee from asserting negligence causes of action against co-employees.

In Marshall v. University of Hawai'i, 9 Haw. App. 21, 821 P.2d 937

(1991), the Court held that HRS § 385-5 did not bar an employee from claiming

negligent infliction of emotional distress caused by co-workers.  In Marshall, the

plaintiff alleged the defendants, the University of Hawai'i and three of its

employees, "negligently inflicted emotions distress on him through the

investigation and through the delay in reviewing his tenure application."  9 Haw.

App. at 35, 821 P.2d at 945.  The Court stated "[a]nother employee of the same

employer shall not be relieved of his liability as a third party, if the personal injury

is caused by his willful and wanton misconduct."  Id. at 36, 821 P.2d at 945.  The

Court in Marshall held that the plaintiff's and defendants' affidavits raised a

genuine issue of material fact as to the motivation of the defendant employees' conduct. Id. at 37, 821 P.2d at 946. Thus, "[s]ummary judgment is only proper on the issue when it has been removed from the case by uncontroverted affidavits or depositions." Id. Thus, summary judgment is inappropriate in this case because Abbatiello's affidavit raises genuine issues of material fact about the nature of Lum's misconduct and the reasons and intentions behind his misconduct.

In Iddings v. Mee-Lee, 82 Hawaiʻi, 919 P.2d 263 (1996), the Court held that granting summary judgment against the plaintiff, Iddings, was in error because HRS § 386-8 allows claims against co-employees for willful and wanton misconduct. 82 Hawaiʻi at 6, 919 P.2d at 268. The Iddings Court clarified the meaning of willful and wanton misconduct as "conduct which is either intentional or committed under circumstances exhibiting a reckless disregard for the safety of others." Id. at 7, 919 P.2d at 269. "The plain meaning of the words used in the term 'willful and wanton misconduct' includes reckless conduct that does not require a specific intent to cause injury within its scope." Id. at 6, 919 P.2d at 268. The term "willful" means "with indifference to the natural consequences." Id. at 7, 919 P.2d at 269. The term "wanton" means "recklessly disregardful of the rights or safety of others or of consequences." Id.

The Iddings Court, citing Pleasant v. Johnson, 312 N.C. 710, 325

S.E.2d 244, 249 (1985), stated "[t]herefore we hold that the Workers'

Compensation Act does not shield a co-employee from liability for injury caused

by his [or her] <u>willful, wanton, and reckless negligence</u>." <u>Id.</u> at 9, 919 P.2d at 271.

"Allowing suits between co-employees based upon reckless conduct does not

contravene or impair the purpose of Hawaii's workers' compensation scheme." <u>Id.</u>

Contrary to Lum's statement that "negligence conduct excludes willful and/or

wanton conduct" (Lum memorandum at 27), the <u>Marshall</u> and <u>Iddings</u> courts

labeled and qualified willful and wanton misconduct claims as negligence actions.

Thus, in accordance with <u>Marshall</u> and <u>Iddings</u>, Counts V and VII are "negligence"

causes of action.

Abbatiello alleged in Count I that "[t]he actions of Defendants were

willful, wanton, malicious, and in such callous and reckless disregard of civil

obligations." (*See* Complaint, ¶ 102.) Count V realleges and incorporates

paragraphs 1 to 119, inclusive (*See* Complaint, ¶ 120) and therefore alleges that

Lum's conduct was willful and wanton. Count VII also realleges and incorporates

paragraphs 1 to 129, inclusive. (*See* Complaint, ¶ 129.) Count VII also

specifically alleges "[t]he actions of Defendants were willful, wanton, malicious,

and in such callous and reckless disregard of civil obligation." (*See* Complaint, ¶

132.) Both Counts V and VII allege that Lum's conduct was willful and wanton,

therefore those causes of action fall within the exception of HRS § 396-8 and are not barred by HRS § 386-5.

In <u>Marshall</u>, *supra*, the plaintiff was allowed to pursue a claim of negligent infliction of emotional distress for co-employees' failure to timely review his tenure application.  <u>Marshall</u>, 9 Haw. App. at 35, 821 P.2d at 946.  Thus Abbatiello has properly stated a negligent infliction of emotional distress claim against the Defendants which may not be dismissed by summary judgment.

