IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DARLA ABBATIELLO,         )   Civ. No. 04-00562 SOM/BMK
                         )
        Plaintiff,    )
                         )   ORDER GRANTING IN PART AND
        vs.         )   DENYING IN PART DEFENDANTS'
                         )   MOTION FOR SUMMARY JUDGMENT
COUNTY OF KAUAI, KAUAI POLICE )
DEPARTMENT, K.C. LUM, WILDRED )
M. IHU, GORDON ISODA, DEAN   )
PIGAO, and IRVIL KAPUA,     )
                         )
        Defendants.   )
_____ )

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.        INTRODUCTION.

On April 21, 2006, Plaintiff Darla Abbatiello

("Abbatiello") filed her First Amended Complaint ("FAC") against

Defendants County of Kauai ("the County"), Kauai Police

Department ("KPD"), K.C. Lum ("Lum"), Wildred M. Ihu ("Ihu"),

Gordon Isoda ("Isoda"), Dean Pigao ("Pigao"), and Irvil Kapua

("Kapua") (collectively, "Defendants").  In the FAC, Abbatiello

asserts the following claims:  (1) violation of her rights to

free speech, substantive and procedural due process, and equal

protection under the United States Constitution, in violation of

42 U.S.C. § 1983 (Count 1);[1] (2) violation of the Hawaii

Whistleblowers' Protection Act, Haw. Rev. Stat. § 378-61 et seq.

_____

[1] At the hearing on the present motion, Abbatiello
withdrew her claims under 42 U.S.C. § 1985 in Counts 1 and 2.
The court therefore disregards any argument in the present motion
concerning her § 1985 claims.

(Count 3); (3) wrongful termination (Count 4); (4) negligent supervision and retention of an employee (Count 5); (5) intentional infliction of emotional distress (Count 6); (6) negligent infliction of emotional distress ("NIED") (Count 7); and (7) violation of her rights to free speech, due process, and equal protection under the Hawaii constitution (Count 8).[2]  Abbatiello prays for declaratory and injunctive relief, general, special, and punitive damages, and attorneys' fees and costs.

        The County, KPD, Ihu, Isoda, and Pigao now move for summary judgment.  In seeking summary judgment on Abbatiello's claims that they violated her First Amendment rights, they argue that Abbatiello did not engage in protected speech.  Relying on Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), they argue that all of her speech and reports were made pursuant to her official duties and are therefore unprotected.  Defendants alternatively contend that, if Abbatiello's speech was protected, they are qualifiedly immune with respect to her First Amendment claims.  Expecting this court to grant summary judgment on all of Abbatiello's federal claims, Defendants also ask this court to decline jurisdiction over the remaining state claims.  Defendants assert that Count 5, alleging negligent supervision and retention

_____

        [2] All of the individual Defendants are sued in their official capacities, but only Lum and Kapua are also sued in their individual capacities.  FAC ¶ 8-9.

2

of Kapua, and Count 7, alleging NIED, are barred by Hawaii's workers' compensation law.

Because there is a genuine dispute of fact regarding whether Abbatiello engaged in protected speech, the court denies summary judgment on her First Amendment claims. The court therefore denies Defendants' request to decline jurisdiction over the state claims. The court also denies summary judgment on the issue of qualified immunity, as municipalities and municipal employees sued in their official capacities are not entitled to the defense of qualified immunity. Abbatiello's negligence claims in Count 5 (negligent supervision and retention) and Count 7 (NIED) are barred by Hawaii's workers' compensation law, and the court grants summary judgment in Defendants' favor on those claims.

On December 21, 2006, and January 3, 2007, Lum and Kapua, respectively, filed joinders of simple agreement in the present motion for summary judgment. The rulings in this order therefore apply to Abbatiello's claims against Lum and Kapua.

II.     LEGAL STANDARD.

        A.     Motion for Summary Judgment.

        Summary judgment shall be granted when

        the pleadings, depositions, answers to
        interrogatories, and admissions on file,
        together with the affidavits, if any, show
        that there is no genuine issue as to any
        material fact and that the moving party is
        entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 383 F.3d 1018, 1024 (9th Cir. 2004); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific

facts showing that there is a genuine issue for trial." <u>Porter</u>, 383 F.3d at 1024 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003); <u>accord</u> <u>Addisu</u>, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." <u>Addisu</u>, 198 F.3d at 1134 (citation omitted). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." <u>Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587).

        When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. <u>Porter</u>, 338 F.3d at 1024.  The court does not make credibility determinations or weigh

conflicting evidence at the summary judgment stage.  <u>Id.</u>
However, inferences may be drawn from underlying facts not in
dispute, as well as from disputed facts that the judge is
required to resolve in favor of the nonmoving party.  <u>T.W. Elec.</u>
<u>Serv.</u>, 809 F.2d at 631.

 The summary judgment burdens are properly applied to a
motion asserting qualified immunity.  <u>See</u> <u>Butler v. San Diego</u>
<u>Dist. Attorney's Office</u>, 370 F.3d 956, 958 (9th Cir. 2004) ("When
a defendant makes a properly supported motion for summary
judgment based on official immunity, the plaintiff has an
obligation to produce evidence of his or her own.  In such a
case, the district court is not required (or even allowed) simply
to assume the truth of challenged factual allegations in the
complaint.  In other words, a motion for summary judgment based
on official immunity is governed by Federal Rule of Civil
Procedure 56, just like all motions for summary judgment in civil
suits in federal district court.").

 B. <u>Motion for Dismissal.</u>

 Defendants also ask this court to dismiss claims
pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure.  Although the parties dispute whether this court
should analyze Defendants' request for dismissal under Rule
12(b)(6) or Rule 12(c), the standard for a motion under either
rule is essentially the same.  <u>See</u> <u>Lake Tahoe Watercraft</u>
<u>Recreation Ass'n v. Tahoe Reg'l Planning Agency</u>, 24 F. Supp. 2d

1062, 1066 (E.D. Cal. 1998).  Because the motion was filed after
Defendants filed their Answers to the FAC, any motion to dismiss
would fall under Rule 12(c).  See Elvig v. Calvin Presbyterian
Church, 375 F.3d 951, 954 (9th Cir. 2004) ("A Rule 12(b)(6)
motion must be made before the responsive pleading.  Here,
Defendants filed their motion to dismiss after filing their
answer.  Thus, the motion should have been treated as a motion
for judgment on the pleadings, pursuant to Rule 12(c) or
12(h)(2)." (internal citation omitted)); see also Aldabe v.
Aldabe, 616 F.2d 1089, 1093 (9th Cir. 1980) (noting that Rule
12(h)(2) of the Federal Rules of Civil Procedure specifically
allows a Rule 12(c) motion based on an alleged failure to state a
claim upon which relief can be granted); George C. Frey
Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554
F.2d 551, 553 n.2 (2d Cir. 1977) ("Pursuant to Rule 12(h)(2), a
Rule 12(c) motion may be used to raise the defense of failure to
state a claim upon which relief can be granted, a defense
ordinarily raised under Rule 12(b)(6) before the pleadings are
closed." (quotation marks omitted)).

