# EHXIBIT "B"

# (PART 1 OF 2)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DARLA ABBATIELLO,              )<br>                                )<br>          Plaintiff,            )<br>                                )<br>     vs.                        )<br>                                )<br> COUNTY OF KAUAI, KAUAI POLICE  )<br> DEPARTMENT, K.C. LUM, WILDRED  )<br> M. IHU, GORDON ISODA, DEAN     )<br> PIGAO, and IRVIL KAPUA,        )<br>                                )<br>          Defendants.           )<br> _____ ) | Civ. No. 04-00562 SOM/BMK<br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT |

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.  INTRODUCTION.

On April 21, 2006, Plaintiff Darla Abbatiello ("Abbatiello") filed her First Amended Complaint ("FAC") against Defendants County of Kauai ("the County"), Kauai Police Department ("KPD"), K.C. Lum ("Lum"), Wildred M. Ihu ("Ihu"), Gordon Isoda ("Isoda"), Dean Pigao ("Pigao"), and Irvil Kapua ("Kapua") (collectively, "Defendants"). In the FAC, Abbatiello asserts the following claims: (1) violation of her rights to free speech, substantive and procedural due process, and equal protection under the United States Constitution, in violation of 42 U.S.C. § 1983 (Count 1);[1] (2) violation of the Hawaii Whistleblowers' Protection Act, Haw. Rev. Stat. § 378-61 et seq.

---

[1] At the hearing on the present motion, Abbatiello withdrew her claims under 42 U.S.C. § 1985 in Counts 1 and 2. The court therefore disregards any argument in the present motion concerning her § 1985 claims.

EXHIBIT " B "

(Count 3); (3) wrongful termination (Count 4); (4) negligent supervision and retention of an employee (Count 5); (5) intentional infliction of emotional distress (Count 6); (6) negligent infliction of emotional distress ("NIED") (Count 7); and (7) violation of her rights to free speech, due process, and equal protection under the Hawaii constitution (Count 8).[2] Abbatiello prays for declaratory and injunctive relief, general, special, and punitive damages, and attorneys' fees and costs.

The County, KPD, Ihu, Isoda, and Pigao now move for summary judgment. In seeking summary judgment on Abbatiello's claims that they violated her First Amendment rights, they argue that Abbatiello did not engage in protected speech. Relying on Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), they argue that all of her speech and reports were made pursuant to her official duties and are therefore unprotected. Defendants alternatively contend that, if Abbatiello's speech was protected, they are qualifiedly immune with respect to her First Amendment claims. Expecting this court to grant summary judgment on all of Abbatiello's federal claims, Defendants also ask this court to decline jurisdiction over the remaining state claims. Defendants assert that Count 5, alleging negligent supervision and retention

---

[2] All of the individual Defendants are sued in their official capacities, but only Lum and Kapua are also sued in their individual capacities. FAC ¶ 8-9.

2

of Kapua, and Count 7, alleging NIED, are barred by Hawaii's workers' compensation law.

Because there is a genuine dispute of fact regarding whether Abbatiello engaged in protected speech, the court denies summary judgment on her First Amendment claims. The court therefore denies Defendants' request to decline jurisdiction over the state claims. The court also denies summary judgment on the issue of qualified immunity, as municipalities and municipal employees sued in their official capacities are not entitled to the defense of qualified immunity. Abbatiello's negligence claims in Count 5 (negligent supervision and retention) and Count 7 (NIED) are barred by Hawaii's workers' compensation law, and the court grants summary judgment in Defendants' favor on those claims.

On December 21, 2006, and January 3, 2007, Lum and Kapua, respectively, filed joinders of simple agreement in the present motion for summary judgment. The rulings in this order therefore apply to Abbatiello's claims against Lum and Kapua.

II.     LEGAL STANDARD.

   A.   Motion for Summary Judgment.

Summary judgment shall be granted when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 383 F.3d 1018, 1024 (9th Cir. 2004); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323. A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden initially falls upon the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific

facts showing that there is a genuine issue for trial." Porter, 383 F.3d at 1024 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion."). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134 (citation omitted). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 338 F.3d at 1024. The court does not make credibility determinations or weigh

conflicting evidence at the summary judgment stage. Id. However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

The summary judgment burdens are properly applied to a motion asserting qualified immunity. See Butler v. San Diego Dist. Attorney's Office, 370 F.3d 956, 958 (9th Cir. 2004) ("When a defendant makes a properly supported motion for summary judgment based on official immunity, the plaintiff has an obligation to produce evidence of his or her own. In such a case, the district court is not required (or even allowed) simply to assume the truth of challenged factual allegations in the complaint. In other words, a motion for summary judgment based on official immunity is governed by Federal Rule of Civil Procedure 56, just like all motions for summary judgment in civil suits in federal district court.").

