# EXHIBIT "C"

# PART 1 OF 2

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3    DARLA ABBATIELLO,          )
                                 )  CV 04-00562 SOM-BMK
 4              Plaintiff,       )
                                 )  Honolulu, Hawaii
 5         vs.                   )  February 6, 2007
                                 )  9:00 A.M.
 6    COUNTY OF KAUAI, et al.,   )
                                 )  Defendant's Motion for
 7              Defendants.      )  Summary Judgment or, in the
                                 )  Alternative, Dismissal;
 8    _____  )  Joinders

 9

10                   TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE SUSAN OKI MOLLWAY
11                 UNITED STATES DISTRICT JUDGE

12    APPEARANCES:

13    For the Plaintiff:        MARGERY S. BRONSTER
                                JOHN T. HOSHIBATA
14                              Bronster Crabtree & Hoshibata
                                2300 Pauahi Twr.
15                              1001 Bishop St.
                                Honolulu, HI 96813
16
      For the Defendants        DAVID J. MINKIN
17    County of Kauai, Kauai    McCorriston Miller Mukai MacKinnon
      Police Department,        500 Ala Moana Blvd.
18    Wilfred Ihu, Gordon Isoda, Honolulu, HI 96813
      and Dean Pigao:
19
      For the Defendant         MICHAEL J. McGUIGAN
20    Irvil Kapua:              Reinwald O'Connor & Playdon LLP
                                Pac. Guardian Ctr., Makai Twr.
21                              733 Bishop St., 24th Fl.
                                Honolulu, HI 96813
22
      For the Defendant         CARY T. TANAKA
23    K. C. Lum:                Fort Street Twr.
                                745 Fort St., Ste. 510
24                              Honolulu, HI 96813

25
```

EXHIBIT " C "

2

1    APPEARANCES (Continued):

2    Official Court Reporter:    Debra Kekuna Chun, RPR, CRR
                                 United States District Court
3                                300 Ala Moana Blvd. Ste. C285
                                 Honolulu, HI 96850
4                                (808) 534-0667

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

3

```
1    TUESDAY, FEBRUARY 6, 2007              9:06 O'CLOCK A.M.
2              THE CLERK:  Civil 04-562 SOM-BMK, Darla Abbatiello
3    versus County of Kaua'i, et al.  This case has been called for
4    Defendant's Motion for Summary Judgment on or, in the
5    Alternative, Dismissal of Counts 1 and 2 of the First Amended
6    Complaint, and Dismissal of Counts 5 and 7 of the First Amended
7    Complaint, and Joinders in that motion.
8              Counsel, please make your appearances for the
9    record.
10             MS. BRONSTER:  Good morning, Your Honor.  Margery
11   Bronster and John Hoshibata on behalf of Darla Abbatiello.
12             MR. MINKIN:  Good morning, Your Honor.  David Minkin
13   on behalf of the County of Kaua'i, the Kaua'i Police
14   Department, Wilfred Ihu, Gordon Isoda, and Dean Pigao.
15             MR. McGUIGAN:  Good morning, Your Honor.  Michael
16   McGuigan on behalf of defendant Kapua.
17             MR. TANAKA:  Good morning, Your Honor.  Cary Tanaka
18   on behalf of defendant K.C. Lum.
19             THE COURT:  Okay.  Thank you very much.
20             Did everybody get the inclination that we posted
21   yesterday?
22             MR. MINKIN:  Yes.
23             THE COURT:  Okay.  Now, as you can tell, this is kind
24   of a detailed inclination.  And I guess what I would like to do
25   is start with getting answers to the questions, and then we'll
```

4

1    talk about how the ruling should go.

2         So let me check first with plaintiff's counsel on the

3    questions I ask, the first one being whether each claim was

4    intended to be asserted against all the named defendants or

5    not.  It's not entirely clear.

6         MS. BRONSTER:  Your Honor, let me just say that we

7    had hoped to have had a stipulation that would have clarified

8    that.  And, unfortunately, there were some delays, but let me

9    go through it for you in the interim.

10         The -- all of the claims, with the exception of claim

11    4, are made against all parties, and claim 4, which is the

12    wrongful termination, is not made against Kapua.

