IN THE UNITED STATES DISTRICT COURT

STATE OF HAWAII

| | |
|---|---|
| DARLA ABBATIELLO, | ) CIVIL NO. CV04 00562 SOM BMK |
| Plaintiff, | ) |
| vs. | ) |
| COUNTY OF KAUAI; KAUAI POLICE | ) |
| DEPARTMENT; K.C. LUM, | ) |
| WILFRED M. IDA; GORDON ISODA; | ) Trial Date: May 8, 2007 |
| DEAN PIGAO; IRVIL KAPUA, | ) Time : 9:00 a.m. |
| Defendants. | ) Trial Judge: Susan O. |
| ______________________________ | ) Mollway |

DEPOSITION OF PAUL KANOHO

Taken on behalf of PLAINTIFF DARLA ABBATIELLO, at the offices of Ralph Rosenberg Court Reporters, Inc., c/o Hale & Goldberg, Lihu`e Plantation Bldg., 2970 Kele Street, Suite 220, Lihu`e, Hawai`i 96766, commencing at 9:02 a.m., on Wednesday, November 8, 2006, pursuant to notice.

BEFORE: JOY C. TAHARA, RPR, CSR 408
Notary Public, State of Hawai`i

**EXHIBIT 6**

A P P E A R A N C E S

| | |
|---|---|
| FOR PLAINTIFF DARLA ABBATIELLO: | JOHN HOSHIBATA, ESQ.<br>Bronster Crabtree & Hoshibata<br>2300 Pauahi Tower<br>1001 Bishop Street<br>Honolulu, Hawai`i 96813<br>Tel. (808) 524-5644<br>Fax. (808) 599-1881<br>jhoshibata@bchlaw.net |
| FOR DEFENDANTS COUNTY OF KAUAI; KAUAI POLICE DEPARTMENT: | CHRISTIANE L. NAKEA-TRESLER, ESQ.<br>Office of the County Attorney<br>4444 Rice Street<br>Suite 220<br>Lihu`e, Hawai`i 96766<br>cntresler@kauai.gov |
| FOR DEFENDANT AND THIRD-PARTY PLAINTIFF K.C. LUM: | DIANE AGOR-OTAKE, ESQ.<br>Law Offices of Cary Tanaka<br>Fort Street Tower, Suite 510<br>745 Fort Street<br>Honolulu, Hawai`i 96813<br>carytanaka@aol.com |
| FOR DEFENDANTS WILFRED M. IHU, GORDON ISODA, and DEAN PIGAO: | DAVID J. MINKIN, ESQ.<br>McCorriston Miller Mukai MacKinnon LLP<br>Five Waterfront Plaza, 4th Floor<br>500 Ala Moana Blvd.<br>Honolulu, Hawai`i 96813<br>minkin@m4law.com |
| FOR DEFENDANT IRVIL KAPUA: | KALANI BUSH, ESQ.<br>Reinwald O'Connor & Playdon LLP<br>Pacific Guardian Tower, Makai Tower<br>733 Bishop Street, Suite 2400<br>Honolulu Hawai`i 96813<br>Mjm@roplaw.com |

NOTE: All individuals present in Kaua`i EXCEPT for Kalani Bush who attended via land line, conference call.

# I N D E X

| EXAMINATION | | PAGE |
|---|---|---|
| | MR. HOSHIBATA | 4 |
| | MR. MINKIN | 59 |
| | MS. AGOR-OTAKE | 66 |
| | MR. HOSHIBATA | 68 |

# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Hawai`i Police Department -- Strip and Body Cavity Searches, General Order No. 603 | 29 |
| 2 | Draft proposal presented by De Busca | 40 |

certain things that happen, you know, in cases and whatnot. And part of supervision I guess in that relationship, you know, don't tell the boss everything.

Q. In your present job at A&T, what do you do?

A. I basically type for a living. I review policy, try to develop procedures and policies. I also oversee recruitment and hiring, which is probably our biggest responsibility. We've been in a manpower personnel deficit for several years and I oversee that. I also oversee the community relations division which is being kind of on hold because of our other responsibilities.

Q. You said right now your superior officer is Acting Assistant Chief Tanabe?

A. Yes.

Q. Is there anybody in the hierarchy between you and Acting AC Tanaka?

A. No.

Q. So you report directly to Tanabe?

A. Yes.

Q. As acting assistant chief, who does Tanaka report to?

A. To the deputy chief.

Q. Who is that right now?

A. That's Acting Deputy Chief Isoda, Gordon Isoda.

Q. In your duties as a lieutenant at A&T, do you recall having any connection or anything to do with a strip search

policy?