In addition, a negligent supervision claim such as Count V may also be asserted.  In <u>Iddings</u>, the plaintiff claimed that the defendant had the ability to control the patient population.  <u>Iddings</u>, 82 Hawaiʻi at 5, 919 P.2d at 267.  The plaintiff asserted that "[t]he actions of Defendant Mee-Lee in failing to take steps to provide for the safety of plaintiff Iddings and other staff members who were required to work within the Intensive Care Module with individuals who often were hostile and/or violent constituted negligence and/or willful and wanton misconduct on the part of Defendant Mee-Lee."  <u>Id.</u>

The claim asserted in <u>Iddings</u> is similar to Count V in that Abbatiello alleges that Lum and Ihu knew or should have known of the necessity and opportunity for exercising control over Kapua but failed to exercise such control.  (See Complaint, ¶ 121 and 122.)  It was well known throughout KPD that Kapua

had previously harassed and threatened two KPD dispatchers on KPD premises.

(CS ¶ 34.)

Lum has failed to prove there is no genuine issue of material fact with regard to Counts V and VII because they merely assert that such claims are barred by statute. Abbatiello has demonstrated that such claims are not barred. In addition, Abbatiello has asserted that Lum's actions were willful and wanton. Lum did not offer any evidence to support a claim that the Lum's actions were not willful and wanton. Even if Lum submitted such evidence, there would still be an issue of material fact that should be decided at trial. Therefore, Lum's motion for summary judgment on Counts V and VII should be denied.

E.  <u>Lum's Failure to Stop the Threats, to Ameliorate the Hostile Work Environment, and to Discipline Kapua Should Be Viewed in the Light of Lum's Own Complaint Against the County, et al.</u>

Lum's claim that Abbatiello is not entitled to relief rings hollow in light of his own complaint, before this very Court, that he was unfairly treated, discriminated against when a County official called him what he considered to be an emotionally distressing, embarrassing, harassing and discriminatory racial epithet for which he has claimed entitlement to punitive damages.[4]

---

[4] Lum has filed a Complaint claiming that being referred to as "Hop Sing" was a slur, was discriminatory, and entitled him to damages, including punitive damages. (<u>Lum v. Kauai County Council <em>et al.</em>,</u> 1:06-CV-00068-SOM-BMK)  The slur was used in a third-party context, not said to Lum's face.

Lum's Complaint obviously differs from that of Abbatiello.  Yet, it is ironic and supremely disingenuous of Lum to claim that he was subjected to a hostile work environment because of two words, at the same time that he ignored Abbatiello's repeated complaints that Kapua threatened her by gestures, screams, intimidating actions, words and menacing violence.

Lum argues that he did not negligently, willfully or wantonly violate the rights of Abbatiello, and he argues that Abbatiello cannot prove such conduct. However, Lum has proclaimed, in his own lawsuit, how horrible the use of such language can be.  Under such circumstances, it is ludicrous for him to deny and refuse to do anything about Abbatiello's claim that she was forced to work in a hostile and violent workplace environment.

F.   Lum's Motion for Summary Judgement Should Also Be Denied On the Basis of His Failure to Participate in Discovery.

Lum may not frustrate Abbatiello's attempts to obtain evidence while, at the same time, claim that Abbatiello has no evidence to establish a genuine issues of material fact.  Lum claims there is a no genuine issue of material fact because Abbatiello lacks any evidence against him.  Specifically, Lum claims Abbatiello has produced no evidence of intentional infliction of emotional distress or willful, wanton, or oppressive conduct on his part.  (See Lum Motion for Summary Judgment at 28-9.)  However, it is through his invocation of his Fifth

33

Amendment right that Lum asserts such a claim.

In <u>Lyons v. Johnson</u>, 415 F.2d 540 (9th Cir 1969), the Ninth Circuit

upheld the dismissal of a complaint by a plaintiff who refused to answer deposition

questions based upon her Fifth Amendment right against self incrimination.  415

F.2d at 541-2.  The Court stated:

> <u>It is a little difficult to visualize how a possibility of self-incrimination could be involved in any mere relevant interrogation of appellant as to the background, aspects and incidents of her asserted claims</u>, unless she had engaged in a matter of perjury as to the allegations of her complaints; but that question was not one which the court was called upon to consider. If, however, appellant could properly have had a fear of the possibility of exposure to some collateral or unrelated incrimination, she has received full protection against any such possibility from the court's complete honoring of the scope of the privilege asserted by her.