       Motions for judgment on the pleadings under Rule 12(c)
are proper when, taking all material allegations in a complaint
as true and construing them in the light most favorable to the
nonmoving party, the moving party demonstrates that it is
entitled to judgment as a matter of law.  Geraci v. Homestreet
Bank, 347 F.3d 749, 751 (9th Cir. 2003) ("A motion for judgment

on the pleadings should be granted where it appears the moving party is entitled to judgment as a matter of law."). However, under Rule 12(c), when matters outside the pleadings are considered, the motions are treated as motions for summary judgment. <u>Grimmett v. Brown</u>, 75 F.3d 506, 510 (9th Cir. 1996) (converting a Rule 12(c) motion to a motion for summary judgment under Rule 56 because matters outside the pleadings were considered); Fed. R. Civ. P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

Defendants and Abbatiello submit evidence for the court's consideration, and the court considers that evidence on this motion. The court therefore analyzes Defendants' entire motion, including those portions seeking dismissal pursuant to Rule 12(b)(6), under the standards applicable to motions for summary judgment.

III.    <u>BACKGROUND.</u>

Abbatiello has been employed by KPD as a police officer since 1989. Affidavit of Darla J. Abbatiello (1/18/2007) ("Abbatiello Affidavit") ¶ 2; FAC ¶ 13. In October 2002, after receiving numerous awards and commendations by KPD, she was assigned to the Investigative Services Bureau, Vice/Narcotics

Division ("the Vice Unit") of KPD.  Abbatiello Affidavit ¶ 2; FAC
¶¶ 13-14.  The Vice Unit is "primarily responsible for
investigating and solving drug trafficking on Kauai."  FAC ¶ 14.
As a Vice officer, Abbatiello's main duties were to investigate
drug complaints by gathering information and obtaining and
executing search warrants.  Id. ¶ 15.  She says she "worked
undercover, in plain clothes, [and] formed connections and
relationships with known and/or suspected drug users and dealers
in an attempt to investigate and build criminal cases against
drug users and dealers."  Abbatiello Affidavit ¶ 3.

        Abbatiello alleges that, in December 2003, she obtained
a warrant to search the residence of A.B.,[3] a suspected drug
dealer.  Id. ¶ 16.  Because Abbatiello believed that A.B.'s
boyfriend was C.D., a drug dealer who allegedly dealt in larger
quantities of drugs than A.B., Abbatiello says she "intended to
arrest A.B. and 'flip' her to arrest C.D."  Id. ¶ 17.  Abbatiello
alleges that, while she was attempting to execute the search
warrant on A.B., Sergeant Kapua, who was not a Vice officer, told
Abbatiello's commanding officer in the Vice Unit, Lieutenant
E.F., that "Vice should not work on either A.B. or C.D."  Id. ¶¶
18-19.

        Abbatiello says that, on December 15, 2003, she was
ordered to meet privately with Sergeant Kapua and A.B, at which

---

        [3] In the FAC, Abbatiello refers to various individuals
"in 'John Doe' fashion."  In this order, the court refers to
those individuals by the names Abbatiello uses in the FAC.

time Kapua registered A.B. as a confidential informant.  <u>Id.</u>
¶¶ 19-20.  Abbatiello allegedly thought that Kapua's registration
of A.B. "violated KPD rules regarding recruitment of confidential
informants."  <u>Id.</u> ¶ 20.  Between December 16 and 25, Abbatiello
says A.B. "did not make any controlled buys from specific drug
dealers as A.B. agreed, nor did A.B. attempt to work 'bigger
targets.'"  <u>Id.</u> ¶ 21.  According to Abbatiello, Sergeant Kapua
was upset with her for asking A.B. to make a controlled buy from
C.D and discouraged her from pursuing C.D.'s arrest.  <u>Id.</u> ¶ 22.

Abbatiello alleges that, on December 26, 2003, she
"returned to her original plan to serve the search warrant on
A.B. and then 'flip' her to obtain evidence against C.D."  <u>Id.</u>
¶ 23.  Abbatiello says that, after she executed the search
warrant and arrested A.B., A.B. "admitted that she sold crystal
methamphetamine with C.D., and that C.D. paid Sergeant Kapua six
thousand dollars ($6,000) through a third person to protect both
A.B and C.D."  <u>Id.</u> ¶¶ 23-24.  Abbatiello says that, after hearing
A.B.'s allegations about Kapua, "she feared for her safety"
because Kapua had "a reputation for having a violent temper and
background."  <u>Id.</u> ¶¶ 25-29.

Abbatiello alleges that, on December 28, 2003, she was
admitted to the Kauai Veterans Memorial Hospital Emergency Unit
for "sleeplessness, diarrhea, dehydration, severe coughing,
stomach pains, and other physical stress-related symptoms,"

conditions she says were "due directly to the stress of the situation at work and fear of Sergeant Kapua." Id. ¶ 30.