B. Motion for Dismissal.

Defendants also ask this court to dismiss claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Although the parties dispute whether this court should analyze Defendants' request for dismissal under Rule 12(b)(6) or Rule 12(c), the standard for a motion under either rule is essentially the same. See Lake Tahoe Watercraft Recreation Ass'n v. Tahoe Reg'l Planning Agency, 24 F. Supp. 2d

1062, 1066 (E.D. Cal. 1998). Because the motion was filed after Defendants filed their Answers to the FAC, any motion to dismiss would fall under Rule 12(c). See Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 954 (9th Cir. 2004) ("A Rule 12(b)(6) motion must be made before the responsive pleading. Here, Defendants filed their motion to dismiss after filing their answer. Thus, the motion should have been treated as a motion for judgment on the pleadings, pursuant to Rule 12(c) or 12(h)(2)." (internal citation omitted)); see also Aldabe v. Aldabe, 616 F.2d 1089, 1093 (9th Cir. 1980) (noting that Rule 12(h)(2) of the Federal Rules of Civil Procedure specifically allows a Rule 12(c) motion based on an alleged failure to state a claim upon which relief can be granted); George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553 n.2 (2d Cir. 1977) ("Pursuant to Rule 12(h)(2), a Rule 12(c) motion may be used to raise the defense of failure to state a claim upon which relief can be granted, a defense ordinarily raised under Rule 12(b)(6) before the pleadings are closed." (quotation marks omitted)).

Motions for judgment on the pleadings under Rule 12(c) are proper when, taking all material allegations in a complaint as true and construing them in the light most favorable to the nonmoving party, the moving party demonstrates that it is entitled to judgment as a matter of law. Geraci v. Homestreet Bank, 347 F.3d 749, 751 (9th Cir. 2003) ("A motion for judgment

on the pleadings should be granted where it appears the moving party is entitled to judgment as a matter of law."). However, under Rule 12(c), when matters outside the pleadings are considered, the motions are treated as motions for summary judgment. Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996) (converting a Rule 12(c) motion to a motion for summary judgment under Rule 56 because matters outside the pleadings were considered); Fed. R. Civ. P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

Defendants and Abbatiello submit evidence for the court's consideration, and the court considers that evidence on this motion. The court therefore analyzes Defendants' entire motion, including those portions seeking dismissal pursuant to Rule 12(b)(6), under the standards applicable to motions for summary judgment.

III.    BACKGROUND.

Abbatiello has been employed by KPD as a police officer since 1989. Affidavit of Darla J. Abbatiello (1/18/2007) ("Abbatiello Affidavit") ¶ 2; FAC ¶ 13. In October 2002, after receiving numerous awards and commendations by KPD, she was assigned to the Investigative Services Bureau, Vice/Narcotics

Division ("the Vice Unit") of KPD. Abbatiello Affidavit ¶ 2; FAC ¶¶ 13-14. The Vice Unit is "primarily responsible for investigating and solving drug trafficking on Kauai." FAC ¶ 14. As a Vice officer, Abbatiello's main duties were to investigate drug complaints by gathering information and obtaining and executing search warrants. Id. ¶ 15. She says she "worked undercover, in plain clothes, [and] formed connections and relationships with known and/or suspected drug users and dealers in an attempt to investigate and build criminal cases against drug users and dealers." Abbatiello Affidavit ¶ 3.

Abbatiello alleges that, in December 2003, she obtained a warrant to search the residence of A.B.,[3] a suspected drug dealer. Id. ¶ 16. Because Abbatiello believed that A.B.'s boyfriend was C.D., a drug dealer who allegedly dealt in larger quantities of drugs than A.B., Abbatiello says she "intended to arrest A.B. and 'flip' her to arrest C.D." Id. ¶ 17. Abbatiello alleges that, while she was attempting to execute the search warrant on A.B., Sergeant Kapua, who was not a Vice officer, told Abbatiello's commanding officer in the Vice Unit, Lieutenant E.F., that "Vice should not work on either A.B. or C.D." Id. ¶¶ 18-19.