13         THE COURT:  But it is against everybody else.

14         MS. BRONSTER:  Correct.  Now, with respect to all of

15    the counts, all of the counts are made against K.P.D. and the

16    county, and all of the counts, with the exception of the one I

17    just mentioned, are made against Kapua and Lum in both their

18    official and individual capacities.

19         THE COURT:  Okay.

20         MS. BRONSTER:  With respect to the rest of the named

21    individuals -- that is, Isoda, Ihu, and Pigao -- they are made

22    only in their official capacities.

23         THE COURT:  Okay.

24         MS. BRONSTER:  And with respect to those individuals

25    there had been an agreement, which we were working on getting

5

1    reduced to writing, which was that they -- because they're in

2    their official capacities only at this point that the claims

3    against them are subsumed in the claims against K.P.D. and the

4    county.  We had reserved our right by agreement to bring them

5    back in individually if discovery showed that that was

6    appropriate, but for the meantime we have agreed that they are

7    only in their official capacity and really are only nominal

8    defendants at this point because they are -- all of the claims

9    against them are subsumed in the county claims.

10              THE COURT:  Okay.  And then her due process and equal

11   protection claims in counts 1 and 2, I'd like to talk about

12   those.

13              Now, in the defense motions they actually didn't talk

14   about due process and equal protection in terms of

15   constitutional claims.  They only talked about First Amendment

16   claims.  And I'm wondering whether the understanding of the

17   parties is that to the extent due process and equal protection

18   are mentioned, that those fall under the rubric of the First

19   Amendment claim and are part and parcel of that, and, if not,

20   how are they different?

21              MS. BRONSTER:  Your Honor, I believe that throughout

22   the complaint, and as the discovery has shown, there are a

23   whole panoply of due process and equal protection claims, which

24   for whatever reasons the defendants have chosen to ignore.  But

25   I believe that we have asserted and made clear throughout this

1    case that Darla Abbatiello's demotion, her removal from being a

2    field training officer, her being kept from working overtime at

3    the cellblock, the order to do illegal strip searches, the

4    having to endure the threats and intimidation, and forcing her

5    to avoid Kapua through a circuitous route around the office

6    were all deprivations -- deprivation claims under due process

7    and equal protection Fourteenth Amendment.  And we believe that

8    those are freestanding whether or not the First Amendment

9    claims survive.

10            THE COURT:  Okay.  And then question 3 I asked for

11    clarification on claims brought under section 1985.  So, first,

12    is count 1 under -- does count 1 include a section 1985 claim

13    or not?

14            MS. BRONSTER:  Your Honor, we did articulate a 1985

15    claim in count 1, but we are not pursuing that at this time.

16            THE COURT:  So for purposes of what we really have to

17    deal with, no.

18            MS. BRONSTER:  Correct.

19            THE COURT:  What about count 2?  And, if so, what is

20    the subsection and clause?

21            MS. BRONSTER:  The subsection and clause that we were

22    referring to when we originally drafted the complaint was

23    subsection (3), the initial clause.  However, again we are not

24    pursuing that at this point.

25            THE COURT:  Okay.  So whatever may have been pled

7

1   under 1985, in essence, you're withdrawing.

2          MS. BRONSTER:  Yes, Your Honor.

3          THE COURT:  Okay.  And then -- so my question 4,

4   which went to 1985, is now mooted out.

5          MS. BRONSTER:  Yes, Your Honor.

6          THE COURT:  Okay.  Then, if we look at question 5, I

7   asked for the bases of the First Amendment claims.  Maybe you

8   can help me understand if it's more than the reports concerning

9   Kapua's alleged involvement with bribery and the allegedly

10   improper order to photograph naked people who had been

11   arrested.

12         MS. BRONSTER:  Yes, Your Honor, it is more.  Once

13   again I think that the defendants have maybe by shorthand --

14   maybe that's how they're trying to deal with this, or maybe

15   they purposely are avoiding it.  But there are a number of

16   reports that Darla Abbatiello has made, including Kapua taking

17   bribes, including the death threat against her, including a

18   report of her gun having been stolen, and including the strip

19   search.

20         THE COURT:  Okay.  So adding the death threat

21   notation in her personnel file and a report of a stolen gun.

22         MS. BRONSTER:  Yes.  And I'm sorry.  The death threat

23   was in the dictionary.