A. Yes.

Q. When you came into A&T on your most recent assignment, again, what year was that?

A. Late 2002.

Q. At that time, did the Kauai Police Department have a strip search policy?

A. No. I didn't know it then, but I know right now. When I first came into the section, I didn't know what general orders we had. We got about a hundred-and-some-odd general orders. I'm aware of some of 'em; but at the time I was transferred, I had to kinda research and see what it is that we did have and what we didn't have.

Q. That took some time, right, to transition in and research general orders and things?

A. Yeah. And I still don't know all of 'em at the top of my head.

Q. When did you become aware of the fact that KPD had a strip search policy?

A. For sure, when a draft was presented to me.

Q. When was this draft presented to you?

A. That was -- been over a year ago.

Q. Can you put a month to that? Month and year, I guess?

A. Off the top of my head -- geez, maybe somewhere around summer of last year.

09:23:08 Q. Summer of 2005?

23:11 A. Yes.

09:23:15 Q. Where did this draft come from?

09:23:18 A. That was presented to me by the commander of the Investigative Services Bureau.

09:23:28 Q. Who was that?

09:23:29 A. That was Fred De Busca. He was the acting assistant chief at the time.

09:23:40 Q. Now, was there a strip search policy that preceded that draft at KPD?

09:23:50 MR. MINKIN: Objection. You're talking about a written policy, or you talking about a nonwritten policy?

09:23:55 Q. Was there a written strip search policy at KPD before you saw that draft given to you by Fred De Busca?

09:24:04 A. No, not to that degree. We may have had -- and this is kinda off the top of my head -- we may have had arrest handling procedures that discussed search, and we may have had other policies related to patrol officer's safety, you know, about handcuffing prisoners, searching prisoners, transfer of prisoners and prisoner searching; but not to the extent that this draft entailed.

09:24:44 Q. Was there, aside from the prisoner type or prisoner-related policies that you just mentioned, were you aware of any kind of unwritten policies that govern strip searches before you got this draft from De Busca?

A. No.

Q. Before you got this draft from De Busca, were you aware of how or under what circumstances female prisoners were strip-searched at KPD, if they were at all?

A. As far as strip search, no.

Q. No, meaning --?

A. There wasn't a policy that I was aware of regarding females and the strip-searching of females. My own prior experience and training, there were cursory searches in self-defense type classes and courses. They would talk about doing a visual scan and then perhaps a cursory type search using the back hand, back of the palm, or the back of your hand to --

Q. Pat down --

A. -- scan -- basically, yeah.

Q. So when you say cursory searches though, this did not entail actually having the female prisoner disrobe?

A. I am not aware of any prior written order or otherwise. Yeah, not off top of my head for a total disrobement.

Q. Did you ever know of any incidents before this draft from De Busca where a female prisoner was actually strip-searched?

A. Not specifically. We could have had, you know, past instances. And I can't remember anything, any specific case where someone may have been asked to disrobe so that either the

clothing could be obtained for evidentiary purposes or to see if anyone was hiding anything or concealing anything. We may have had situations like that, but I can't remember any specific scenarios or instances.

Q. So you really don't know if there were any strip searches of females --

A. Not off the top of my head that I can recall.

Q. What about incidents of photographing female prisoners while they were naked? Had you ever heard of anything like that happening?

A. I don't recall anything like that in my career.

Q. So as far as you know, during your entire career you've never heard of anybody being requested to photograph a naked female prisoner?

MR. MINKIN: Asked and answered.

Q. You can answer.

A. You know, there's -- the only thing I can think of, unless it's for identification type purposes, there are some within the Detectives. There's some situations where you photograph a person in the nude, you know, a naked female victim at an autopsy, things like that. I just can't remember any specific, like, case, you know, so-and-so versus so-and-so.

I know we photographed people who were nude for various reasons. And one of 'em would be for ID type purposes. Like I said, you know, I've been to autopsies. Female victims

were being photographed and they are in the nude. Rape victims. Even have female suspects who may have cross-injuries, detective work, mutual assault, things like that, or for whatever reasons.

So yes, we have photographed people, nude people. I just don't --. Like I can't remember any specific case, but I know we've done it. As far as, like, we could have photographed female prisoners for whatever reasons in the course of our history, but I don't recall any specific case, so.

Q. This draft policy that you got from De Busca; was that in writing?

A. Yes.

Q. Was it typewritten?

A. Yes.

Q. Do you know where that draft policy came from?

A. When he presented it to me, he said that we'd like to have this proposal worked up and that it was similar to something that the Big Island police department had in place.

Q. Was it in fact the Big Island police department's strip search policy?

A. I didn't do an immediate, any kind of immediate research into that. I did take that draft, and it was also presented with an information packet that the lieutenant or the Acting Assistant Chief De Busca had apparently got off a law enforcement web site. I took his draft, or the draft that was presented to me by him, and the informational packet about

searches that was obtained off a law enforcement type web site, and I circulated it to senior staff for their comments and review.