> <u>Her obtaining of this shield, however, could not provide a sword to her for achieving assertion of her claims against the defendants without having to conform to the processes necessary to orderly and equal forensic functioning</u>.  Clearly, the process of discovery has become increasingly recognized as one of the primary and essential elements in making federal court business flow and in contributing to the accomplishing of trial justice or settlement termination of litigation.  The scales of justice would hardly remain equal in these respects, if a party can assert a claim against another and then be able to block all discovery attempts against him by asserting a Fifth Amendment privilege to any interrogation whatsoever upon his claim.

> We would not have indulged in the extent of this expression except for a desire to reach through to appellant in her self-representation as to the course which she has chosen to take.

> She of course had the right to make that choice, but she must now accept the fact that the doors of the law are closed to any attempts by her to reassert her alleged claims.

Id at 542.

Lum refused to answer even basic questions during his deposition such as his former positions with the Kauai Police Department and whether he knew Abbatiello. (CS ¶ 24.) Like <u>Lyons</u>, it is difficult to visualize how self-incrimination could be relevant to the background and aspects of the defenses asserted by Lum. Thus, Lum improperly attempts to use his Fifth Amendment privilege as a sword instead of a shield. Like <u>Lyons</u>, Lum may assert his Fifth Amendment privilege, but the law forecloses his attempt to obtain summary judgment on Abbatiello's claims by obstructing all attempts to obtain evidence from him regarding her claims.

/

/

/

/

/

/

/

35

## V.    CONCLUSION

Abbatiello was and is a police officer and, as such, is required to take action when made aware of alleged criminal acts.  At the time that she reported Kapua's alleged act of corruption, however, Abbatiello was a Vice-Narcotics officer, and her specific job responsibility was to investigate illicit drug deals and to aid in the criminal prosecution of such crimes.  Abbatiello was not assigned any duties related to public corruption or internal affairs, nor was she instructed about such responsibilities.  Abbatiello reported Kapua's actions as a rogue cop as a concerned citizen acting on a matter of serious public concern:  the abuse of power and public corruption in government.

As a matter of law, the <u>Garcetti</u> case is not applicable for the many reasons stated above.  For the purpose of opposing Lum's motion for summary judgment, it is sufficient that Abbatiello's actions and the actions and omissions of the defendants, including Lum, bring to the forefront a number of genuine issues of material fact.  Did Abbatiello make her report because her job description required it, or did she make it because she was a citizen concerned about a matter of public concern?  Was her report a result of an individual personnel dispute or was it the result of information she obtained that was relevant to the public's concerns about public and government corruption?  Were her actions an expression of her First

Amendment rights, or were they performed merely because she happened to be a police officer?  Did the actions (and/or omissions) of Kapua, Lum, other police supervisors, the Kauai Police Department and/or the County of Kauai amount to retaliation against Abbatiello because of her report of Kapua's alleged corruption?  Did Lum know of all of the details of Kapua's threats and harassment of Abbatiello?  Did Lum determine that Kapua's actions, and those of other KPD employees as alleged in Abbatiello's complaint were illegal?  Did Lum understand that Kapua's actions, and those of other KPD employees constituted unlawful retaliation?  Did Lum recognize that the KPD General Orders and/or Standards of Conduct prohibited a number of Kapua's actions?  Was Lum aware of the devastating emotional impact of Kapua's actions and the acts of retaliation, upon Abbatiello?  What was the resulting impact and the damage to Abbatiello?  What could have and should have been done in order to stop and prevent the outrageous conduct and the hostile and violence-prone environment that Abbatiello was forced to endure?

At the very least, Abbatiello's Complaint, her affidavits, numerous records and exhibits, and key deposition testimonies (and, in Lum and Kapua's cases, the lack of any testimony) raise genuine issues of material fact which preclude summary judgment against Abbatiello.  Thus, Lum's motion must be denied.

DATED:   Honolulu, Hawaii, February 2, 2007.

   /S/ John Hoshibata
DANIEL HEMPEY
MARGERY S. BRONSTER
JOHN HOSHIBATA
JEANNETTE HOLMES CASTAGNETTI
Attorneys for Plaintiff
DARLA ABBATIELLO

---

Abbatiello v. County of Kauai, etal.; <u>Civil No. CV04 00562 SOM BMK</u>;
**Memorandum in Opposition to Defendant K.C. Lum's Motion for Summary Judgment.**