Abbatiello says she returned to work on January 2, 2004, and "immediately reported to her supervisor, Lieutenant E.F., what A.B. had told her about Sergeant Kapua and the alleged corruption, and that [she] feared for her safety." Id. ¶ 31. She says she also informed the State of Hawaii Organization of Police Officers ("SHOPO") and the Federal Bureau of Investigations ("FBI") about A.B.'s allegations. Abbatiello Affidavit ¶ 8. At the hearing on the present motion, the County suggested that the County itself may have provided the information to the FBI even before Abbatiello did. Abbatiello alleges that, although Lieutenant E.F. informed Acting Chief Ihu and Assistant Chief Isoda of A.B.'s allegations and Abbatiello's request that Kapua be ordered to stay away from her, "no such orders were made and no corrective action was taken." FAC ¶ 31. Abbatiello says she provided a written report about A.B.'s allegations to Lieutenant E.F. on January 19, 2004. Id. ¶ 32. Although Chief Ihu ordered a criminal and administrative investigation, Abbatiello alleges that "no meaningful action has been taken in either the criminal or internal investigations." Id. ¶¶ 33, 35. Rather, Abbatiello alleges, Sergeant Kapua harassed her by calling her derogatory names at work and in public and by "tipping off" suspects before she executed search warrants on them. Id. ¶¶ 36, 38.

According to Abbatiello, she contacted SHOPO in March 2004 about "the possibility of temporarily transferring out of the Vice unit" so that "she could work a significant distance away from Sergeant Kapua." Id. ¶ 39. At the hearing on the present motion, the County stressed that Abbatiello had only been on temporary assignment to the Vice Unit from the start. Abbatiello says she also discussed temporarily transferring out of the Vice Unit with Chief Ihu and Lieutenant E.F. Id. ¶ 39. On March 31, 2004, she requested a temporary transfer in writing and was transferred on April 2, 2004. Id. ¶¶ 40-41. Abbatiello alleges that, after she was transferred, Chief Ihu informed her that her transfer was not temporary, but permanent. Id. ¶ 41. Abbatiello says she was also demoted "from Police Officer II at a salary range of PO-9 to a Police Officer I at a Range of PO-7." Id. ¶ 43.

Abbatiello further alleges that, on April 18, 2004, another officer told her to look in her personal dictionary at the Vice Unit office. Id. ¶ 44. She says that, in the dictionary, "three red arrows were handwritten and pointed to the word 'DEATH' . . . . Next to the definition of 'DEATH' was her name written in red ink with an arrow pointing to the definition." Id. ¶ 44. Abbatiello says she perceived this to be a death threat and reported it to her supervisors, but that "no internal investigation or meaningful criminal investigation has taken place." Id. ¶ 44.

According to Abbatiello, on June 23, 2004, she met with Chief Lum and another officer in Chief Lum's office.  Id. ¶ 47. She says that, during the meeting, "Sergeant Kapua stood outside Chief Lum's door and 'stared [her] down'" and that Sergeant Kapua's behavior was "so disruptive to the meeting that Chief Lum closed his office door."  Id. ¶ 47.  After the meeting, Abbatiello allegedly heard Kapua "screaming and yelling" in his office and says he punched a hole in his office wall.  Id. ¶ 48. Later that day, Abbatiello says she was ordered to "stay away from Sergeant Kapua and to use the back door when she had to go to the Vice Unit."  Id. ¶ 49.

Abbatiello further alleges that, on April 24, 2005, while on duty, she was ordered "to assist in a search of two female arrestees and to photograph each of them in a naked condition."  Id. ¶ 58.  Abbatiello says she refused to take the photographs and reported the incident the next day, but that "no action was taken."  Id. ¶¶ 62–64.  She alleges that, after that incident occurred, Chief Lum drafted a new KPD policy, which provided that "KPD officers must photograph the search at every stage of the arrest process."  Id. ¶ 70.  Because Chief Lum allegedly backdated the effective date of the proposed policy to cover the April 24 strip search incident, Abbatiello believes Lum's new policy was an "attempt to cover up the fact that [she] made a proper complaint about the photographing of female arrestees."  Id. ¶ 72.

Abbatiello says that, on May 25, 2005, she was removed from her position as a field training officer, which resulted in a "loss of compensation." <u>Id.</u> ¶¶ 65, 68. She also says she has been unable to work in the cellblock because Sergeant Kapua and other officers "who have threatened or intimidated [her]" were also assigned to cellblock duty. <u>Id.</u> ¶ 81. Abbatiello says she had "regularly earned extra compensation . . . for performing [cellblock] duty," and that she suffered a loss of compensation as a result of being unable to work in the cellblock. <u>Id.</u> ¶¶ 81-82.

IV.    <u>ANALYSIS.</u>

A.    <u>First Amendment Claims.</u>

Defendants argue that they are entitled to summary judgment on Abbatiello's First Amendment claims brought under 42 U.S.C. § 1983 because Abbatiello did not engage in protected speech. Motion at 7-20. They contend that, under <u>Garcetti</u>, 126 S. Ct. 1958, "a public employee must speak in her capacity as a citizen in order to receive First Amendment protection for her speech." Motion at 7. Asserting that Abbatiello's speech "was made in her capacity as a police officer employed by KPD, not as a citizen," Defendants argue that "there is no violation of [her] First Amendment rights." Motion at 11. In response, Abbatiello points to evidence showing that her reports were not made pursuant to her official duties as a Vice or patrol officer and contends that a genuine dispute of fact precludes summary

judgment.  Opp. at 14-19.  The court agrees with Abbatiello that
questions of fact remain to be tried.

        "In order to state a claim against a government
employer for violation of the First Amendment, an employee must
show (1) that he or she engaged in protected speech; (2) that the
employer took 'adverse employment action'; and (3) that his or
her speech was a 'substantial or motivating' factor for the
adverse employment action." <u>Coszalter v. City of Salem</u>, 320 F.3d
968, 973 (9th Cir. 2003); <u>see also</u> <u>Freitag v. Ayers</u>, 468 F.3d
528, 543 (9th Cir. 2006).  The Supreme Court recently modified
prior First Amendment jurisprudence regarding the first
prong--<u>i.e.</u>, whether an employee engaged in protected speech.
<u>Freitag</u>, 648 F.3d at 544 (noting that "the Supreme Court's recent
decision in [<u>Garcetti</u>, 126 S. Ct. 1951,] modified prior First
Amendment jurisprudence with respect to the first element-
-employee protected speech").