Abbatiello says that, on December 15, 2003, she was ordered to meet privately with Sergeant Kapua and A.B, at which

---

[3] In the FAC, Abbatiello refers to various individuals "in 'John Doe' fashion." In this order, the court refers to those individuals by the names Abbatiello uses in the FAC.

9

time Kapua registered A.B. as a confidential informant. Id. ¶¶ 19-20. Abbatiello allegedly thought that Kapua's registration of A.B. "violated KPD rules regarding recruitment of confidential informants." Id. ¶ 20. Between December 16 and 25, Abbatiello says A.B. "did not make any controlled buys from specific drug dealers as A.B. agreed, nor did A.B. attempt to work 'bigger targets.'" Id. ¶ 21. According to Abbatiello, Sergeant Kapua was upset with her for asking A.B. to make a controlled buy from C.D and discouraged her from pursuing C.D.'s arrest. Id. ¶ 22.

Abbatiello alleges that, on December 26, 2003, she "returned to her original plan to serve the search warrant on A.B. and then 'flip' her to obtain evidence against C.D." Id. ¶ 23. Abbatiello says that, after she executed the search warrant and arrested A.B., A.B. "admitted that she sold crystal methamphetamine with C.D., and that C.D. paid Sergeant Kapua six thousand dollars ($6,000) through a third person to protect both A.B and C.D." Id. ¶¶ 23-24. Abbatiello says that, after hearing A.B.'s allegations about Kapua, "she feared for her safety" because Kapua had "a reputation for having a violent temper and background." Id. ¶¶ 25-29.

Abbatiello alleges that, on December 28, 2003, she was admitted to the Kauai Veterans Memorial Hospital Emergency Unit for "sleeplessness, diarrhea, dehydration, severe coughing, stomach pains, and other physical stress-related symptoms,"

10

conditions she says were "due directly to the stress of the situation at work and fear of Sergeant Kapua." Id. ¶ 30.

Abbatiello says she returned to work on January 2, 2004, and "immediately reported to her supervisor, Lieutenant E.F., what A.B. had told her about Sergeant Kapua and the alleged corruption, and that [she] feared for her safety." Id. ¶ 31. She says she also informed the State of Hawaii Organization of Police Officers ("SHOPO") and the Federal Bureau of Investigations ("FBI") about A.B.'s allegations. Abbatiello Affidavit ¶ 8. At the hearing on the present motion, the County suggested that the County itself may have provided the information to the FBI even before Abbatiello did. Abbatiello alleges that, although Lieutenant E.F. informed Acting Chief Ihu and Assistant Chief Isoda of A.B.'s allegations and Abbatiello's request that Kapua be ordered to stay away from her, "no such orders were made and no corrective action was taken." FAC ¶ 31. Abbatiello says she provided a written report about A.B.'s allegations to Lieutenant E.F. on January 19, 2004. Id. ¶ 32. Although Chief Ihu ordered a criminal and administrative investigation, Abbatiello alleges that "no meaningful action has been taken in either the criminal or internal investigations." Id. ¶¶ 33, 35. Rather, Abbatiello alleges, Sergeant Kapua harassed her by calling her derogatory names at work and in public and by "tipping off" suspects before she executed search warrants on them. Id. ¶¶ 36, 38.

According to Abbatiello, she contacted SHOPO in March 2004 about "the possibility of temporarily transferring out of the Vice unit" so that "she could work a significant distance away from Sergeant Kapua." Id. ¶ 39. At the hearing on the present motion, the County stressed that Abbatiello had only been on temporary assignment to the Vice Unit from the start. Abbatiello says she also discussed temporarily transferring out of the Vice Unit with Chief Ihu and Lieutenant E.F. Id. ¶ 39. On March 31, 2004, she requested a temporary transfer in writing and was transferred on April 2, 2004. Id. ¶¶ 40-41. Abbatiello alleges that, after she was transferred, Chief Ihu informed her that her transfer was not temporary, but permanent. Id. ¶ 41. Abbatiello says she was also demoted "from Police Officer II at a salary range of PO-9 to a Police Officer I at a Range of PO-7." Id. ¶ 43.