24         THE COURT:  In the dictionary.  So those two are

25   added to the two that I've listed.

1      MS. BRONSTER:  Yes, Your Honor.

2           THE COURT:  And then, if you're claiming an adverse

3    employment action and basing your First Amendment deprivation

4    claim on the idea that an adverse employment action was taken

5    against Miss Abbatiello, what specific actions do you say were

6    adverse employment actions?

7      MS. BRONSTER:  Your Honor, the adverse employment

8    actions include the fact that she was demoted.  She was removed

9    from vice, which resulted in lower pay and a different work

10   environment.  That her FTO status was withdrawn, also involving

11   a loss of pay.  That she lost her ability to work in the

12   cellblock at overtime, also including a loss of pay.  That her

13   other job -- adverse job actions, including the fact that,

14   although she was the one who obtained a TRO against Kapua, she

15   was, in fact, the one who was ordered to take the circuitous

16   route to avoid Kapua.  The fact that she was forced to continue

17   to work in the environ of Kapua and that there was no action

18   taken with respect to Kapua.  The order that she was to engage

19   in the illegal strip search.

20          And, unfortunately, Your Honor, we have recently

21   learned of ongoing retaliation against her and adverse

22   employment actions that I believe we just learned within the

23   last week and have not yet brought before the court.  But just

24   to tell you what it is:  She has also been prevented from being

25   an officer in charge; although, her rank would have allowed

9

1   her -- warranted it.

2        THE COURT:  Okay.

3        MS. BRONSTER:  So by listing this I am not intending

4   to exclude the ongoing actions of K.P.D.  I didn't think that

5   we would be in a situation where we would constantly be finding

6   out new adverse actions, but, unfortunately, that's where we

7   are.

8        THE COURT:  Okay.  I had -- actually, I didn't list

9   these as questions, but I had a couple more.

10       Just to clarify on the 1985 issue, are you

11  withdrawing all of count 2, or are you saying in withdrawing

12  the 1985 allegations that something in count 2 still remains?

13       MS. BRONSTER:  Your Honor --

14       THE COURT:  It looks like to me like it's all on

15  1985.

16       MS. BRONSTER:  Yes, Your Honor.  To the extent that

17  there are allegations of willful, wanton, malicious misconduct

18  with respect to Darla, obviously by withdrawing count 2 we're

19  not intending to withdraw that to the extent that they're

20  included in other places.

21       THE COURT:  Right.  You have that in other counts.

22       MS. BRONSTER:  That's right.

23       THE COURT:  There's no substantive claim anymore.

24       MS. BRONSTER:  That's correct.

25       THE COURT:  Then I had another question, and this is

1    something that's come up in some other cases.  Okay.  Now,

2    there are some state constitutional claims also.  And in other

3    cases I've raised this question.  I don't think it was with any

4    of the attorneys here; although, maybe -- I don't think any of

5    you were involved because this has happened more than once.

6         It's to me a question that I don't have clear state

7    appellate law on, and the question is this:  Can you bring a

8    state constitutional claim directly?  In other words, you know,

9    Jane Smith sues under the state constitution for violation of

10   the First Amendment of the state constitution.

11        And I ask that question because, of course, on the

12   federal side we have a statutory vehicle, section 1983, through

13   which you can bring claims that are based on violations of

14   federal constitutional rights.  We don't have an equivalent to

15   section 1983 that goes to bringing claims of state

16   constitutional violations.  Can you or can you not bring a

17   claim directly under the state constitution?

18        Now, as I say, I don't know that I can tell from

19   state appellate cases, and so in the past, when I've raised

20   this question, I have so concerned the parties about the

21   possibility that I might certify this question to the state

22   Supreme Court, which, of course, would put the federal case on

23   hold while we awaited a decision by the state Supreme Court,

24   that it forced plaintiff's counsel to consider whether they

25   thought there was really something to be gained by pursuing the

1    state constitutional claim.  And, if not, if whatever they

2    might get under the state constitution as a remedy was totally

3    subsumed by remedies they would get if they prevailed on their

4    federal constitutional claims, they withdrew their state

5    constitutional claims.  And in this regard, you know, they

6    didn't think that they would have an easier time, for example,

7    proving a state constitutional violation than a federal one; so

8    they didn't see an advantage.