Q. So you circulated a written policy, basically your draft?

A. He didn't give me a working disc or anything to make modifications on it. And I just took the draft that was presented to me unaltered, typed out a cover sheet, and dispersed it to senior staff.

Q. You also mentioned that there was a web site packet of information?

A. Yes.

Q. Was that in writing or on a disc or?

A. No, no. That was in print, in type.

Q. Was that circulated also to senior staff along with the draft?

A. Yes.

Q. Do you know specifically what web site he got it from?

A. I can't recall that.

Q. Just for identification purposes, about how many pages did that web site package consist of?

A. I don't know for sure. Maybe three to -- three to half a dozen, but I'm not sure.

Q. The senior staff that you circulated to comprised of what officers?

09:33:05 A. We've had some people going in and out on transfers and whatnot. In general, it was dispersed to --. It would be normally dispersed to the acting bureau commanders or bureau commanders -- off the top of my head, I can't remember specifically -- and then to, I think initially, just the deputy chief.

Usually in my first draft presentation, most of our general orders would be distributed to the bureau commanders and deputy chief; and then following their review and comments, I'll take those comments and then submit to the chief so that way the chief can review not only the draft, but his senior command staff comments on that draft as well at the same time.

Q. Was that the procedure that you followed with respect to the draft that De Busca gave you?

A. As far as I can remember, yes. I don't think I distributed directly to chief at that time. I think it was just to the deputy chief, the acting deputy chief.

Q. And who was that?

A. That would have been Ron Venneman.

Q. Would that have been -- did you actually receive any comments on the drafts that were circulated to the bureau commanders?

A. Yes, I did.

Q. What did you do with those comments?

A. I kept them.

Q. Did you incorporate them into the draft that you gave to Venneman?

A. I attached drafts. Those would have gone to the chief, Chief Lum.

MR. MINKIN: That's been a misstatement. The initial testimony was he circulated it to the bureau commanders and the deputy chief --

THE WITNESS: Yes.

MR. MINKIN: -- at the same time. Comments became back, and then it would have gone to the chief. So you asked after you got it back from the commanders, did you give it to Venneman. That's a misstatement of the testimony.

A. That it would have -- it would have gone comments then to chief, and that's best my recollection, that's what I did in that process.

Q. So do you have a specific recollection of giving the comments and the draft to the chief at that time?

A. Yes. I did present the draft and comments. I don't remember the exact date though, but those were presented to chief.

Q. And the chief at that time was K.C. Lum?

A. Yes.

Q. What did the chief do with the draft and comments?

MS. AGOR-OTAKE: Objection. Speculation.

Q. If you know.

10:00:53 Q. But at the time of the conference that you had in the chief's conference room, the policy of the Kauai Police Department was not to photograph people who are naked in the form of a strip search or a body cavity search, correct?

10:01:19 MS. AGOR-OTAKE: Objection. I think you're misstating what he previously said. I think he said he wasn't aware of any policy --

10:01:23 THE WITNESS: Yes.

10:01:23 MS. AGOR-OTAKE: -- not that there was a specific policy that there were to be no strip searching or photographing.

10:01:29 MR. HOSHIBATA: I object to the speaking objections, okay?

01:34 Q. Was there a policy --

10:01:35 MR. MINKIN: Objection. Misstatement of the testimony. Assumes facts not in evidence. Lack of foundation.

10:01:41 Q. Was there a policy before this conference room meeting here that you described in the chief's conference room, that the Kauai Police Department would not search a naked woman in the midst of a body cavity or a strip search?

10:02:00 A. I don't recall having any policy to that degree. As I mentioned earlier, we did have other policies, arrest handling procedures, that I believe mention searches and whatnot and through training, searching prisoners, handcuffing prisoners, and things like that.

Q. Did anybody at this meeting, again at the chief's conference room, ask for your opinion regarding this section or the two sections on photographing?

A. I don't recall if they asked for my opinion.

Q. Do you recall any discussion at all amongst the people attending the meeting about the differences in the two policies?

A. Not specifically. Like I said, I believe I did mention it, to point out the difference in the two. But that may have been the extent of it. I don't remember any specific, off the top of my head, any specific references by anyone there.

Q. Was there any action taken at that meeting regarding the adoption of a policy?

A. To this date, we do not have an approved -- I should put it, this particular policy --

Q. This meaning --

A. -- proposal hasn't been approved for distribution department-wise. It's still in effect a proposal draft.

Q. So --

A. It hasn't been, this particular proposal hasn't been formally adopted into our general orders.

Q. When you say this particular proposal, you're talking about the proposal that was suggested by De Busca?

A. Yes, sir.

Q. So the provisions regarding photographing during strip searches and body cavity searches at this point in time is not

10:03:51 part of the Kauai Police Department's standard of conduct or general orders?