        The plaintiff in <u>Garcetti</u>, 126 S. Ct. at 1955, Richard
Ceballos ("Ceballos"), was a deputy district attorney whose job
responsibilities included supervising other prosecutors and
making recommendations regarding the prosecution of their cases.
At the request of a defense attorney, Ceballos reviewed an
affidavit that had been used to obtain a critical search warrant
in one of his office's cases.  <u>Id.</u>  After examining the affidavit
and speaking to the affiant, Ceballos determined that the
affidavit contained serious misrepresentations, informed his

supervisors of that determination, and drafted a disposition memorandum recommending dismissal of the case.  Id. at 1955-56. Ceballos was thereafter subjected to a series of retaliatory employment actions and filed a federal lawsuit against his supervisors, claiming they had violated his First and Fourteenth Amendment rights "by retaliating against him based on his memo." Id. at 1956.

The supervisors moved for summary judgment, arguing that "Ceballos' memo was not protected speech under the First Amendment."  Id.  The district court granted the motion, concluding that Ceballos "was not entitled to First Amendment protection for the memo's contents" because he "wrote his memo pursuant to his employment duties."  Id.  On appeal, the Ninth Circuit reversed, holding that "Ceballos's allegations of wrongdoing in the memorandum constitute protected speech under the First Amendment."  Id.

On certiorari, the Supreme Court was faced with deciding "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties."  Id. at 1955.  The Court reaffirmed that "public employees do not surrender all their First Amendment rights by reason of their employment," but that "the First Amendment protects a public employee's right, in certain circumstances to speak as a citizen addressing matters of public concern."  Id. at 1957; see also Freitag, 468 F.3d at 543 (noting

16

that, under <u>Garcetti</u>, "the issue is not only whether the speech
in question addresses a matter of public concern, but also
whether it is made <u>as a citizen</u>" (emphasis in original)).  The
Court ultimately held, "when public employees make statements
pursuant to their official duties, the employees are not speaking
as citizens for First Amendment purposes, and the Constitution
does not insulate their communications from employer discipline."
<u>Garcetti</u>, 126 S. Ct. at 1960.

        In reaching its decision, the Court made several
observations applicable to this case.  First, because it was
undisputed that Ceballos "wrote his disposition memo pursuant to
his employment duties," the Court observed that it did not have
the "occasion to articulate a comprehensive framework for
defining the scope of an employee's duties in cases where there
is room for serious debate."  <u>Id.</u> at 1961.  It did reject,
however, "the suggestion that employers can restrict employees'
rights by creating excessively broad job descriptions."  <u>Id.</u>  On
that point, the Court stated:

> The proper inquiry is a practical one.
> Formal job descriptions often bear little
> resemblance to the duties an employee
> actually is expected to perform, and the
> listing of a given task in an employee's
> written job description is neither necessary
> nor sufficient to demonstrate that conducting
> the task is within the scope of the
> employee's professional duties for First
> Amendment purposes.

<u>Id.</u> at 1961-62.  The Court also noted that it was not dispositive
that "Ceballos expressed his views inside his office, rather than

publicly" or that the memo "concerned the subject matter of [his]
employment," as employees "may receive First Amendment protection
for expressions made at work . . . or related to the speaker's
job." Id. at 1959.

In Freitag, 468 F.3d at 532, 532-35, the Ninth Circuit
applied Garcetti's holding to a case in which the plaintiff was a
female correctional officer who had filed numerous complaints
with her supervisors about "the pervasive practice at Pelican Bay
of inmate exhibitionist masturbation." When her complaints went
ignored, she also sent letters to California State Senator
Richard Polanco ("Sentaor Polanco"), in which "she alleged that
she and other female correctional officers were regularly
subjected to sexually abusive behavior . . . and that supervisors
failed to respond adequately to her complaints." Id. at 535.
She also contacted the California Office of the Inspector General
("Inspector General") and wrote a letter to Cal Terhune
("Terhune"), the director of the California Department of
Corrections and Rehabilitation ("the CDCR"). Id. at 534-35.
After voicing her concerns, the plaintiff was allegedly subjected
to various retaliatory employment actions and was eventually
terminated from her job. Id. at 533-36.

The plaintiff filed a lawsuit for retaliation under the
First Amendment against the CDCR and three administrators of
Pelican Bay State Prison. A jury found in her favor, id. at 532,
537, and the defendants appealed, arguing that substantial

evidence did not support the jury's finding of retaliation, id. at 537.

On appeal, the Ninth Circuit focused on whether the plaintiff's complaints constituted protected speech under the First Amendment:  "The critical inquiry is . . . whether [the plaintiff] engaged in the relevant speech 'pursuant to her official duties.'"  Id. at 545 (citing Garcetti, 126 S. Ct. at 1960).  The court concluded that her "internal" complaints were not protected because she had "submitted those reports pursuant to her official duties as a correctional officer and thus not in her capacity as a citizen."  Id. at 546.  However, the court held that her communications with Senator Polanco and the Inspector General were protected, as "[i]t was certainly not part of [the plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly, and specifically its failure to take corrective action to eliminate sexual harassment in its workplace."  Id. at 545.  The court also noted that it was her "responsibility as a citizen to expose such official malfeasance to broader scrutiny."  Id. (emphasis in original).  Lastly, the Ninth Circuit concluded that determining whether the plaintiff's letter to Terhune, the director of the CDCR, was protected was "a closer question."  Id. at 546.  The court stated:

> We are unsure whether prison guards are
> expected to air complaints regarding the
> conditions in their prisons all the way up to
> the Director of the CDCR at the state capitol

in Sacramento.  We are not aware, for
example, what the union contract provides
with respect to the persons to whom such
grievances may or must be presented.

Id.  The court therefore remanded to the district court the issue
of whether that letter was protected under the First Amendment.

In Korea v. City of Kokomo, Indiana, 458 F. Supp. 2d
857, 860, 867-69 (S.D. Ind. 2006), the district court for the
Southern District of Indiana was similarly faced with deciding
whether the plaintiff's complaints about "alleged abuse within
City government" were protected by the First Amendment.  The
plaintiff had been hired as a recreational programmer for the
city's parks department, and his job responsibilities included
"supervising and coordinating recreational programs and
supervising the seasonal staff for concession stands."  Id. at
862-63.  After noticing that one of the seasonal employees "was
being paid for hours that he had not worked," he reported the
problem to his supervisor.  Id. at 863.  The plaintiff also
reported his observation that a refund check that should have
been sent to the state American Softball Association commissioner
was never sent.  Id.  The plaintiff claimed that his supervisor
retaliated against him after he made his reports.  Id. at 864.