Abbatiello further alleges that, on April 18, 2004, another officer told her to look in her personal dictionary at the Vice Unit office. Id. ¶ 44. She says that, in the dictionary, "three red arrows were handwritten and pointed to the word 'DEATH' . . . . Next to the definition of 'DEATH' was her name written in red ink with an arrow pointing to the definition." Id. ¶ 44. Abbatiello says she perceived this to be a death threat and reported it to her supervisors, but that "no internal investigation or meaningful criminal investigation has taken place." Id. ¶ 44.

According to Abbatiello, on June 23, 2004, she met with Chief Lum and another officer in Chief Lum's office. Id. ¶ 47. She says that, during the meeting, "Sergeant Kapua stood outside Chief Lum's door and 'stared [her] down'" and that Sergeant Kapua's behavior was "so disruptive to the meeting that Chief Lum closed his office door." Id. ¶ 47. After the meeting, Abbatiello allegedly heard Kapua "screaming and yelling" in his office and says he punched a hole in his office wall. Id. ¶ 48. Later that day, Abbatiello says she was ordered to "stay away from Sergeant Kapua and to use the back door when she had to go to the Vice Unit." Id. ¶ 49.

Abbatiello further alleges that, on April 24, 2005, while on duty, she was ordered "to assist in a search of two female arrestees and to photograph each of them in a naked condition." Id. ¶ 58. Abbatiello says she refused to take the photographs and reported the incident the next day, but that "no action was taken." Id. ¶¶ 62-64. She alleges that, after that incident occurred, Chief Lum drafted a new KPD policy, which provided that "KPD officers must photograph the search at every stage of the arrest process." Id. ¶ 70. Because Chief Lum allegedly backdated the effective date of the proposed policy to cover the April 24 strip search incident, Abbatiello believes Lum's new policy was an "attempt to cover up the fact that [she] made a proper complaint about the photographing of female arrestees." Id. ¶ 72.

Abbatiello says that, on May 25, 2005, she was removed from her position as a field training officer, which resulted in a "loss of compensation." Id. ¶¶ 65, 68. She also says she has been unable to work in the cellblock because Sergeant Kapua and other officers "who have threatened or intimidated [her]" were also assigned to cellblock duty. Id. ¶ 81. Abbatiello says she had "regularly earned extra compensation . . . for performing [cellblock] duty," and that she suffered a loss of compensation as a result of being unable to work in the cellblock. Id. ¶¶ 81-82.

IV.   ANALYSIS.

   A.   First Amendment Claims.

Defendants argue that they are entitled to summary judgment on Abbatiello's First Amendment claims brought under 42 U.S.C. § 1983 because Abbatiello did not engage in protected speech. Motion at 7-20. They contend that, under Garcetti, 126 S. Ct. 1958, "a public employee must speak in her capacity as a citizen in order to receive First Amendment protection for her speech." Motion at 7. Asserting that Abbatiello's speech "was made in her capacity as a police officer employed by KPD, not as a citizen," Defendants argue that "there is no violation of [her] First Amendment rights." Motion at 11. In response, Abbatiello points to evidence showing that her reports were not made pursuant to her official duties as a Vice or patrol officer and contends that a genuine dispute of fact precludes summary

14

judgment. Opp. at 14-19. The court agrees with Abbatiello that questions of fact remain to be tried.

"In order to state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a 'substantial or motivating' factor for the adverse employment action." Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003); see also Freitag v. Ayers, 468 F.3d 528, 543 (9th Cir. 2006). The Supreme Court recently modified prior First Amendment jurisprudence regarding the first prong--i.e., whether an employee engaged in protected speech. Freitag, 648 F.3d at 544 (noting that "the Supreme Court's recent decision in [Garcetti, 126 S. Ct. 1951,] modified prior First Amendment jurisprudence with respect to the first element--employee protected speech").

The plaintiff in Garcetti, 126 S. Ct. at 1955, Richard Ceballos ("Ceballos"), was a deputy district attorney whose job responsibilities included supervising other prosecutors and making recommendations regarding the prosecution of their cases. At the request of a defense attorney, Ceballos reviewed an affidavit that had been used to obtain a critical search warrant in one of his office's cases. Id. After examining the affidavit and speaking to the affiant, Ceballos determined that the affidavit contained serious misrepresentations, informed his

15

supervisors of that determination, and drafted a disposition memorandum recommending dismissal of the case. Id. at 1955-56. Ceballos was thereafter subjected to a series of retaliatory employment actions and filed a federal lawsuit against his supervisors, claiming they had violated his First and Fourteenth Amendment rights "by retaliating against him based on his memo." Id. at 1956.