9         So I throw that out.  Although it may not be an issue

10   that I have to address on what's in front of me today to

11   decide, I throw that out for your consideration because, if you

12   persist in the state constitutional claim, it may well be that

13   I will be compelled to certify this question, which may not

14   coincide with your plans for the progress of this case.

15        So I throw that out to you to consider, but it's

16   likely to have to be resolved at some point before this case

17   goes to trial.

18        MS. BRONSTER:  I understand, Your Honor.  And having

19   grappled with this issue, not in the employment area but in

20   other areas in my not too distant past --

21        THE COURT:  Yes.  I can imagine that you might have

22   seen this area before.

23        MS. BRONSTER:  -- I would just point out two things

24   and would request additional time and possibly the ability to

25   brief this issue.

12

1          THE COURT:  Well, you can wait till they bring a

2    motion or something.

3          MS. BRONSTER:  I would point out, however, that we do

4    have a whistleblower's action under state law, and, when you

5    bring a whistleblower action, you are bringing a whistleblower

6    action -- the statute is pretty clear that you have a right to

7    object to and make claims for any violation of the rules or the

8    law of the State of Hawai'i, and I believe that that would give

9    you the hook even if there is -- whether or not there is a

10   direct cause of action for a state -- a violation of the state

11   constitution.  I think that the Whistleblower Act itself gives

12   you that, and I think that that --

13         THE COURT:  I don't know it's a hook, but it might

14   give you all the remedies that you could get otherwise claiming

15   the same factual issues.  So, if that's the case, then your

16   state -- direct state constitutional claims become superfluous,

17   and you might consider whether you just get rid of them.  But

18   it's not before me today, but I raise it because it's

19   definitely something that has to be resolved before we can all

20   go forward.

21         MS. BRONSTER:  And I do know that there's been a lot

22   of briefing and some state constitutional jurisprudence on the

23   area of whether or not both Hawaiian rights claims can be

24   brought directly and environmental claims, and we would need to

25   look at the employment and civil rights actions.

13

1        THE COURT:  Okay.  Then -- okay.  Well, thank you.

2        I'm going to then turn to the substance of my

3   inclination since I am grateful to have answers to the

4   questions I asked.

5        Okay.  So as you can tell from the pretty lengthy

6   inclination that I issued, I'm inclined to think that the First

7   Amendment claim still stands with questions of fact as to

8   whether or not Miss Abbatiello made the statements that she

9   claims are protected by the First Amendment in her capacity as

10  a county employee or in her capacity as a citizen.  I'm not so

11  certain that the record I have now allows me to make the

12  conclusion that the defendants urge upon me, which is that she

13  was making statements as part of her job duties.  I mean it may

14  be that they can prove that at trial, but I'm concerned that I

15  may not have a question-free basis at the moment to rule as a

16  matter of summary judgment on that.  I would suggest that we

17  talk about that.

18        MR. MINKIN:  Yes, Your Honor.  What's curious is that

19  Miss Abbatiello in a very self-serving and conclusory

20  declaration -- affidavit completely ignores her standards of

21  conduct as a police officer.  She wants you to believe in an

22  attempt to manufacture evidence that somehow she's doing this

23  as a citizen.  And what's replete here is that she takes facts

24  and manages to mangle them up.

25        For example, they throw in the fact that acting

1    assistant chief Dean Pigao made a statement to her that you

2    don't have to report it.  Well, that allegation is months after

3    it's reported and has no bearing whatsoever.  She's already

4    reported it upper chain of command.

5              They also throw in the fact she filed a TRO.  The TRO

6    was filed approximately nine and a half months after the

7    initial allegations against Kapua surfaced and only in

8    conjunction with the filing of the original complaint in

9    federal court.  There was nothing done whatsoever to bring

10   these issues to public light until the filing of this complaint

11   against the department and the individual officers originally

12   in their individual capacity, all of them, and their official

13   capacity.