10:03:55 A. As is referenced in the proposal.

10:03:58 Q. Is there any standard of conduct, general order, or other rule and regulation in the Kauai Police Department which governs the photographing of naked people during strip searches or body cavity searches?

10:04:16 A. Off the top of my head, I don't recall us having anything on the books right now about that.

10:04:21 Q. Let me ask you this. Who would be, other than you --

10:04:25 A. -- research it. I'd have to go back and review different arrest procedures. But I don't recall anything else other than this proposal to that extent.

Q. You would know, correct, if there were other governing provisions regarding photographing?

10:04:43 MR. MINKIN: Objection. Arguing with the witness. The witness has already stated that he would have to go back and check.

10:04:49 Q. You can answer.

10:04:50 A. Off the top of my head, I'd have to go back and check. But I don't recall seeing anything else similar to that proposal in our general order system. I guess that's the best I can for that.

10:05:09 And I'm only saying that because, you know, there are situations that come up and someone will ask for reference

notice, focus on, was the March date.

Q. During that meeting, did Chief Lum say anything at all about that proposal?

A. I don't remember specific statements other than that he was gonna ask for a review of the proposal by the county attorney's office, and that was the next progressive step in the process. I'm not sure off the top of my head if he made, you know, any other statements on the policy other than that he was gonna ask for a review and that he wanted it sent up to county attorneys.

Q. Who was the county attorney at that time?

A. It would have been Ms. Nakazawa. Lani Nakazawa.

Q. Did he say that he was going to submit it to Ms. Nakazawa?

A. He could have asked me to -- normally, I go back farm out, do a form letter, present it back to chief for signature, and then we do a department-to-department mail-out.

Q. Did you actually do a letter to Ms. Nakazawa?

A. Yes, sir, I believe. Yeah, it was me that did the draft.

Q. On this proposal?

A. Yes, sir.

Q. That would have been for Chief Lum to sign off on?

A. Yes, sir.

Q. Do you know if he ever signed off on it?

10:17:28 A. Yes, sir.

17:28 Q. He did?

10:17:29 A. Yes, sir.

10:17:30 Q. Do you know whether or not it was ever transmitted to the county attorney's office?

10:17:33 A. Yes.

10:17:34 Q. It was sent out?

10:17:35 A. Yes.

10:17:36 Q. Or was it delivered, do you know?

10:17:38 A. I put it in our department mail, and then someone else does the delivery of it.

10:17:43 Q. To your knowledge, was there ever a response by the county attorney or Ms. Nakazawa on this proposal?

.7:50 A. Not to me directly, and I'm not sure if there's any correspondence between the time I did the mail drop-off -- well, to our mail person between the county attorney and Chief Lum. A couple months ago, I was called in to Acting Chief Arinaga's office, as there was an inquiry from the county attorney's office regarding the status of the strip search proposal. I'm not sure if this was June or July. I apologize, but.

.0:18:35 Q. Of this year?

.0:18:36 A. Yes, sir. It was a couple months ago. And at that time, Acting Chief Arinaga -- he could have even forwarded me a letter. There was a correspondence between the county attorney's office and our department requesting update

I, PAUL KANOHO, hereby certify that I have read the foregoing typewritten pages 1 through 69, inclusive, and corrections, if any, were noted by me, and the same is now a true and correct copy of my testimony.

Dated at, ___________, Kaua`i, Hawai`i, this _____ day of _______________, 2006.

_____________________________

PAUL KANOHO

Signed before me this _____ day of _____________________, 2006.

_______________________________

Witness to Deponent's Signature

CIVIL NO. CV04 00562 SOM BMK, DARLA ABBATIELLO v. COUNTY OF KAUAI; KAUAI POLICE DEPARTMENT, taken on November 8, 2006, by Joy C. Tahara, RPR, CSR

NOV 2 0 2006

C E R T I F I C A T E

STATE OF HAWAI`I )
) ss.
CITY AND COUNTY OF HONOLULU )

I, JOY C. TAHARA, RPR, CSR 408, Notary Public, State of Hawai`i, hereby certify:

That on Wednesday, November 8, 2006, at 9:02 a.m., before me appeared PAUL KANOHO, the witness whose deposition is contained herein; and that prior to being examined was duly sworn;

That I am neither counsel for any of the parties herein nor interested in any way in the outcome of this action;

That the deposition herein was by me taken down in machine shorthand and thereafter reduced to print via computer-aided transcription; that the foregoing represents, to the best of my ability, a complete and accurate transcript of the testimony of said witness.

DATED: Honolulu, Hawai`i, November 17, 2006 .

Joy C Tahara
Notary Public, State of Hawai`i
My commission expires: 10/11/10