The plaintiff brought suit against various defendants,
including his supervisor, alleging that his First Amendment
rights had been violated.  Id. at 865-66.  The defendants moved
for summary judgment, arguing that the plaintiff's reports were
not protected under the First Amendment.  The court turned to

<u>Garcetti</u> and noted, "Unlike the situation in <u>Garcetti</u>, . . .
there is a factual dispute in this case concerning whether [the
plaintiff's] complaints . . . were made pursuant to his ordinary
duties." <u>Id.</u> at 867.  The court cited to evidence establishing
that "nothing in [the plaintiff's] job description required him
to monitor or report misconduct," that the plaintiff "was not
responsible for handling money," and that "there is no evidence
that [the plaintiff] had any oversight of the [missing] refunds."
<u>Id.</u> at 867–68.  Rather, the evidence showed that the plaintiff's
"core function as a recreational program director" did not
include the activities about which he complained.  <u>Id.</u> at 868.
The court was therefore "unable to conclude that [the
plaintiff's] complaints were made simply as an employee rather
than a concerned citizen" and denied summary judgment on his
retaliation claim.  <u>Id.</u>

        Courts have also addressed whether departmental rules
and regulations are dispositive of whether an employee speaks
pursuant to his or her official duties.  For example, in <u>Batt v.
City of Oakland</u>, No. C 01–04975 MHP, 2006 WL 1980401, at *1 (N.D.
Cal. July 13, 2006), the plaintiff, a police officer with the
Oakland Police Department ("OPD"), "witnessed numerous illegal
and brutal acts on the part of his supervising officer and three
other OPD officers."  After reporting his observations, the
plaintiff was allegedly retaliated against by his coworkers and
eventually resigned from the department.  <u>Id.</u> at *1–2.  The

plaintiff filed suit under the First Amendment, and the
defendants moved for summary judgment, arguing that the
plaintiff's reports were not protected because departmental rules
and regulations required him to report such misconduct. <u>Id.</u> at
*4. The court rejected that argument, stating that general rules
and regulations requiring an employee to report misconduct were
not dispositive under <u>Garcetti</u>. <u>Id.</u>; <u>see also</u> <u>Skrutski v. Marut</u>,
No. 3:CV-03-2280, 2006 WL 2660691, at *9-10 (M.D. Pa. Sept. 15,
2006) (ruling that "State Police regulations" were "not
dispositive" as to whether the plaintiff's reports of his
co-employees' misconduct were protected under the First
Amendment); <u>Barclay v. Michalsky</u>, 451 F. Supp. 2d 386, 395 (D.
Conn. 2006) (rejecting the defendants' argument that "the
complaints plaintiff allegedly made to her supervisors regarding
employees sleeping on the job and the use of excessive restraints
were made pursuant to her official duties because behavior that
endangers the safety and welfare of persons is specifically
prohibited by Work Rule # 22 and employees have an affirmative
duty pursuant to Work Rule # 30 to report violations of existing
work rules, policies, procedures, or regulations").

     Defendants seek summary judgment on Abbatiello's First
Amendment claims, arguing that she spoke pursuant to her official
duties and not as a citizen when she reported:  (1) Kapua's

alleged involvement with bribery, and (2) the order to photograph
naked arrestees.[4]

As the <u>Freitag</u> court made clear, the "critical inquiry"
for this court in determining whether Abbatiello spoke as a
citizen is "whether [she] engaged in the relevant speech
'pursuant to her official duties.'"  <u>See</u> <u>Freitag</u>, 468 F.3d at 545
(citing <u>Garcetti</u>, 126 S. Ct. at 1960).  Defendants point to the
KPD Standards of Conduct as evidence of Abbatiello's official job
duties.  The Standards of Conduct require officers to "[i]dentify
potentially serious law enforcement and government problems," to
"[e]nforce all federal, state and local laws and ordinances," and
to report "unlawful, unjust or improper orders."  Reply at 6;
Ex. B (attached to Reply CSF) at 5, 7.  These KPD regulations are
not dispositive, however, as they, like formal job descriptions,
may "bear little resemblance to the duties an employee actually
is expected to perform."  <u>See</u> <u>Garcetti</u>, 126 S. Ct. at 1962; <u>see</u>
<u>also</u> <u>Batt</u>, 2006 WL 1980401, at *1; <u>Skrutski</u>, 2006 WL 2660691, at
*9-10; <u>Barclay</u>, 451 F. Supp. 2d at 395.

As evidence of her official job duties, Abbatiello
submits evidence showing that her main responsibility as a Vice
officer was "to investigate, in an undercover capacity, illegal
drug activities on the island of Kauai."  Abbatiello Affidavit

---

[4] Although Defendants focus on only these two reports,
Abbatiello clarified at the hearing on this motion that her First
Amendment claims are also based on her reports regarding the
alleged theft of her handgun and the alleged death threat in her
personal dictionary.

¶ 2.  Specifically, as a Vice officer, she "worked undercover, in plain clothes [and] formed connections and relationships with known and/or suspected drug users and dealers in an attempt to investigate and build criminal cases against drug users and dealers." Id. ¶ 3.  Additionally, Abbatiello says she was "not employed to investigate misconduct by other police officers," was "not informed that investigating or reporting misconduct by other KPD employees was one of [her] job duties," and was not "trained to do so." Id. ¶¶ 4-5.  She also says, "Neither [her] position as a police officer nor [her] oath as a police officer caused [her] to act any differently." Id. ¶ 8.  Evidence before the court also shows that Abbatiello was told by "Assistant Chief of Police Dean Pigao that [she] did not have to report the alleged corruption by Kapua."[5] Id. ¶ 9.  But see Ex. 2 (attached to Motion) at 19, 22.  This evidence supports Abbatiello's position that her reports of Kapua's alleged bribery and of the order to take photographs were not made pursuant to her official duties or responsibilities as a Vice and patrol officer at KPD.