The supervisors moved for summary judgment, arguing that "Ceballos' memo was not protected speech under the First Amendment." Id. The district court granted the motion, concluding that Ceballos "was not entitled to First Amendment protection for the memo's contents" because he "wrote his memo pursuant to his employment duties." Id. On appeal, the Ninth Circuit reversed, holding that "Ceballos's allegations of wrongdoing in the memorandum constitute protected speech under the First Amendment." Id.

On certiorari, the Supreme Court was faced with deciding "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." Id. at 1955. The Court reaffirmed that "public employees do not surrender all their First Amendment rights by reason of their employment," but that "the First Amendment protects a public employee's right, in certain circumstances to speak as a citizen addressing matters of public concern." Id. at 1957; see also Freitag, 468 F.3d at 543 (noting

that, under <u>Garcetti</u>, "the issue is not only whether the speech in question addresses a matter of public concern, but also whether it is made <u>as a citizen</u>" (emphasis in original)). The Court ultimately held, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Garcetti</u>, 126 S. Ct. at 1960.

In reaching its decision, the Court made several observations applicable to this case. First, because it was undisputed that Ceballos "wrote his disposition memo pursuant to his employment duties," the Court observed that it did not have the "occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." <u>Id.</u> at 1961. It did reject, however, "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." <u>Id.</u> On that point, the Court stated:

> The proper inquiry is a practical one.
> Formal job descriptions often bear little
> resemblance to the duties an employee
> actually is expected to perform, and the
> listing of a given task in an employee's
> written job description is neither necessary
> nor sufficient to demonstrate that conducting
> the task is within the scope of the
> employee's professional duties for First
> Amendment purposes.

<u>Id.</u> at 1961-62. The Court also noted that it was not dispositive that "Ceballos expressed his views inside his office, rather than

17

publicly" or that the memo "concerned the subject matter of [his] employment," as employees "may receive First Amendment protection for expressions made at work . . . or related to the speaker's job." Id. at 1959.

In Freitag, 468 F.3d at 532, 532-35, the Ninth Circuit applied Garcetti's holding to a case in which the plaintiff was a female correctional officer who had filed numerous complaints with her supervisors about "the pervasive practice at Pelican Bay of inmate exhibitionist masturbation." When her complaints went ignored, she also sent letters to California State Senator Richard Polanco ("Sentaor Polanco"), in which "she alleged that she and other female correctional officers were regularly subjected to sexually abusive behavior . . . and that supervisors failed to respond adequately to her complaints." Id. at 535. She also contacted the California Office of the Inspector General ("Inspector General") and wrote a letter to Cal Terhune ("Terhune"), the director of the California Department of Corrections and Rehabilitation ("the CDCR"). Id. at 534-35. After voicing her concerns, the plaintiff was allegedly subjected to various retaliatory employment actions and was eventually terminated from her job. Id. at 533-36.

The plaintiff filed a lawsuit for retaliation under the First Amendment against the CDCR and three administrators of Pelican Bay State Prison. A jury found in her favor, id. at 532, 537, and the defendants appealed, arguing that substantial

evidence did not support the jury's finding of retaliation, id. at 537.

On appeal, the Ninth Circuit focused on whether the plaintiff's complaints constituted protected speech under the First Amendment: "The critical inquiry is . . . whether [the plaintiff] engaged in the relevant speech 'pursuant to her official duties.'" Id. at 545 (citing Garcetti, 126 S. Ct. at 1960). The court concluded that her "internal" complaints were not protected because she had "submitted those reports pursuant to her official duties as a correctional officer and thus not in her capacity as a citizen." Id. at 546. However, the court held that her communications with Senator Polanco and the Inspector General were protected, as "[i]t was certainly not part of [the plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly, and specifically its failure to take corrective action to eliminate sexual harassment in its workplace." Id. at 545. The court also noted that it was her "responsibility as a citizen to expose such official malfeasance to broader scrutiny." Id. (emphasis in original). Lastly, the Ninth Circuit concluded that determining whether the plaintiff's letter to Terhune, the director of the CDCR, was protected was "a closer question." Id. at 546. The court stated:

> We are unsure whether prison guards are
> expected to air complaints regarding the
> conditions in their prisons all the way up to
> the Director of the CDCR at the state capitol

19