14             She has attempted to take and say that she's doing

15   this out of concern about public corruption.  There is nothing

16   whatsoever in any of her complaints, written or oral, that

17   that's what she's doing.  She's worried, quote, unquote, about

18   what's going to happen to her in the workplace, and now in an

19   attempt to avoid her oath as a police officer to enforce the

20   laws as dictated by the standards of conduct she's now doing

21   self-serving, conclusory statements in an attempt to

22   manufacture and generate for their purposes a genuine issue of

23   material fact.  And this court should not countenance that type

24   of evidence.

25             THE COURT:  What about the report she made to SHOPO

1    and to the F.B.I.?

2          MR. MINKIN:  Well, that's really curious because we

3    were debating whether we could do something to defeat that.

4    And there were reports made to the F.B.I.  My understanding is

5    that the department made the referral well before Miss

6    Abbatiello made the referral because they had issues of police

7    corruption.  There are police reports that have not been

8    provided in discovery.  I've been in contact with the F.B.I.

9    The matter is still under investigation.  They have spoken to

10   numerous people.  They will not tell us who first reported the

11   matter, but, based upon a chronology of dates, that accusation

12   or that supposition by the plaintiff, I believe, is entirely

13   wrong and self-serving.  She doesn't show you how she reported

14   it.  Where's the letter?  Where's the phone call?  When was

15   that done?  It's a conclusory effort to make something out of

16   nothing.

17         The SHOPO allegation.  The SHOPO -- she spoke to

18   SHOPO about the transfer from vice to parole in March of '04, I

19   believe it was.  At that point in time she met with acting

20   chief Ihu and somebody from SHOPO.  They told her, "Yes, you

21   can do this.  You're not being demoted.  It is a -- you're

22   going back to your prior position," because her position in

23   vice was a temporary reallocation upward.  She wants to

24   characterize it as a demotion.  It is not a demotion.  She was

25   up in vice on a six-month temporary reallocation up that got

1    extended a couple of times.  And, when she went to them in

2    February and March -- not in December when the allegations

3    about Kapua first come forward, not in January when she reports

4    an upper chain of command -- only in February and March she

5    meets with SHOPO, and that's completely -- based upon the

6    collective bargaining agreement, that is something that is

7    employer-employee related.  If SHOPO felt that there was a

8    problem with that transfer or that -- going back to the patrol

9    slot, SHOPO under the collective bargaining agreement would

10   have been in there challenging it just like they did on the FTO

11   situation.

12          THE COURT:  Anybody else?

13          No?  Okay.  You want to be heard?

14          MS. BRONSTER:  Your Honor, I need to object to the

15   reference to the county first reporting it to the F.B.I.  First

16   of all, I think it's not relevant to this matter because, if

17   Darla was exercising her First Amendment rights and making the

18   complaint, it doesn't matter who else made it or when they made

19   it.  But this is the first time that I've even heard this, and

20   I believe that it's nowhere in anything in the record.

21          THE COURT:  Well, because he says he's not been able

22   really to get the information.

23          MR. MINKIN:  They deposed Detective Wes Kaui, a

24   30-year veteran, who indicated he was assigned to do the

25   criminal investigation.  He indicated that, when he did that,

1   he also contacted outside agencies, the F.B.I., and the state

2   Attorney General's Office.  That information is there.  The

3   specific dates, he didn't talk about that; that wasn't gone

4   into.

5          So we were confronted with manufacturing of evidence

6   that, I believe, is entirely conclusory and self-serving, and I

7   will go before -- I'll submit in camera the dates, and, if they

8   have documents, then I'll sit down.  If they have no documents

9   that show that she went to the F.B.I. before the county, that

10  is completely specious, that argument.

11         THE COURT:  Okay.  Well, don't give me anything in

12  camera yet.

13         Okay.  Go ahead.

14         MS. BRONSTER:  And the other thing is that this whole

15  argument about this self-serving affidavit, well, if it wasn't

16  self-serving, obviously, as Judge King has often said, you

17  wouldn't be submitting it.  I mean the fact is that she was

18  putting in an affidavit that set forth her claims in this case.

19  She did it, and I think the fact that it helps her case is what

20  you would expect.

21         To the extent that the county does not have any

22  evidence to refute her, the fact that they have not bothered to

23  take her deposition I think is an indication that they know

24  that what she will say will be consistent with the affidavit

25  that has been submitted.