Defendants nevertheless argue that Abbatiello has not "made any effort to make public her concerns" and that her speech "owes its existence to her professional responsibilities." Motion at 15, 19.  But the Supreme Court made clear that public

---

[5] Abbatiello also points to additional evidence of her official duties and responsibilities, to which Defendants object. Because the court need not rely on that evidence in deciding the present motion, the court disregards that evidence for purposes of this order.

employees "may receive First Amendment protection for expressions
made at work . . . or related to the speaker's job." Garcetti,
126 S. Ct. at 1959; see also Skrutski, 2006 WL 2660691, at *9-10;
Barclay, 451 F. Supp. 2d at 395.  Additionally, evidence before
the court shows that Abbatiello reported Kapua's alleged
misconduct to SHOPO and the FBI.  Abbatiello Affidavit ¶ 8.

        Defendants also contend that, because Abbatiello
reported that she was concerned about her safety, the sole
motivation of her reports "seems to be fear of her safety in the
workplace."  Motion at 14.  Abbatiello responds that she reported
Kapua's alleged misconduct "because corruption is a matter of
public concern and because, as a citizen and resident of Kauai,
[she is] concerned about the persistent allegations of corruption
within KPD."  Abbatiello Affidavit ¶ 8.  Regarding her report of
the order to photograph naked arrestees, Abbatiello says that
"[she] reported the strip search incident because the violation
of an individual's right to be free from unreasonable searches is
a matter of public concern and, as a citizen and resident of
Kauai, [she is] concerned about the persistent allegations of
police misconduct and abuse of authority within KPD."  Id. ¶ 11.
There is at least a genuine dispute as to whether Abbatiello's
sole motivation in making her reports was fear for her own
safety.

        Defendants finally posit that Abbatiello must not have
been speaking as a citizen because she "fail[ed] to mention [in

25

the FAC] that her reports were made in her capacity as a citizen." Motion at 16. However, Garcetti, which clarified that public employees must speak as citizens when engaging in protected speech, was not decided until Abbatiello had already filed the FAC. Moreover, Defendants do not cite to, and this court has not found, any authority requiring a public employee to allege in the complaint that he or she spoke "as a citizen" when engaging in protected speech. Defendants are therefore unpersuasive in arguing that they are entitled to summary judgment simply because the FAC does not allege that Abbatiello spoke "as a citizen."

Defendants have not met their burden of establishing that there is no genuine dispute of fact as to whether Abbatiello's reports were made pursuant to her official duties and responsibilities as a Vice or police officer. The evidence before the court, viewed in the light most favorable to Abbatiello, raises a question of fact as to whether her official duties included reporting Kapua's alleged misconduct or the order to photograph naked arrestees. The court therefore denies summary judgment on Abbatiello's First Amendment claims.

Anticipating that this court would grant summary judgment in favor of Defendants on Abbatiello's federal claims, Defendants ask the court to decline jurisdiction over the remaining state law claims "in the event the federal claims are dismissed." Motion at 27. Because the court denies summary

judgment on Abbatiello's First Amendment claims, the court also
denies Defendants' request with respect to the state claims.

      B.   <u>Qualified Immunity.</u>

      Defendants alternatively contend, "Even if
[Abbatiello's] speech were protected under the First Amendment,
Defendants are entitled to summary judgment on Counts I and II of
the First Amended Complaint because . . . they are qualifiedly
immune to [her] claims under 42 U.S.C. § 1983."  The problem with
this argument is that qualified immunity does not apply to
movants sued in their official capacities.

      In <u>Hallstrom v. City of Garden City</u>, 991 F.2d 1473,
1487 (9th Cir. 1992), the Ninth Circuit stated in clear terms, "A
municipality (and its employees sued in their official
capacities) may not assert a qualified immunity defense to
liability under Section 1983."  <u>Id.</u>; <u>Kentucky v. Graham</u>, 473 U.S.
159, 165-68 (1985) (noting that qualified immunity is not
available to an official sued in his or her official capacity);
<u>Owen v. City of Independence</u>, 445 U.S. 622, 638 (1980) ("We hold,
therefore, that the municipality may not assert the good faith of
its officers or agents as a defense to liability under § 1983.").
The County, KPD, and the individual Defendants sued in their
official capacities are not entitled to qualified immunity.[6]

_____

[6] The County, KPD, and the official Defendants may have
available to them other defenses unique to municipalities.  <u>See</u>,
<u>e.g.</u>, <u>Tongson v. County of Maui</u>, Civ. No. 05-00683 SOM/LEK, Order
Granting in Part and Denying in Part Defendants' Motions for
Summary Judgment (D. Haw. Dec. 15, 2006) (addressing several
arguments made by the County of Maui and its employees sued in

Unlike the other individual Defendants, Lum and Kapua are sued in both their official and individual capacities and therefore may raise the defense of qualified immunity with respect to the individual capacity claims. See, e.g., Kentucky, 473 U.S. at 166-67 (noting that qualified immunity is available to officials sued in their personal capacity, but not to officials sued in their official capacity); Owen, 445 U.S. at 638 n.18 (noting that, where "government officers had been sued in their individual capacities, . . . [qualified] immunity served to insulate them from personal liability for damages"); Hallstrom, 991 F.2d at 1482 (applying qualified immunity to officials sued in their individual capacity, but stating that the district court erred in applying qualified immunity to a municipality and its employees sued in their official capacities). However, the present motion was not brought by either Lum and Kapua, and their joinders in the motion do not ask this court to apply qualified immunity to them in their individual capacities.

Under Local Rule 7.9, parties may file substantive joinders or joinders of simple agreement. Local Rule 7.9. A "substantive joinder" is "a joinder based on a memorandum supplementing the motion . . . joined in" and "must be filed and served within two business days of the filing of the motion . . .

their official capacities that they are not liable for First Amendment violations brought under 42 U.S.C. § 1983); cf. Kentucky, 473 U.S. at 167 n.13 ("punitive damages are not available under § 1983 from a municipality"); Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1993) (discussing the requirements for municipality liability under § 1983).

joined in." Id.  A "joinder of simple agreement" is a joinder in
which no supplemental memorandum is provided and "may be filed at
any time." See id.  Because Lum and Kapua did not provide
supplemental memoranda with their joinders and did not file their
joinders within two days of the present motion, the court
construes their joinders as joinders of simple agreement.  Their
joinders therefore were either (1) statements by Lum and Kapua
that they agree that the moving Defendants are entitled to
summary judgment for the reasons stated in their motion, or
(2) requests by Lum and Kapua that the court apply any rulings on
the present motion to them, if applicable.  The court does not,
however, interpret their joinders as asking this court to go
beyond the present motion and to apply qualified immunity to them
in their individual capacities.  Therefore, with respect to Lum
and Kapua, the court concludes only that they are not entitled to
the defense of qualified immunity in their official capacities.

Any argument by Lum or Kapua that they, in their
individual capacities, are entitled to qualified immunity may
nevertheless be brought in a separate motion.  See id. (noting
that Local Rule 7.9 "does not preclude the filing of an
independent motion that does not seek to be included in a pre-
existing hearing schedule").  Lum did just this, as he filed his
own motion for summary judgment on January 4, 2007, arguing that
he is qualifiedly immune.  Kapua did not file his own summary

judgment motion, but may file a joinder of simple agreement in
Lum's motion at any time.  Local Rule 7.9.

       C.  <u>Negligence Claims.</u>

       Defendants argue that Abbatiello's claims for negligent
supervision and retention (Count 5) and NIED (Count 7) are barred
by Hawaii's workers' compensation law.  Motion at 25-27.
Defendants assert that Haw. Rev. Stat. § 386-5 precludes
negligence claims against employers, while section 386-8
precludes negligence claims against co-employees.  Motion at
25-27.  Abbatiello does not dispute the applicability of section
386-5, but contends that, because section 386-8 allows for claims
alleging "wilful and wanton misconduct," her negligence claims
are not barred.  Opp. at 28-31.  The court agrees with Defendants
that Counts 5 and 7 are barred by Hawaii's workers' compensation
law.

       "Generally, the workers' compensation scheme serves to
bar a civil action for physical and emotional damages resulting
from work-related injuries and accidents."  <u>Nelson v. Univ. of
Haw.</u>, 97 Haw. 376, 393, 38 P.3d 95, 112 (Haw. 2001).  The
exclusive remedy provision of Hawaii's workers' compensation law
precludes certain claims against employers:

> The rights and remedies herein granted to an
> employee . . . on account of a work injury
> suffered by the employee shall exclude all
> other liability of the employer to the
> employee . . . to recover damages from the
> employer, at common law or otherwise, on
> account of injury, except for sexual
> harassment or sexual assault and infliction

                    of emotional distress or invasion of privacy
                    related thereto, in which case a civil action
                    may also be brought.

Haw. Rev. Stat. § 386-5; Luzon v. Atlas Ins. Agency, Inc., 284 F.

Supp. 2d 1261, 1263 (D. Haw. 2003) ("Under Hawaii law, claims for

negligent infliction of emotional distress [against a plaintiff's

employer] are barred by Haw. Rev. Stat. § 386-5, unless the

claims relate to sexual harassment or assault."); Beaulieu v.

Northrop Grumman Corp., 161 F. Supp. 2d 1135, 1148 (D. Haw. 2000)

("Under Hawaii law, Worker's Compensation is the exclusive remedy

against an employer for employee injuries outside of those

related to sexual harassment or sexual assault . . . .  The Court

finds that the claims of Negligent Supervision and Retention and

Negligent Infliction of Emotional Distress, are both 'work

injuries' arising from the conditions of Plaintiff's employment.

These claims, therefore are all barred by H.R.S. § 386-5.").

Because Abbatiello does not dispute that Haw. Rev. Stat. § 386-5

bars negligence claims against her employers--the County and

KPD--the court grants summary judgment in their favor on her

claims in Counts 5 and 7.

        Like the exclusivity provision in Haw. Rev. Stat.

§ 386-5, section 386-8 "extends immunity from suit to an injured

worker's co-employees." Iddings v. Mee-Lee, 82 Haw. 1, 6, 919

P.2d 263, 268 (Haw. 1996).  Section 386-8 provides:  "When a work

injury for which compensation is payable under this chapter has

been sustained under circumstances creating in some person other

                                   31

that the employer <u>or another employee of the employer acting in</u> <u>the course of his or her employment a legal liability to pay</u> <u>damages</u> on account thereof, the injured employee . . . may claim compensation under this chapter and recover damages from such third person." <u>Id.</u> (quoting Haw. Rev. Stat. § 386-8) (emphasis in original). Haw. Rev. Stat. § 386-8 also provides, however, "Another employee of the same employer shall not be relieved of his liability as a third party, if the personal injury is caused by his wilful and wanton misconduct."

In <u>Iddings</u>, 82 Haw. at 265, 919 P.2d at 263, the Hawaii Supreme Court was asked to determine "the scope and requirements" of Haw. Rev. Stat. § 386-8. In that case, Barbara Iddings ("Iddings"), a nurse, filed a lawsuit against her co-employee, Dennis Mee-Lee, M.D., ("Dr. Mee-Lee"), who was in charge of the Human Services Unit ("the HSU") of Castle Medical Center, for injuries she received at work while assisting in subduing a violent patient in the HSU. <u>Id.</u> at 4, 919 P.2d at 266. Iddings alleged that she "was thrown to the floor, became wedged between pieces of furniture, and suffered injuries to her head, neck, back, and knee." <u>Id.</u> In her complaint, Iddings claimed that, although Dr. Mee-Lee had "been advised that excessive furniture within [the HSU] posed a safety hazard, . . . [Dr. Mee-Lee] took no steps to remove the furniture." <u>Id.</u> at 4-5, 919 P.2d at 266-67. Iddings therefore brought claims for "negligence and/or willful and wanton misconduct on the part of [Dr. Mee-Lee]." <u>Id.</u>

at 5, 919 P.2d at 267.  Iddings subsequently stipulated to dismiss her negligence claims, and the trial court entered summary judgment against Iddings on her claims for wilful and wanton misconduct.  Id.  Iddings appealed.

On appeal, the Hawaii Supreme Court concluded that "the plain meaning of the term 'wilful and wanton misconduct' encompasses both reckless conduct that lacks a specific intent to cause injury and intentional conduct motivated by a specific intent to cause injury."  Id. at 7, 919 P.2d at 269 (emphases added).  The court also held that allowing suits between co-employees based on intentional or reckless conduct "does not impair or contravene the workers' compensation scheme's elimination of suits between co-employees based on employees' negligence in the workplace."  Id. at 7-8, 919 P.2d at 269-70 (emphasis in original).

Although the Iddings court held in clear terms that Haw. Rev. Stat. § 386-8 precludes negligence claims against co-employees and allows only claims based on intentional or reckless conduct, Abbatiello cites to Marshall v. University of Hawaii, 9 Haw. App. 21, 821 P.2d 937 (Haw. Ct. App. 1991), as authority for her position that negligence claims against co-employees are not barred.  Motion at 28.  The court is not persuaded.

In Marshall, 9 Haw. App. at 24, 821 P.2d at 941, Michael D. Marshall ("Marshall"), a former assistant professor at

the University of Hawaii, filed a lawsuit against the university, the chancellor, the dean of student services, and the dean of the college of arts and sciences.  Marshall had applied for tenure and promotion, after which he was investigated for sexual harassment, causing his application process to be delayed.  Id. at 25, 34, 821 P.2d at 941, 945.  Marshall brought suit against the defendants for, among other things, NIED.  Id. at 28, 34, 821 P.2d at 942, 945.  The trial court entered summary judgment in favor of the defendants, and Marshall appealed.

On appeal, the Intermediate Court of Appeals of Hawaii affirmed summary judgment as to the university, stating that Haw. Rev. Stat. § 386-5 barred his NIED claim against his employer. Id. at 35, 821 P.2d at 945-46.  Regarding Marshall's NIED claims against his co-employees, the court noted that Haw. Rev. Stat. § 386-8 "clearly allows an employee to sue a fellow employee for damages resulting from an injury caused by the fellow employee's willful and wanton misconduct."  Because Marshall's complaint alleged only that his co-employees negligently inflicted emotional distress on him, the court held, "Without more, the allegation fails to state a cause of action."  Id. at 34-36, 821 P.2d at 945-47.  However, because Marshall had submitted an affidavit to the trial court alleging that the "investigation was maliciously conjured up," and because his allegation of malice in the affidavit alleged wilful conduct, the court stated that "Marshall should be allowed to amend his pleading to allege a

proper cause of action for willful and wanton misconduct." Id. at 36, 821 P.2d at 946. In other words, contrary to Abbatiello's assertion, the court held that Marshall's negligence claim was barred, but stated that he could nevertheless raise claims based on wilful and wanton misconduct. Marshall, like Iddings, precludes negligence claims against co-employees under Haw. Rev. Stat. § 386-8.

In Count 5, Abbatiello alleges that Defendants "were negligent in their supervision and retention of Sergeant Kapua." FAC ¶ 121. Nowhere in Count 5 does Abbatiello allege that Defendants wilfully or wantonly (or intentionally or recklessly) supervised and retained Kapua, and Abbatiello admits in her opposition memorandum that Count 5 is a "negligence cause[] of action." Opp. at 30. Further, although Count 5 "realleges and incorporates" the preceding paragraphs in the FAC, which include an allegation that Defendants' retaliation was "willful, wanton, malicious, and in such callous and reckless disregard of civil obligations," Abbatiello fails to allege anywhere in the FAC that Defendants wilfully or wantonly supervised or retained Kapua. See FAC ¶ 102 (regarding Abbatiello's claim for retaliation in Count 1). Because Abbatiello's claim in Count 5 is based on negligent conduct and is therefore barred under Haw. Rev. Stat. § 386-6, the court grants summary judgment in favor of the individual Defendants on Count 5.

Regarding Count 7 for NIED, Abbatiello alleges in the FAC, "The actions of Defendants, as set forth above, were negligent, and foreseeably resulted in physical harm to [Abbatiello], and was a legal cause of injury to [her]."  FAC ¶ 130.  Although Abbatiello's NIED claim is clearly based on negligent conduct, she nevertheless argues that the following statement in Count 7 establishes that her NIED claim is actually based on wilful or wanton conduct:  "The actions of Defendants were wanton, malicious, and in such callous and reckless disregard of civil obligations, as to entitle [Abbatiello] to recover punitive damages."  Opp. at 31.  The court is not persuaded that Abbatiello's request for punitive damages somehow converts a claim expressly based on negligent conduct into one based on wilful or wanton (or intentional or reckless) conduct. See also Opp. at 30 ("Counts V and VII are 'negligence' causes of action").  Abbatiello's claim for NIED is "nothing more than a negligence claim" and is therefore barred by Haw. Rev. Stat. § 386-8.  See Doe Parents No. 1 v. State Dept. of Educ., 100 Haw. 34, 69, 58 P.3d 545, 580 (Haw. 2002) ("an NIED claim is nothing more than a negligence claim in which the alleged actual injury is wholly psychic and is analyzed 'utilizing ordinary negligence principles'").  Accordingly, the court grants summary judgment in favor of the individual Defendants on Count 7.

At the hearing on the motion, Abbatiello asked that she be allowed to amend the FAC.  Abbatiello provided no reason she

could not have sought leave to amend earlier.  With trial
scheduled in just a few months, this court declines to allow a
further amendment of the complaint in a case commenced in 2004.

IV.        CONCLUSION.

        In light of the foregoing, the court grants summary
judgment on Abbatiello's claims for negligent supervision and
retention (Count 5) and NIED (Count 7), but denies summary
judgment on all other claims.  This order leaves for further
adjudication:  (1) Count 1 for violation of Abbatiello's rights
to free speech, due process, and equal protection under the
United States Constitution and 42 U.S.C. § 1983; (2) Count 3 for
violation of the Hawaii Whistleblowers' Protection Act;
(3) Count 4 for wrongful termination; (4) Count 6 for intentional
infliction of emotional distress; and (5) Count 8 for violation
of Abbatiello's rights to free speech, due process, and equal
protection under the Hawaii constitution.[7]

        In the event any party wishes to file a further
dispositive motion, that party must move the trial judge to amend
the scheduling order, as the deadline for filing dispositive
motions has passed.  Additionally, as stated in the July 19,
2006, Order Regarding Trial Date, the parties are reminded that
the trial date, currently May 8, 2007, may not be continued
without the express consent of the trial judge.

_____

        [7] Abbatiello is urged to consider the issue of whether
claims may be brought directly under the state constitution.  If
the state constitutional claims remain in issue, this court may
be compelled to certify that issue to the Hawaii Supreme Court.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 7, 2007.



/s/ Susan Oki Mollway
_____
Susan Oki Mollway
United States District Judge

**Abbatiello v. County of Kauai, et al.**, Civ. No. 04-00562 SOM/BMK; ORDER
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.